**NOT YET SCHEDULED FOR ORAL ARGUMENT**

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

No. 12-1481

_____

MINISINK RESIDENTS FOR ENVIRONMENTAL PRESERVATION AND SAFETY, et al.,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent

_____

On Petition for Review from the
Federal Energy Regulatory Commission

_____

**PETITIONER'S INITIAL BRIEF**

_____

Carolyn Elefant
Law Offices of Carolyn Elefant
2200 Pennsylvania Avenue N.W.
Fourth Floor East
Washington D.C. 20037
(202) 297-6100
Carolyn@carolynelefant.com
*Counsel for Minisink Residents for Environmental Preservation and Safety et. al*

July 19, 2013

Table of Contents

TABLE OF AUTHORITIES ................................................................. vi

JURISDICTIONAL STATEMENT .................................................... 1

INTRODUCTION ............................................................................. 7

ISSUES PRESENTED FOR REVIEW ...............................................10

STATUTES AND REGULATIONS .................................................12

STATEMENT OF FACTS ................................................................12

  A.   Overview .................................................................................12

  B.  History of Proceedings ..........................................................14

    1.  Millennium's Application ...................................................14

    2.  The Scoping Process and the Slow Trickle of    Information ............15

    3.  Draft EA Comments ..........................................................21

    4.  Attempts to Obtain Information .........................................22

    5.  Commission Order Issuing Certificate for    Millennium Project ...24

    6.  Motion to Reopen ..............................................................27

    7.  December Order on Rehearing ............................................29

SUMMARY OF ARGUMENT ........................................................31

STANDING .....................................................................................33

STANDARD OF REVIEW ..............................................................35

ARGUMENT ...................................................................................36

I.    THE COMMISSION VIOLATED THE NATURAL GAS ACT, THE CERTIFICATE POLICY PRESUMPTIVELY FAVORING A PRIVATE COMPANY'S PROPOSAL NOTWITHSTANDING OVERWHELMING EVIDENCE OF THE EXISTENCE OF AN OPERATIONALLY, ENVIRONMENTALLY AND ECONOMICALLY PREFERABLE ALTERANTIVE ENDORSED BY DISSENTERS..........................................36

   A.    The Commission failed to consider the present and   future convenience of the project as required by the   public interest standard of Section 7 of the Natural Gas   Act. ........................................................36

      1.  NGA Section 7's public interest requires consideration   of future convenience ...............................................................37

      2.  NGA section 7's public interest requires consideration   of alternatives ...............................................................41

   B.  The Commission orders violated the Certificate Policy because there is no need for this "specific project" given the existence of the environmentally, economically, and operationally preferable Wagoner Alternative. ...................................................................43

      1.    The Commission did not balance the project's   benefits against adverse economic impacts. ......................................................45

      2.  Failure to balance residual impacts .................................................47

II.    THE COMMISSION FAILED TO TAKE A HARD LOOK AT MILLENNIUM'S PROPOSED ACTION AS REQUIRED BY NEPA .........49

   A.    The Commissions cost-benefit analysis was inaccurate         and unsupported by substantial evidence.......................................................50

   B.  The Commission did not examine adverse impacts to ......   property values                                        52

C. The Commission did not consider cumulative and    future impacts 53

III.   THE COMMISSION ABUSED ITS DISCRETION BY APPROVING THE COMPRESSOR STATION IN VIOLATION OF ITS SITING GUIDELINES AND PRECEDENT ..............................................................54

A.    The Commission's regulations and precedent establish a hierarchy of siting protocols to reduce impacts to residents and greenfield sites. 55

B. The Commission's Order ignores longstanding siting practices without rational explanation .....................................................................58

1. The Minisink Compressor violates virtually every siting guideline. 58

2. The Commission did not explain its departure from siting ............60

IV.   THE COMMISSION VIOLATED THE ADMINISTRATIVE PROCEDURE ACT AND DUE PROCESS RIGHTS OF MREPS MEMBERS. .....................................................................................................64

A.    The Commission refused to hold an evidentiary hearing  to resolve whether the Neversink segment would require an upgrade in violation of the Administrative Procedure Act and Natural Gas Act ....64

B. The Commission violated MREPS members due process rights by relying on evidence that was neither available to petitioners for meaningful  comment nor included in the record for review by this Court. ........................................................................................................68

IV.   THE COMMISSION ERRED BY REFUSING TO REOPEN THE RECORD TO CONSIDER EXPERT TESTIMONY THAT COMPELLED A DIFFERENT RESULT THAN THAT REACHED BY THE MAJORITY ....71

A.    The Kuprewicz Report compels a different result by  showing that the Minisink Compressor will necessitate  replacement of Neversink to

avoid potently high gas  velocities in excess of prudent design
standards ....................................................................................................71

B.  The Commission abused its discretion in refusing   to consider the
Kuprewicz Report.......................................................................................75

CONCLUSION..................................................................................................77

# TABLE OF AUTHORITIES

## Cases

*Acadian Gas Pipeline System v. FERC*, 878 F.2d 865 (5th Cir. 1989).......59

*Algonquin v. Loqa*, 79 F.Supp. 2d 49 (D. R.I. 2000) ................................60

*American Gas Assoc. v. FERC*, 593 F.3d 14 (D.C. Cir. 2010) ...................66

*ANR Pipeline Co. v. FERC*, 885 F.2d 937 (D.C. Cir. 1989) ...............10, 38

*Atlantic Refining Company v. Public Service Comm'n.*, 360 U.S. 378 (1961) .........................................................................................................12

*Cajun Elec. Coop. v. FERC*, 28 F.3d 173 (D.C. Cir. 1994) ........................68

*Chelsea Neighborhood Association v. United States Postal Service*, 516 F.2d 378 (2d. Cir. 1975) ........................................................................55

*\*City of Pittsburgh v. Federal Power Comm.*, 237 F.2d 741 (DC Cir 1956)41, 43, 44

*Columbia Basin Land Protection v. Schlesinger*, 643 F.2d 585 (9th Cir. 1981) .......................................................................................................... 9

*Conn. Light and Power Co. v. Nuclear Reg. Com'n*, 673 F. 2d 525 (D.C. Cir 1982) ........................................................................................................72

*E. Carolinas Broadcasting Co. v. FCC*, 762 F.2d 95 (D.C. Cir. 1985)........76

*Exxon Co. v. FERC*, 182 F. 3d 30 (D.C. Cir. 1999) ...................................70

*Exxon Mobil Corp. v. FERC*, 315 F.3d 306 (D.C. Cir. 2003) ...................59

*FPC v. Transcontinental Gas Pipeline*, 365 U.S. 1 (1961).........................41

*Friends of The Earth v. Laidlaw Environmental Services*, 528 U.S. 167 (2000) .......................................................................................................38

vi

*Friends of the River v. FERC*, 720 F.2d 93 (D.C. Cir. 1983) ...............31, 76

*Hudson River Fishermen's Ass'n v. Federal Power Com'n*, 498 F. 2d 827 (2d Cir 1974) ........................................................................77

*Louisiana Ass'n. of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d 1101 (D.C. Cir. 1992)..............................................................69, 71

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................37

*Michigan Consol. Gas Co. v. Fed. Power Commission*, 283 F.2d 204 (D.C. Cir. 1960) ........................................................................39

*Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960 (2000)......46

*Mine Reclamation Corporation v. FERC*, 30 F.3d 1519 (D.C. Cir. 1994)..59

*Moreau v. FERC*, 982 F.2d 556 (D.C. Cir 1993) ....................................8, 9

*Pyramid Lake v. Paiute*, 918 P.2d 697 (Nev. 1996) ...................................45

*Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1 (1974).........72

*Scenic Hudson Preservation Conf. v. Federal Power Comm.*, 354 F.2d 608 (2d Cir 1965) .......................................................................45, 77

*Schneidewind v. ANR Pipeline*, 485 U.S. 293 (1988)................................60

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir 2000)....................................37

*State of Louisiana v. Federal Power Commission*, 503 F.2d 844 (5th Cir. 1974) ........................................................................58

*Texaco Inc. v. Federal Power Commission*, 329 F.2d 223 (D.C. Cir. 1963)39

*Texas Eastern v. Wildlife Preserves*, 225 A.2d 130 (NJ 1966) .............45, 46

*Transcontinental Gas Pipeline Corp. v. FPC*, 488 F.2d 1325 (D.C. Cir. 1973) .......................................................................13, 47

*Washington Gas Light v. FERC*, 532 F. 3d 928 (D.C. Cir. 2009)..............39

*Western Resources Inc. v. FERC*, 9 F.3d 1568 (D.C. Cir. 1993)................38

## Statutes

*15 U.S.C. § 717f ............................................................................4, 40, 68

*15 U.S.C. § 717r ........................................................................5, 7, 8, 39

Federal Rule of Appellate Procedure 28.................................................. 9

## Regulations

18 C.F.R. § 380.15 (2012) .............................................................60, 61, 67

18 C.F.R. § 385.2010 (2012) ......................................................................74

18 C.F.R. § 388.112 (2012) ......................................................................26

18 C.F.R. Part 380, Appendix A (2012)...........................................19, 21

40 C.F.R. § 1502.23 (2012) ......................................................................55

*Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶61,227
    (1999), *clarified*, 90 FERC ¶61,128, *further clarified*, 92 FERC ¶61,094
    (2000)(Certificate Policy Statement).......................................10, 48, 49

*Dominion Transmission Inc.*, 111 FERC ¶ 61,414, P50 (2005)................61

*Dominion Transmission, Inc.*, 135 FERC ¶ 61,239, P73  (2012)..............62

*Florida Gas Transmission Co.*, 129 FERC ¶ 61,150, P69 (2009) ..............62

*Millennium Pipeline LLC*, 117 FERC ¶ 61,319 (2006)........................20, 42

*Millennium Pipeline*, 97 FERC ¶ 61,292 (2001)........................................42

*Tennessee Gas Pipeline, Co.*, 139 FERC ¶ 61,161 (2012)...............79, 80, 81

*Tex. Eastern Transmission, LP,* 141 F.E.R.C. ¶ 61,043 (2012).................62

*Transco Pipeline,* 120 FERC ¶ 61,181 (2007) ...........................................61

*Transcontinental Gas Pipeline*, 124 F.E.R.C. ¶ 61,160 (2008)..................61

*Transwestern Pipeline,* 121 FERC ¶ 61,175 (2007) ...................................62

*Turtle Bayou*, 135 FERC ¶ 61233 (2011)....................................................51

# JURISDICTIONAL STATEMENT

On July 14, 2011, the Millennium Pipeline Company L.L.C. (Millennium) filed an application at the Federal Energy Regulatory Commission (Commission) pursuant to section 7(c) of the Natural Gas Act, 15 U.S.C. § 717f(c), for a certificate of public convenience and necessity to construct and operate a new natural gas compressor station in the Town of Minisink, New York (Minisink Compressor Station). R. 1, JA____.  The Commission published notice of Millennium's application on August 3, 2011. 76 *Fed. Reg.* 46,786.

Between October 2011 and March 2012, various Minisink residents moved to intervene in the proceeding, including petitioners Michael Mojica, Pramilla Malick, and Karen Gartenberg. R. 243, JA____; R. 45, JA____; R. 743, JA____ (individual "residents") Petitioner Minisink Residents for Environmental Preservation and Safety (MREPS), a group of

ten Minisink residents[1] who live in close proximity to the compressor station, moved to intervene on April 16, 2012. R. 837, JA____. All petitioners were granted intervenor status. Order Issuing Certificate, Appendix A-B, R. 870, JA____.[2]

By a 3-2 majority, the Commission granted Millennium a certificate on July 17, 2012.[3] MREPS, Gartenberg, Mojica, and Malick, respectively, filed timely requests for rehearing (R. 880, JA____; R.877, JA____; R. 879, JA___; R. 878, JA____) on August 15, 2012—within thirty days of issuance of the order. *See* Natural Gas Act, 15 U.S.C. § 717r(a) (2006). Between

---

[1]  Petitioners Mojica, Malick, and Gartenberg are also members of MREPS.

[2]  The Appendix to this order incorrectly lists MREPS and several other petitioners as untimely intervenors. R. 870, JA___. The motions to intervene were all filed within the time allowed in the notice of application or at latest, before the deadline for comments on the environmental assessment and therefore were timely. 18 C.F.R. §157.10. MREPS requested an errata correction on July 20, 2012 (R. 871, JA____), which went unaddressed by the Commission.

[3]  Order Issuing Certificate, 140 FERC ¶ 61,045 (July 17, 2012)(July Order), Chairman Wellinghoff dissenting, Commissioner LaFleur dissenting and Commissioner Clark concurring with separate statements. R. 870, JA____.

August 2012 and October 2012, MREPS also filed several unsuccessful stay

requests, including a petition under the All Writs Act before this Court, to

prevent Millennium from constructing the compressor station pending the

rehearing and appellate process.[4]

On November 30, 2012, MREPS and the individual petitioner-

residents moved to reopen and supplement the record with an expert

opinion based on previously undisclosed critical energy infrastructure

information (CEII). R. 940, JA____.[5] MREPS also renewed its request for a

stay. R. 941, JA____.

On December 7, 2012, the Commission denied rehearing, dismissed

the requests to reopen and supplement the record, and denied the request

_____

[4] MREPS Request for Stay (August 28, 2012), R. 885, JA____; MREPS
Emergency Motion for Stay (September 19, 2012), R. 894, JA____; MREPS
Petition for Writ for Emergency Stay Under the All Writs Act, Docket 12-
1390 (D.C. Cir. Oct. 5, 2012)(denied); Commission Order Denying Stay
(Oct. 9, 2012), R. 899, JA____.

for a stay.[6] On December 20, 2012, MREPS and the individual petitioners,

individually and jointly petitioned for review of the Commission's orders

within 60 days of issuance. *See* Natural Gas Act (NGA), 15 U.S.C. § 717r(b).

Shortly thereafter, on January 7, 2012, petitioner Mojica filed an unopposed

motion at this Court to voluntarily withdraw his petition (*See* Docket Sheet,

12-1481) and a request for expedited rehearing of the December 7, 2012

order at the Commission. R. 970, JA____. The Commission denied Mojica's

rehearing request on January 31, 2013 (R. 977, JA___) and the next day, he

filed a petition for review with this Court (docketed as Case No. 13-1018).

On March 5, 2013, this Court issued a *per curiam* order denying

MREPS' January 16, 2013 stay request at the Court denying Millennium's

January 31, 2013 motion to dismiss MREPS' petition on jurisdictional

grounds as premature. In the spring of 2013, Millennium completed

---

[6] Order Denying and Dismissing Requests for Rehearing, Denying
Request to Reopen and Supplement the Record and Denying Requests for
Stay. R. 961, JA____ (December Order).

construction of the compressor station and placed it in service on June 10, 2013.[7]

This Court has jurisdiction over the petitions under Section 717r(d)(2) of the Natural Gas Act. The Act authorizes "any party aggrieved by a Commission order to obtain review…in the United States Court of Appeals for the District of Columbia….by filing a petition for review within sixty days after the order of the Commission" and raise those objections previously brought before the Commission on rehearing. MREPS and the individual petitioners satisfied these jurisdictional requirements.

Even though the Minisink Compressor Station is now operating, this petition presents a "live case or controversy" over which this Court has Article III jurisdiction. *See, e.g.,* ANR *Pipeline Co. v. FERC*, 885 F.2d 937, 938 (D.C. Cir. 1989). The "building of the [compressor station] does not make the case hypothetical or abstract" in light of the continuing harm to Minisink residents. *Moreau v. FERC*, 982 F.2d 556, 566 n.4 (D.C. Cir

---

[7]  Millennium Notice of Commencement of Service (June 10, 2013), FERC.gov e-library, Accession No.  20130610-5051.

1993)(finding no mootness in review of pipeline certificate in light of continuing harm to petitioners' aesthetic interests). *Columbia Basin Land Protection v. Schlesinger*, 643 F.2d 585, 591 at n.1 (9th Cir. 1981)(rebuffing mootness objections to challenge of already-constructed power lines because landowners suffer continued encroachment); Millennium's compressor assaults nearby MREPS members with loud noise and foul-smelling emissions, diminishing the value of their homes, and leaving them fearful for their future health, safety, and economic well-being. *See* Video Testimonials, available at http://vimeo.com/70430629, and supporting affidavits, Attachment 1.[8] And should petitioners prevail, this Court has authority to grant redress by vacating the certificate and

---

[8] This testimony about ongoing harm shows that the case is not moot and therefore, addresses the Federal Rule of Appellate Procedure 28(a)(4)(B)'s requirement that a brief "state relevant facts establishing jurisdiction." *See also Moreau*, 982 F.2d 556, at n.4 ("Although respondents have not raised [mootness], we are obligated to do so *sua sponte* because mootness is a jurisdictional issue.")

requiring removal of the project.[9] *Id*. (finding no mootness where "this Court has the power to decide if [already constructed power lines]…may have to be removed.") *See also ANR Pipeline Co.*, 885 F.2d at 938 ("plainly, a colorable claim for retroactive relief…dispel[s] any idea of mootness.") Because the Petitioners have and continue to suffer real harm capable of real relief, this case is not moot.

## INTRODUCTION

As development of pipeline infrastructure accelerates, encroaching into populated areas, this Court must resolve a critical question:  Does Section 7f(e) of the Natural Gas Act and the Commission's Certificate Policy Statement[10] leave the Commission no choice but to approve a

---

[9]  *See* Commission Order Denying Stay, 141 FERC ¶ 61,022 (2012), P17, P21 R. 899, JA____ ("The Commission has broad authority under the Natural Gas Act sufficient to require Millennium to take whatever steps we deemed appropriate in the event that the certificate was vacated...and in the worst case could be required to remove them").

[10]  *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶61,227 (1999), *clarified*, 90 FERC ¶61,128, *further clarified*, 92 FERC ¶61,094 (2000)(Certificate Policy Statement).

natural gas compressor station on the applicant's requested terms in the face of overwhelming evidence of an economically, environmentally, and operationally preferable alternative that would avoid devastating impacts to a small residential neighborhood that is just a stone's throw away? The Commission majority ruled just that.  The two dissenting Commissioners ruled to the contrary.

Spurning decades of precedent on its public interest obligation to consider the present and future public convenience and necessity under NGA Section 7, the Commission majority turned a blind eye to the benefits of a project alternative introduced by Minisink residents. The alternative proposal, which offered the benefit of increased system reliability, reduced air emissions, elimination of a high-risk bottleneck on the system, and which was eventually blessed by two dissenting Commissioners, was expressly disregarded by the Commission because "it was not before the Commission as a proposed project to be approved or disapproved." December Order, at P66, R. 961, JA____.

---

Worse than the Commission's disregard of the alternative proposal is its reason why—because the Commission assumes that the applicant is right:

> The Commission analyzes the pipeline's filed application. The Commission's procedures, requirements and criteria for evaluating applications are well-known by the industry and they discourage project sponsors from filing incomplete or insufficiently vetted applications. Given the significant expense sponsors incur to prepare applications, *there is no incentive for a project sponsor to present an application that cannot meet our standards for approval*….the high approval rate for pipeline proposals *demonstrates prudence on the part of the industry* and consistency on the part of the Commission, resulting in a process which weeds out marginal projects and *leaves us to consider only those that merit serious consideration.*

(emphasis added) December Order, at P46, R. 961, JA____.

The Commission's presumption that applicants will meet the standard for approval offends the notions of due process and fairness, and flies in the face of the public interest considerations that permeate NGA Section 7. *See, e.g., Atlantic Refining Company v. Public Service Comm'n.*, 360 U.S. 378, 391 (1961)(emphasizing that Section 7 obligates Commission to

evaluate all factors bearing on the public interest), *Transcontinental Gas Pipeline Corp. v. FPC*, 488 F.2d 1325, 1329 (D.C. Cir. 1973)(vacating order where Commission "rigidly" deferred to private contractual arrangements without "searching inquiry" into other public interest factors).  This Court can, and should, vindicate these principles by vacating the Commission's order approving the Minisink Compressor and directing its removal. The future of a small community and the integrity of the Commission's Section 7 certificate process hang in the balance.

## ISSUES PRESENTED FOR REVIEW

1.    Whether the Commission majority was arbitrary, capricious, and in violation of the public interest standard of the Natural Gas Act and the Certificate Policy Statement in presumptively favoring and approving Millennium's proposed Minisink Compressor Station, notwithstanding overwhelming evidence of existence of the operationally, economically and environmentally preferable Wagoner Alternative endorsed by the dissent?

2.    Whether the Commission's failure to take a "hard look" at project alternatives or engage in a robust cost benefit analysis violated the National Environmental Policy Act (NEPA)?

3.    Whether the majority was arbitrary and capricious in approving a compressor station in violation of the Commission's siting rules and precedent that favor locating above-ground facilities on unobstrusive sites, in already-existing rights of way, and avoiding long term impacts?

4.    Whether the majority violated the Administrative Procedure Act and the due process rights of MREPS by failing to hold an evidentiary hearing (notwithstanding that hearings are common to resolve issues of fact) and relying on evidence that was neither available to petitioners for meaningful comment nor included in the record for review by this Court?

5.    Whether the Commission erred by refusing to reopen the record to consider industry expert testimony analyzing evidence not previously available which showed that the Minisink Compressor would introduce dangerously high gas velocities into the Neversink

11

pipe and necessitate its replacement, thereby compelling a different result than that reached by the Commission majority?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reprinted in the Addendum to this brief.

## STATEMENT OF FACTS

### A.     Overview

The town of Minisink, New York is a small rural-residential hamlet tucked away in Orange County, New York, just northeast of the New Jersey border. With its rolling hills, lush forests of older trees and cropland, Minisink is a haven to a diverse population: families seeking tranquility and a sense of community apart from the bustle of the impersonal city life, organic farmers who earn their livelihood from tilling the famed "black dirt" for which the area is known and, most poignantly, 9-11 first responders who migrated to Minisink after the horrible events of September 11 to improve their health and feel more secure. Until now.

Now, Millennium's 12,260 horsepower compressor station, approved by the Commission in the orders subject to review, blots a landscape now shorn of dozens of older trees, waking residents at night with noisy blowdowns, and polluting the air with noxious fumes.

Long before this petition arrived at this Court, Minisink residents fought hard to protect their community from siting of an industrial facility in a residential neighborhood across the street from families. Residents attended scoping sessions, researched impacts and filed hundreds of pages of comments at the Commission.  In March 2012, ten residents—some living as close as across a narrow country road or down the street from the station to 2500 feet away—joined forces to form MREPS, an unincorporated community group.[11]

In contrast to many environmental and citizens groups organizing in response to proposed pipelines, it bears emphasizing that in this proceeding, MREPS has not attempted to prevent Millennium from

---

[11]  MREPS individual members are: Laurie Arias, Leanne Baum, Asha Canalos, Karen Gartenberg, Deborah Lain, Pramilla Malick, Michael Mojica, John Odland, Carolyn Petschler, and Tom Salamone. Gartenberg, Malick, and Mojica are also individual petitioners in this proceeding.

upgrading its system to serve its customers. To the contrary, it was MREPS members who identified an alternative to Millennium's proposal—the Wagoner alternative—that would not only allow Millennium to meet its short-term objectives, but to also to cost-effectively expand its system and improve its overall safety, all without disrupting a residential neighborhood. In fact, the Wagoner alternative was so much of a win-win that it was championed by Chairman Wellinghoff and Commissioner LaFleur, who took the unusual step of dissenting from the majority decision in an NGA Section 7 proceeding.[12]

## B. History of Proceedings

### 1. Millennium's Application

On July 14, 2011, Millennium filed its application to construct and operate the Minisink Compressor in Minisink, New York.  R. 1-6, JA_____.[13]

_____

[12]   As a general matter, divided Commission rulings are rare – and nearly unprecedented in Section 7 certificate cases. Indeed, we could not find a 3-2 split Commission decision in a Section 7 certificate proceeding.

[13]   A Compressor Station is a facility "that provides energy to move natural gas within a pipeline by increasing the pressure of the gas."

Millennium averred that the Compressor station is needed to transport an additional 225,000 dekatherms per day to its interconnection with Algonquin Gas Transmission at Ramapo, New York. Millennium Application at 2, R. 1, JA____.

The Minisink Compressor consists of two 6130-horsepower gas-fired compressor unit housed within a building the size of a large warehouse on property purchased by Millennium in the middle of a rural-residential community across the street from homes with young families. Because Millennium's site is not zoned for industrial use, but for the Natural Gas Act's preemption of local law, the compressor station would have been barred by local zoning ordinances. *See* December Order at P68, R. 961, JA_____.

## 2.    The Scoping Process and the Slow Trickle of Information

The Commission regulations require certificate applicants to describe "reasonably foreseeable plans for future expansion of facilities" aside from

_____

*Glossary*, Millennium Pipeline Co.,

the facilities subject to the application.  (Appendix A to Part 380,

Commission Regulations). Millennium was not forthcoming.  Through an

internet search, MREPS members discovered a Millennium presentation

describing that Minisink Compressor station was actually the first step of a

three-phase expansion plan. [14]  Phase 2 contemplates the addition of

another compressor station, (Hancock)[15] while Phase 3 involves an

enlargement of the 7.2 mile Neversink pipe segment, a 24-inch pipe built in

1987 and acquired by Millennium from its affiliate Columbia Gas (Phase

3).[16]

---

http://www.millenniumpipeline.com/glossary.html.

[14]  *See* Motion to Intervene of MREPS, Protest of Application & Comments on Environmental Assessment, Currie Report, Appendix C (submitted April 16, 2012) at 215 from Powerpoint presentations regarding Millennium's three phase expansion plan. R. 837, JA_____.

[15]  On April 20, 2012, Millennium initiated pre-filing for the Hancock Compressor Station, Docket No. CP13-14. After the Commission approved the Minisink Compressor Station, Millennium filed its application on November 11, 2012. That application is still pending before the Commission.

[16]  *See Millennium Pipeline LLC*, 117 FERC ¶ 61,319 (2006) (describing Millennium's acquisition of the Neversink segment from Columbia as part of its system expansion.  With the exception of the Neversink segment,



*Currie Report (date), R.\_\_\_, JA\_\_\_\_*

Not only did Millennium omit mention of its plans to add Hancock, it

also did not, contrary to the Commission regulations, disclose a potential

which is 25 years old, the mainline pipe on Millennium's system within the

vicinity of the compression station was built in 2008).

17

alternative location for the compressor station: [17] a remote site a few miles from the Minisink location, adjacent to an existing metering station and more than a half mile from any homes, which previously housed an operating compressor station. It was Minisink residents who, on their own initiative, discovered the site that Millennium had not disclosed, known as the "Wagoner Alternative," and it was Minisink residents who proposed that Commission staff consider it in the environmental assessment (EA). R. 298, JA_____.

The Wagoner Alternative involves the construction of a smaller 5100 horsepower compressor station at a remote site adjacent to Millennium's existing Wagoner Meter Station in Sparrowbush, New York, with no residents within a surrounding half-mile radius. *See Environmental Assessment*, at 51, R. 654, JA_____. The alternative site was previously used by Columbia Gas (a Millennium affiliate) for a temporary compressor station for three years between November 2008 and June 2011. According

---

[17] Appendix A to Part 380 of the Commission regulations (requiring applicants to identify and describe viable project alternatives).  *See* Addendum.

to Millenium, the Wagoner Alternative would also necessitate upgrading the Neversink segment from 24 to 30 inches—most likely by parallel construction within the existing right-of-way to avoid taking the line out of service) to accommodate additional gas. Of course, even without Wagoner, Millennium was planning to upgrade the Neversink segment anyway. *Supra* at 19. *See* Environmental Assessment at 53, R. 654, JA_____; July 2012 Order, P27 (describing Wagoner Alternative); R. 870, JA____.

## Visual Comparison of Minisink and Wagoner Alternative



Not only did Minisink residents support the Wagoner Alternative,

several landowners adjacent to the Neversink pipeline expressed support

for the Wagoner Alternative as well since a larger, newer pipeline would

improve Millennium's safety and increase capacity. R. 556, JA____. In any

event, none of the 58 landowners along the Neversink pipeline objected.

*See* July Order, LaFleur Dissent at 3, R. 870, JA_____.

But Millennium balked at the Wagoner Alternative. It claimed that

the Wagoner Alternative would cost at least 50 percent more to build than

the Minisink Compressor and would jeopardize timely service to new

customers. Millennium also denied any intention to upgrade the Neversink

segment in 2014, as shown in the Currie Presentation. R. 567, JA_____.

### 3.    Draft EA Comments

On March 2, 2012, the Commission released for comment the draft

EA for the Millennium proposed project, recommending the Minisink

Compressor as the preferred alternative. R. 653, JA____.  MREPS and its

members filed multiple comments critiquing virtually every aspect of the

draft EA from its irrational rejection of the Wagoner Alternative to failure

to consider adverse project impacts such as increased noise, toxins and

safety risks on the welfare of the community, residential property values,

and the local organic farming and tourism. R. 827-835, 837, JA____.

21

MREPS also filed a separate request seeking a hearing to probe

Millennium's future expansion plans described in the Currie Presentation

that Millennium disclaimed in subsequent filings. MREPS Request for

Hearing, R. 834, JA____. If a hearing confirmed that Millennium intended

to replace the Neversink line in the near future *anyway*, that would

repudiate one of the claimed drawbacks of the Wagoner Alternative as

compared to Minisink.

### 4.    Attempts to Obtain Information

Because the draft environmental assessment (EA) relied on

Millennium's hydraulic studies to rule out the Wagoner alternative,

MREPS sought to obtain the studies. EA at 41, R.653, JA____. MREPS

member John Odland filed a Freedom of Information Act (FOIA) request

for Millennium's studies and the staff's associated analysis on March 7,

2012, a week after the EA was released.[18] Odland did not receive any

---

[18] *See* Odland Affidavit, filed in *MREPS v. FERC*, Case No. 13-cv-141
(D.D.C. March 4, 2013); JA____. The Commission does not publicly docket
FOIA requests (in fact, when undersigned counsel filed a copy of FOIA-
related correspondence in the CP11-515 docket, the Commission removed

information before the April 16, 2012 deadline for comments—and in fact,

it was not until June 9, 2012 that Odland first received any of the requested

information, such as Millennium's Exhibit G flow diagrams through the

Commission's critical energy information infrastructure (CEII) regulations.

18 C.F.R. § 388.112 (2012).

But the CEII process did not allow Odland—nor any of the other

MREPS members for that matter—access to Commission staff's putative

independent verification of Millennium's claims that the Wagoner

alternative was not feasible, or that the Minisink compressor would not

(like Wagoner) also necessitate an upgrade to Neversink. After several

rounds of unsuccessful FOIA requests and appeals that lasted until January

2013, Odland and Mojica ultimately filed FOIA complaint in federal district

it) so there is no record citations for any of the FOIA-related matters
notwithstanding that the Commission's non-disclosures in the FOIA case
are relevant in this proceeding.

court seeking disclosure of the Commission's studies and methodology

used to verify Millennium's claims.[19]

### 5.    Commission Order Issuing Certificate for Millennium Project

On July 16, 2012, a 3-2 majority issued an order granting Millennium

a certificate for the Minisink Alternative. Applying the first step of the

Certificate Policy, the Commission majority accepted Millennium's claimed

need for the Compressor Station based on its existing precedent agreement

and determined that existing customers would not subsidize the cost of the

Compressor Station. Next, the Commission agreed with the EA's finding of

no significant impact, with nary a mention of the Wagoner Alternative

except to state agreement without analysis, agreement with the EA's

conclusion that Wagoner would not offer a significant environmental

advantage over the Minisink Project. July Order, at P27, R. 870, JA _____.

_____

[19] *MREPS v. FERC*, Case No. 13-cv-141(D.D.C. March 4, 2013); JA_____ (pending briefing on Motions for Summary Judgment).

Accordingly, the Commission approved the Millennium Compressor Station.

As to due process claims, the Commission denied MREPS' request for a hearing, ruling that "there is no material issue of fact that we cannot resolve on the basis of the written record."  July Order, at P68; R. 870, JA___. The Commission also found that MREPS members were not prejudiced by lack of access to Millennium's hydraulic studies and other data because "Commission staff independently verified the engineering requirements of each alternative studied. Thus, the fact that MREPS did not have access to Millennium's hydraulic models did not negatively impact MREPS."

In contrast to the majority, dissenting Chairman Wellinghoff and Commissioner LaFleur did not confine their review to Millennium's proposal alone but took a more expansive view of the record, as protection of the public convenience and necessity demands. Based on this more comprehensive review, Chairman Wellinghoff concluded that:

> I believe that the Millennium Pipeline should have considered
> the long-term effects of improved reliability, greater impact on

capacity, reduced emissions and reduced fuel costs offered by the Wagoner Alternative and proposed that comprehensive solution in lieu of the short-term fix presented by Minisink.

Commissioner LaFleur likewise criticized the majority's conclusion:

> I am dissenting in this case because I do not believe that the majority has correctly applied the standards set forth in the Certificate Policy Statement to the facts in the record before us. Based upon that record, I believe that the serious averse consequences of the Minisink compressor facility outweigh its public benefits, particularly given the existence of the environmentally preferable Wagoner Alternative.

R. 870, JA_____. Commissioner LaFleur added that "the EA's finding that the Wagoner Alternative does not provide a significant environmental advantage over the proposed *project is incorrect…and inconsistent with previous environmental analyses" by staff. Id.* (emphasis added).

Newly-appointed Commissioner Clark[20] also chimed in with a concurrence betraying a lack of understanding of the Commission's

---

[20] Nominated by the President to replace Commissioner Spitzer, whose term had expired, Commissioner Clark was sworn in on June 15,

certificate application process and the public-interest standard of the

Certificate Policy and Natural Gas Act.  His stated view the Commission

need not consider alternatives at all:

> It is necessary to review an application based on the appropriate
> standards and if the applications meets those standards to
> approve the certificate…To deviate from these principles could
> create a precedent wherein the Commission is asked to serially
> consider alternate sites for a project and applicants are expected
> to file applications under a constantly moving target of
> requirements.

Clark concurrence, R. 870, JA_____.

## 6.    Motion to Reopen

MREPS and the individual residents timely filed for rehearing on

August 15, 2012. R.940, JA____. On August 10, 2012, Mojica requested

Commission staff's independent verifications through FOIA.[21] Awaiting

---

2012. *Commissioner Tony Clark*, http://www.ferc.gov/about/com-
mem/clark.asp.

[21]  Mojica Affidavit, P 9, *MREPS v. FERC*, 13-cv-141 (D.D.C. 2013),
JA____.

the Commission's response, the residents decided to retain expert to analyze the studies and "independent verifications" referenced in the order. By fall 2012, however, it was apparent that the FOIA responses would not be forthcoming any time soon. So MREPS retained Richard Kuprewicz, an industry expert on pipeline engineering and safety (Kuprewicz CV, R.943, JA____) and asked him to review the only technical documents that MREPS had received at that point:  the Exhibit G materials received through the CEII process.

On November 30, 2013, MREPS moved to reopen the record and supplement it with the Kuprewicz Report. (R. 943, JA___), arguing that the Report would "compel or persuade a different result."[22] Mr. Kuprewicz found that the Minisink Compressor would "introduce very high gas velocities in the Neversink Pipeline, so much so that it exceeds design standards and raises significant questions about the adequacy of previous hydraulic studies used to justify approval of the Minisink Project."

---

[22] *Friends of the River v. FERC*, 720 F.2d 93, 98 n. 6 (D.C. Cir. 1983) (establishing standard for reopening the record).

Kuprewicz Report, R.943, JA____. In light of these increased risks, Mr.

Kuprewicz contended with the Minisink Project, the Neversink pipeline

would require replacement. *Id*.

### 7.    December Order on Rehearing

Just a week after MRPES submitted the Kuprewicz report, the

Commission, by a 3-2 majority denied rehearing and by unanimous vote,

denied MREPS' reopen the record.

This time around, Chairman Wellinghoff and Commissioner LaFleur

were even more forceful in their dissent, criticizing the majority for

refusing to deny Millennium's application:

> For the reasons fully set forth in our respective dissents…we
> continue to believe that even after mitigation, the Minisink
> project *will have significant adverse environmental consequences*.
> We continue to believe that, even after mitigation, the Minisink
> project will have significant adverse environmental
> consequences. Further, we believe that the Wagoner Alternative
> would create significantly fewer and less enduring
> environmental impacts and is therefore an environmentally
> preferable alternatives.

29

December Order, R. 961, JA___ (emphasis added).

As for the majority, it reaffirmed its original decision to approve the Minisink Compressor. December Order, R. 961, JA_____.  But while the result on rehearing was disappointing, the majority's rationale was far worse: It disavowed any duty to rigorously consider the Wagoner Alternative, Millennium's future plans to upgrade Neversink,[23] or indeed, *any* factor beyond the four corners of the applicant's proposal because the company is presumptively right:

> The Commission analyzes the pipeline's filed application. The Commission's procedures, requirements and criteria for evaluating applications are well-known by the industry and they discourage project sponsors from filing incomplete or insufficiently vetted applications.  Given the significant expense

---

[23] *See*, *e.g.*, December Order. P 25, R. 961, JA_____ ("Whether or not the Neversink Segment will someday need to be replaced depend on the as-of-now unknowable needs of future unknown customers…"); P66 ("the fact is that the [Wagoner] alternative was not before the Commission as a proposed project to be approved or disapproved."). R.961, JA_____.

sponsors incur to prepare applications, there is no incentive for
a project sponsor to present an application that cannot meet our
standards for approval…the high approval rate for pipeline
proposals demonstrates prudence on the part of the
industry…resulting in a process which weeds out marginal
projects and leave us to consider only those that merit serious
consideration.

December Order, R. 961, JA____.

Not surprisingly then, the majority also held that "the Kuprewicz
study provides no basis for reversing approval of the Minisink
compressor." December Order, P80, R.961, JA_____. The majority denied
rehearing of the denial of the motion to reopen the record, with Chairman
Wellinghoff and Commissioner LaFleur concurring, asserting for the third
time that "*we believe the record already supports a denial of the application*."
(emphasis added), R.961, JA_____. This petition ensued.

## SUMMARY OF ARGUMENT

The Commission's order approving the Minisink Compressor station
notwithstanding the overwhelming economic, environmental and

31

operational benefits of the Wagoner Alternative was arbitrary, capricious and in violation of applicable law and Commission policy.        First, the Commission's violated NGA Section 7 public interest standard by confining its review to the four corners of the applicant's proposal and presuming that the proposal would "meet [the Commission's standard for approval] (December Order, ¶24) instead of evaluating the future convenience and alternatives. The Commission also violated the Certificate Policy by minimizing economic harm to residents and failing to properly balance the adverse residual impacts of the Minisink Compressor again finding that the Minisink Compressor would *Certificate Policy* by failing to balance the residual impacts against the need for the project.

The Commission's failure to look at alternatives and engage I a robust cost-benefit analysis violated the National Environmental Policy Act as well.

Next, the Commission committed various procedural errors that violated the Administrative Procedure Act and due process. The Commission failed to hold a hearing to resolve disputed facts over Millennium's plan to upgrade the compressor. And the Commission

repeatedly denied MREPS of the information it needed to meaningfully

comment on Millennium's proposal—the exact information that the

Commission then based its certificate order on. Because it denied MREPS

this information the Commission violated both the Administrative

Procedures Act and the petitioners' right to due process.

Finally, the Commission erred in refusing to reopen the record, to

consider an expert report based on previously unavailable information that

"compelled a different result" than what the Commission previously

found. The report highlighted how the Wagoner Alternative would have

been operationally preferable option to the Minisink Compressor Station

thereby eliminating its perceived advantage over the Wagoner Alternative.

## STANDING

Petitioners Mojica, Malick, and Gartenberg have standing to seek

review because they are aggrieved by the Commission's orders.  Living

between two and seven blocks from the compressor site, all three have

suffered loud noise, noxious emissions, personal health and safety risks

and diminished property values (*See* Video at http://vimeo.com/70430629

and Affidavits, Attachment 1).[24] These injuries are directly traceable to the challenged Commission majority's action approving the compressor station, and capable of redress by this Court. *See* Order Denying Stay, 141 FERC ¶ 61,022 (2012), P17, P21, R. 899, JA____; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (delineating elements for constitutional standing).

Petitioner MREPS, an unincorporated association of Minisink residents (*See* Rule 26.1 Disclosure Statement) formed to opposing location of an industrial-sized compressor station in their rural-residential community, also has standing. MREPS' members are directly impacted by the compressor station and have standing to sue in their own right (*See* Video http://vimeo.com/70430629 and Affidavits, Attachment 1) and the relief sought—reversal of the Commission's order—does not require the participation of MREPS' individual members. *Friends of The Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 183 (2000)(describing test for association standing and accepting affidavits by individual members in support of standing claims).

---

[24]  *See Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir 2000)

## STANDARD OF REVIEW

This Court applies the Administrative Procedure Act's "arbitrary and capricious standard" review to Commission orders issued under the Natural Gas Act to ensure that the Commission's decision-making is reasoned, principled, and based on the record. *ANR Pipeline Co. v. FERC*, 771 F.2d 507, 517 (D.C. Cir. 1985)(stating that an agency's decision must be supported by substantial evidence on the record). This Court will not sustain Commission orders that do not "adhere to the statutory allocation of burden of proof" or "demonstrate [a satisfactory explanation or rational] connection between the facts found and the choice made." *Western Resources Inc. v. FERC*, 9 F.3d 1568, 1575 (D.C. Cir. 1993) ("we are unpersuaded that the Commission's decision… comports with reason and logic.") A certificate applicant under Section 7 "must bear the burden of proving that the public interest will be served." *Michigan Consol. Gas Co. v. Fed. Power Commission*, 283 F.2d 204, 214 (D.C. Cir. 1960). This Court also rejects factual findings unsupported by substantial evidence, *See Natural*

(permitting use of affidavits to demonstrate individual standing).

*Gas Act*, 15 U.S.C. § 717r(b), *Washington Gas Light v. FERC*, 532 F. 3d 928,

933 (D.C. Cir. 2009)(remanding FERC's unsupported findings regarding

safety impacts of LNG facility) or based on wrongful exclusion of material,

non-cumulative evidence. *Texaco Inc. v. Federal Power Commission*, 329 F.2d

223, 227 (D.C. Cir. 1963).

## ARGUMENT

I. **THE COMMISSION VIOLATED THE NATURAL GAS ACT, THE CERTIFICATE POLICY PRESUMPTIVELY FAVORING A PRIVATE COMPANY'S PROPOSAL NOTWITHSTANDING OVERWHELMING EVIDENCE OF THE EXISTENCE OF AN OPERATIONALLY, ENVIRONMENTALLY AND ECONOMICALLY PREFERABLE ALTERANTIVE ENDORSED BY DISSENTERS.**

A. **The Commission failed to consider the present and future convenience of the project as required by the public interest standard of Section 7 of the Natural Gas Act.**

*[A]s representative of the public interest], the Commission may not act as an umpire blindly calling balls and strikes for adversaries appearing before it; the right of the public must receive active and affirmative protection at the hands of the Commission….The Commission must see to it that the record is*

*complete. The Commission has an affirmative duty to inquire into and consider all relevant facts.*

Under Section 7 of the Natural Gas Act,15 U.S.C. §717f(e) the Commission must find that a proposed interstate natural gas facility will serve the "present or future public convenience and necessity" prior to granting a certificate authorizing "the whole or any part" of the proposed project. If the Commission concludes that a proposal does not serve the present or future public convenience and necessity, the Commission must either deny the application outright, or "attach conditions to the issuance of the certificate…as the public convenience and necessity may require." The Commission's public interest standard is not limited to ratepayer interests but requires a broad consideration of factors. *FPC v. Transcontinental Gas Pipeline*, 365 U.S. 1 (1961) (evaluating air pollution impacts in Section 7 proceeding). As discussed below, the Commission violated Section 7 by failing to consider two key factors – future convenience and alternatives.

**1.     NGA Section 7's public interest requires consideration of future convenience**

The public interest standard requires the Commission to consider *future* needs and alternatives, even if not contemplated by an applicant's proposal. In *City of Pittsburgh v. Federal Power Comm.*, 237 F.2d 741 (DC Cir 1956)(finding exclusion of evidence relating to future expansion and the refusal to consider future expansion in determining the public convenience was erroneous).

In ruling out the Wagoner Alternative, the Commission found that because it would necessitate replacement of the Neversink pipeline, the option would cost 50% more and have adverse impacts such as crossing over multiple waterways. July Order, P67, R. 870, JA___.  But the Neversink Alternative has been on the table for some time. In fact, more than a decade ago, the Commission previously approved replacement of the Neversink pipe—which it now finds objectionable.[25]

In any event, the record also contains evidence of Millennium's future plans to upgrade Neversink.  Millennium's own presentation shows

---

[25]   As the December Order notes, the Neversink upgrade was initially authorized in 2001 as part of a larger pipeline project found to be in the public interest. December Order at n.74, c*iting Millennium Pipeline*, 97 FERC ¶ 61,292 (2001). Subsequently, Millennium asked to amend the order and

that the Neversink upgrade is a later phase of an expansion project that commenced with the Minisink Compressor. Likewise, testimony from Kuprewicz was that the aging Neversink pipeline must be replaced under any option because its smaller size and lower MAOP bottlenecks the entire system. Kuprewicz Report, R. 943, JA____. Had the Commission compared a Minisink/Neversink project to the Wagoner/Neversink upgrade, the Wagoner alternative would have emerged as the superior choice.[26]

But the Commission refused to consider Millennium's future plans as required by *City of Pittsburgh.*  On rehearing, the Commission strains to distinguish *City of Pittsburgh* – arguing that *City of Pittsburgh* concerns abandonment but "here, there is no proposal by Millennium to abandon existing capacity." P25, R.961, JA____. It is a distinction without a difference. *City of Pittsburgh* stands for the proposition that events beyond the activities proposed in the specific application bear directly on whether

---

opted to acquire the 24-inch Neversink segment from Columbia instead of replacing it. *Millennium*, 117 FERC ¶61,319 at P242 (2006).

[26]  The EA suggests the same. The comparison of the two options in the EA shows that most of the impacts from Wagoner are associated with the Neversink upgrade, and if that those impacts were also presumed for Minisink as well, the Wagoner project would be a far better choice. EA at 51, R. 654, JA____.

the proposed action is in the public interest -- and therefore must be considered by the Commission.

In *City of Pittsburgh*, a company sought approval of a proposal to abandon a line that would increase the cost of future upgrades. Because of the impact of the abandonment on future costs, the court found that the Commission was required to consider future expansion plans in determining whether the abandonment was in the public interest.

Just as the abandonment would increase the cost of future expansion in *City of Pittsburgh*, constructing the Minisink Compressor Station as a quick fix to meet a few customers needs will make the overall cost of Millennium's future planned expansion (as shown in the Currie Presentation) far more expensive. With an eye to the future, Chairman Wellinghoff correctly found that the Wagoner alternative combined with the Neversink upgrade is the most efficient proposal for expanding capacity on the Millennium system and that "the long term effects of improved reliability greater impact on capacity, reduced emissions and reduced fuel costs offered by the Wagoner Alternative" should have been considered. July Order, Wellinghoff Dissent at 3, R. 870, JA_____.

40

## 2.    NGA section 7's public interest requires consideration of alternatives

In addition to consideration of future convenience, the public interest also requires review of alternatives as well. There is longstanding precedent, grounded on *City of Pittsburgh* that "existence of a more desirable alternative is one of the factors which courts have recognized as entering into a determination of whether a particular proposal would serve the public convenience and necessity." *Texas Eastern v. Wildlife Preserves*, 225 A.2d 130 at 273-74 (NJ 1966); *Pyramid Lake v. Paiute*, 918 P.2d 697, 760 (Nev. 1996)("whether… [a proposed action] is a threat to the public interest cannot be made without some consideration being given to the alternatives"); *Scenic Hudson Preservation Conf. v. Federal Power Comm.*, 354 F.2d 608, at 624-625 (2d Cir 1965)(finding that record is insufficient to support proposed project where Commission did not thoroughly evaluate alternatives as part of public interest analysis).

Notwithstanding that the public interest requires a broad, searching review of future convenience and alternatives, the majority myopically confines its review to the four corners of a company's proposal:  "The

41

Commission analyzes the pipeline's filed application."  December Order,

P45, R.870, JA____; *see also* P66 (declining to consider landowner support

for Wagoner because it was "not before the Commission as a proposed

project…"). Although the Commission considers alternatives as part of

environmental analysis under NEPA (*See* Part II., *infra*), that is not enough

to meet its public interest obligation under Section 7.  Under NEPA, so long

as a project has no significant impacts, it may be approved even though an

alternative is environmentally preferable.[27] *See Midcoast Interstate*

*Transmission, Inc. v. FERC*, 198 F.3d 960, 968 (2000). By contrast, under a

public interest standard, the availability of a superior alternative calls into

question whether the applicant's proposal should be approved at all.

Moreover, that the Commission has no authority to "command the

alternative" or in the Commission's words, "direct regional development

of the gas industry's infrastructure" does not mean that it cannot reject the

proposal entirely. *Texas Eastern*, 25 A.2d at 273-74 (NJ 1966)

What the majority misses is that simply because a company has a

claimed need to serve customers as demonstrated by contracts does not

mean that its project is in the public interest. *See* MREPS Request for

---

27

42

Rehearing, R. 880, JA_____ ("The majority improperly conflates need with public necessity and convenience").  While this court recognizes that "private contracts must be accorded significant weight…rigid deferral to contractual arrangements without searching inquiry into other factors" is inadequate to protect the interests of the public. *Transcontinental Gas Pipeline*, 488 F.2d 1325 (addressing public interest standard of NGA Section 7's abandonment provisions).  The public interest demands more of the Commission than abiding allegiance acceptance to an applicant's proposal because the Commission presumes that the company would not invest resources in a marginal project. MREPS Request for Rehearing at 45, R. 880, JA_____

By restricting its review to the applicant's proposal, without reference future convenience or serious consideration of project alternatives, the Commission's orders violated Section 7 and must be overturned.

**B.    The Commission orders violated the Certificate Policy because there is no need for this "specific project" given the existence of the environmentally, economically, and operationally preferable Wagoner Alternative.**

The Commission's Certificate Policy establishes guidelines for

43

approval of Section 7 certificates.  The purpose of the policy is:

> to foster competitive markets, protect captive customers, and
> avoid unnecessary environmental and community impacts
> while serving increasing demands for natural gas.  It should
> also provide appropriate incentives for the optimal level of
> construction and efficient customer choices.

Certificate Policy at 61,743.

Under the *Certificate Policy*, the Commission evaluates whether there

is a need for project by balancing public benefits to be achieved against

economic impacts of customers and landowners and residents impacted by

construction. Public benefits include whether a project provides service to

customers, avoidance of overbuilding, advancing competition, and

protecting the environment. Adverse economic impacts include

subsidization by existing customers and adverse impacts on residents'

property interests, such as a need for eminent domain. The economic

harms and benefits identified in the *Certificate Policy* are illustrative only;

the Commission recognizes that there may be others. *Certificate Policy*, at

61,747. Overall, rather than impose a one-size fits all approach, the

*Certificate Policy* endorses a case-by-case analysis where public benefits and adverse impacts of a project are balanced and evaluated on a sliding scale in the context of the facts in the record.  As discussed, the Commission violated the certificate policy or failed to correctly apply it as discussed below.

### 1.     The Commission did not balance the project's benefits against adverse economic impacts.

The majority did not engage in the appropriate analysis under the *Certificate Policy*. First, the majority assumed that the project has public benefits because of precedent agreements with two customers.  December Order at 23, R. 961, JA_____. But the Commission's review of a project's need under the *Certificate Policy* is not limited to precedent agreements. The Commission must also evaluate whether a particular project serves other goals such as advancing competition, improving reliability or result in overbuilding. Had the Commission employed that standard, it would have concluded that the Minisink Compressor offers few public benefits.

Worse, the Commission failed to examine the adverse economic

impact of the Compressor Station on the community. The Certificate

Policy identifies eminent domain as an adverse economic impact, and

while condemnation is not an issue in this case,[28] residents suffer other far

worse, adverse economic impacts. Most critically, homes across the street

and or down the block from the compressor station will markedly

depreciate in value due to proximity to an above-ground industrial

facility. Moreover, in contrast to a case where a company must acquire

property for a project through eminent domain, because residents'

property was not taken, they received no compensation for the lost value

of their homes, which for many is their most significant asset.

In addition, the New York Department of Agriculture and Markets

expressed concern about the Millennium proposal because it would result

in permanent loss of ten acres of farmland. *See* Wellinghoff Dissent July

Order, R. 870, JA___. The Commission cannot claim that it properly

---

[28] Millennium purchased the site for the Minisink Compressor so no eminent domain was involved. Likewise, the Wagoner/Neversink alternative will not involve eminent domain either since Millennium owns the Wagoner site and can accomplish the Neversink upgrade within the existing right of way that it also owns.

applied the Certificate Policy when it did not weigh these serious and
substantial economic impacts.  *Cf, Turtle Bayou*, 135 FERC ¶ 61233, P33
(2011) (finding no project need in light of significant adverse economic
impacts).

## 2.    Failure to balance residual impacts

The dissenters found that the majority failed to correctly apply the
Certificate Policy. July Order, LaFleur Dissent, R. 870, JA___. As
Commissioner LaFleur pointed out, the majority did not balance the
residual impacts against the need for the project (LaFleur at n.9 and text):

> The residual impacts of the Millenium facility must, under the
> Certificate Policy Statement be balanced against the need for the
> project.  *However, the record does not demonstrate that the "specific
> project" is needed in light of the availability of an environmentally and
> operationally preferable alternative, the Wagoner Alternative.* (emphasis
> added)

In support of her position, Commissioner LaFleur explained:

> The Wagoner alternative involves construction of a smaller
> compressor station …[on a site] that was previously used as a
> site [for a compressor station] and replacement of the

47

Neversink segment…to remove a bottleneck on the system. The EA concedes that the smaller compressor needed under the Wagoner Alternative would result in lower emissions…[and] that the visual impacts of the [station] would be negligible.

Meanwhile, Chairman Wellinghoff found that a full evaluation under the Certificate Policy shows that "the Wagoner Alternative is the most efficient proposal for expanding capacity on the Millennium system" whereas the Minisink proposal is a short-term fix. July Order, Wellinghoff Dissent, R. 870, JA____. The Chairman observed:

Not only does upgrading the Neversink Segment result in the need for decreased compression and the corresponding decreased emissions and fuel requirements, it will provide for greater capacity on the Millenium system in the long term…Eliminating the bottleneck created by the Neversink Segment could enhance the reliability of the Millenium pipeline system and allow Millennium wider options for expansion of its system…

July Order, Wellinghoff Dissent, R.870, JA____.

Even on rehearing, the majority does not respond to the merit of the

48

Chairman's criticism of the short-comings of Millennium's proposal or to

Commissioner' LaFleur's conclusion that this *specific* project is not needed.

December Order at P66, R. 961, JA___. Instead, the majority simply insists

that "because the [Wagoner] alternative was not before the Commission as

a proposed project to be approved or disapproved," the advantages of the

Wagoner Alternative are largely irrelevant. The majority's view, however,

is inconsistent with the Certificate Policy which requires a broad review of

all relevant factors.  Because the Commission majority violated the

Certificate Policy and NGA Section 7, its order approving the Millennium

Compressor must be reversed.

## II.    THE COMMISSION FAILED TO TAKE A HARD LOOK AT MILLENNIUM'S PROPOSED ACTION AS REQUIRED BY NEPA

NEPA requires agencies to take a hard look at a proposed action and

potential alternatives. *Natural Resources Defense Council*, Inc. v. Morton, 458

F. 2d 827, 838 (D.C. Cir 1972).  Had the Commission done so here, it would

have arrived as the same conclusion as the dissenting Commissioners that

"even after mitigation, the Minisink project *will have significant adverse*

49

*environmental consequence*." (emphasis added) December Order, Dissent, R. 961, JA_____.

Although MREPS is well aware that the courts refrain from flyspecking an agency's environmental analysis, here the Commission's omissions are not tiny specks but instead gaping holes that undermine the claimed reasonableness of its review. Moreover, given the Commission's presumption that an applicant's proposal is meritorious, ("prudence on the part of the industry…leaves us to consider only those [proposals] that merit serious consideration") December Order, at P46, R. 961, JA_____, this Court must view the Commission's NEPA analysis with a skeptical eye. *C.f., Conservation Society of South Vermont v. Dep't of Transportation*, 362 F.Supp 627, 629 (D.Vt 1973)(finding bias "evident in the rhapsodic prose of the Introduction to the EIS" but ultimately concluding agency generally acted in good faith).  We focus on the most substantial legal errors below.

## A.    The Commissions cost-benefit analysis was inaccurate and unsupported by substantial evidence.

NEPA requires a broadly defined cost-benefit analysis of major activities.  *See Chelsea Neighborhood Association v. United States Postal Service*,

516 F.2d 378, 386 (2d. Cir. 1975), *see also* 40 C.F.R. § 1502.23) (identifying

those factors that an agency should consider as part of a cost benefit

analysis). The Commission's environmental review falls short.

First, though the majority agreed with Chairman Wellinghoff that the

Minisink compressor would cost $1.63 million more in annual fuel charges

(roughly $32 million more over the life of the project), it nonetheless

asserted that "the capital costs" of Wagoner are "considerably higher. *See*

July Order, Wellinghoff Dissent, July, R. 870, JA____ ; December Order, R.

961, JA_____. Yet, the record is void of any cost data or comparison save for

the EA's finding that:

> Millennium states that the Wagoner Alternative would cost at
> least 50 percent more than its proposed project.

Aside from Millennium's unsupported guess-timate of cost differentials,

the EA lacks any rigorous analysis of whether the savings in fuel costs over

the life of the project make the Wagoner project more cost effective overall.[29]

Neither did the EA consider the longer-term far-reaching benefits of the Wagoner/Neversink alternative by providing for greater capacity on Millennium's system. As Chairman Wellinghoff points out, "a full evaluation of the long term benefits and costs of the two options shows that the Wagoner Alternative is the most efficient proposal for expanding capacity on the Millennium system." Wellinghoff Dissent, July Order, R. 870, JA_____. The majority erred in concluding otherwise.

**B.  The Commission did not examine adverse impacts to property values**

The majority "recognizes the general potential for property values to be negatively impacted by the construction of nearby energy infrastructure, noting that the EA reached a similar conclusion." July Order P70, R. 870,

---

[29] The majority also adds that customers "have not commented negatively about the cost of the Minisink project." December Order, P66, R. 961, JA_____. Perhaps what is more telling is that customers did not comment negatively about the purported higher capital costs of Wagoner either.

JA____. To mitigate these impacts, the Commission instructed Millennium use part of the site as a buffer and design and screen the site to minimize aesthetic impacts. These conditions, however, fall far short of what NEPA requires because they fail to allay the more serious impacts such as potential nuisance, pollution, noise, and potential for explosion that contribute to diminished property values far more than loss of view shed.

## C.    The Commission did not consider cumulative and future impacts

The majority did not consider the impacts of construction related to the CPV Valley Power Plant, which evidence showed would be served via a lateral line to the Minisink Compressor. MREPS Motion to Intervene, CPV/Millennium contract, R. 837, JA___. Nor did it explore impacts associated with the Hancock Compressor, the second phase of Millennium's expansion plan for which it started the pre-filing process right after the EA comment period closed. The majority stated that it to consider these impacts because a proposal to construct these facilities was not before it.

53

The Commission's reluctance to evaluate future impacts violates NEPA.  As explained by the Fifth Circuit:

> Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry.[30]

As a minimum, the Commission could have inquired further into Millennium's plans for future development. By refusing to evaluate the future and cumulative impacts, the Commission shirked its duties under NEPA.

## III.    THE COMMISSION ABUSED ITS DISCRETION BY APPROVING THE COMPRESSOR STATION IN VIOLATION OF ITS SITING GUIDELINES AND PRECEDENT

Agencies are required to follow their own regulations. Departure from existing rules without explanation is arbitrary and capricious. *Mine Reclamation Corporation v. FERC*, 30 F.3d 1519, 1524 (D.C. Cir. 1994) ("It is a

---

[30] *State of Louisiana v. Federal Power Commission*, 503 F.2d 844, 877 (5th Cir. 1974).

'well-settled rule that an agency's failure to follow its own regulations is

fatal to the deviant action.'"); *Acadian Gas Pipeline System v. FERC*, 878 F.2d

865 (5th Cir. 1989)("judicial deference is tempered when agency ruling is

inconsistent with a prior pronouncement or prior actions). Here, the

Commission ignored its siting guidelines and precedent order in granting a

certificate to Millennium and failed to offer a "reasoned explanation" for its

departure. *Exxon Mobil Corp. v. FERC*, 315 F.3d 306, 309 (D.C. Cir. 2003).

**A.    The Commission's regulations and precedent establish a hierarchy of siting protocols to reduce impacts to residents and greenfield sites.**

Although the Natural Gas Act preempts local zoning laws,[31] gas

companies don't have unfettered discretion to site facilities as they wish.

*Algonquin v. Loqa*, 79 F.Supp. 2d 49, 51-52 (D. R.I. 2000) (describing that

---

[31] *See, e.g. Schneidewind v. ANR Pipeline*, 485 U.S. 293 (1988)(holding
that Natural Gas Act preempts the field, including state and local laws).
Except for preemption, Minisink's zoning regulations would have
prohibited Millennium from constructing and  operating an industrial
facility in the middle of a rural-residential neighborhood.  *See* July Order at
P80, R. 870, JA_____.

Commission considers zoning concerns in certificate process under Section

380.15). Section 380.15 of the Commission's regulations instruct companies

to conform to the following guidelines:

- Section 380.15(b) *Landowner consideration.* The desires of landowners should be taken into account in the planning, locating, clearing, and maintenance of rights-of-way and the construction of facilities…

- Section 380.15(d) *Pipeline and electric transmission facilities construction.* (1) The use, widening, or extension of existing rights-of-way must be considered in locating proposed facilities.

- Section 380.15(f) *Construction of aboveground facilities.*

   (1) Unobtrusive sites should be selected for the location of above-ground facilities […]

   (2) Aboveground facilities should cover the minimum area practicable.


   (3) Noise potential should be considered in locating compressor stations, or other aboveground facilities,

   The Commission consistently follows these guidelines. The

Commission looks favorably on project alternatives that minimize visual

and noise impacts to landowners,[32] or that are sited in existing rights-of-to

limit overall impacts.[33] Finally, though not specified in the guidelines,

when evaluating alternatives the Commission views permanent, adverse

project impacts as more serious than short-term effects.[34]

---

[32] *See, e.g.*, *Dominion Transmission Inc*., 111 FERC ¶ 61,414, P50 (2005)(finding compliance with Section 380.15 where compressor station site is located at an unobtrusive site surrounded by woodland, and not visible from any of the noise sensitive areas surrounding the compressor station);*Transco Pipeline*, 120 FERC ¶ 61,181, P45-P46 (2007) (finding that compressor station site near existing industrial facilities is less visually obtrusive to landowners than more alternative sites).

[33] *Transcontinental Gas Pipeline*, 124 F.E.R.C. ¶ 61,160, P57(2008) ("Since the affected lands abut a long established natural gas pipeline corridor, we believe that the use of this land, whether on a temporary or permanent basis, should not significantly impact the overall land value."); *Dominion Transmission, Inc*., 135 FERC ¶ 61,239, P73  (2012)(rejecting route variation which would establish a new right of way as inconsistent with Commission policy).

[34] *Tex. Eastern Transmission, LP*, 141 F.E.R.C. ¶ 61,043, P35 (2012)(noting that effects such as noise and dust would be of short duration with minimal permanent impacts); *Florida Gas Transmission Co.*, 129 FERC 61,150, P 69 (2009) (noting that most impacts are short term, and further, will be reduced to less than significant levels with mitigation). *Transwestern*

**B.    The Commission's Order ignores longstanding siting practices without rational explanation**

      **1.    The Minisink Compressor violates virtually every siting guideline.**

If the Commission's siting criteria were a report card, the Wagoner Alternative would receive an "A" for achieving each standard, while the Millennium proposal would fail:

- **Unobtrusive location:** The Wagoner Alternative would be shrouded in a forest more than a half-mile from any homes where a compressor station previously operated undetected for three years.  The Minisink Compressor lies within just a few hundred feet from families with homes on terrain cleared of dozens of old trees and visible on all sides.

- **Existing right-of-way:** The Wagoner Alternative will be built on a

*Pipeline,* 121 FERC ¶ 61,175, P43 (2007) (finding that alternative stream-crossing method will have short term impacts and is therefore acceptable).

brownfield site owned by Millennium and previously used for a compressor station, while the aging Neversink upgrade which is part of the alternative can be replaced within the existing right-of-way that has already been cleared of trees. [35]

- **Landowner considerations:**  Notably, none of the 58 landowners adjacent to the Neversink upgrade objected; while two actively supported replacement of the pipeline. July 2012 Order, Commissioner LaFleur Dissent at 3; R. 870, JA____. The Minisink proposal has generated considerable and understandable community objection.

- **Long-term v. short-term impacts:** The Wagoner Alternative would also cause temporary, short-term loss of agricultural crops for one season along the Neversink right-of-way. The Minisink Compressor

---

[35]  MREPS members question Millennium's claims accuracy of the need for additional workspace based on photos of the right-of-way submitted in comments to the EA. The photos show that large swaths have already been cleared, and it is unclear why Millennium will need more workspace. *See* July Order, at n. 27, R. 870, JA_____., *See also* MREPS Appendix to EA Comments, at 81. R. 834, JA____.

will occupy 73.4 acres of agricultural land permanently, foreclosing any future use for crops or agribusiness[36] and permanently reduce property values of surrounding homes, and eliminating development of residential or other compatible development that might generate added tax revenues.

## 2. The Commission did not explain its departure from siting Guidelines.

Dissenting Commissioner LaFleur recognized the departure from its siting guidelines and precedent as plain error:

> I believe that the EA's finding that the Wagoner Alternative "does not provide a significant environmental advantage over the proposed project is incorrect. This conclusion incorrectly equates temporary environmental impacts due to construction of the Wagoner Alternative with permanent residual impacts of the Minisink proposal and therefore makes an invalid comparison.

---

[36] Initially, the Commission certificate required Millennium to establish a conservation easement on lands not used by the compressor station "to provide important environmental benefits such as preserving existing vegetation and maintaining a buffer for noise and visual impacts." July Order, P 35, R. 870, JA____. In its subsequent orders, the Commission withdrew the conservation easement requirement. *Millennium Pipeline Co.*, 142 FERC ¶ 61,077 P13 (January 31, 2013)(January Order) R. 977, JA____.

July Order, LaFleur Dissent at R.870, JA____. Similarly, Chairman Wellinghoff noted that the Minisink option would result in permanent loss of 10 acres of farmland, whereas the Wagoner Alternative would interfere with just a single season of farming. On rehearing both the Chairman and Commissioner LaFleur reiterated their preference for the Wagoner alternative because "it would create significantly fewer and *less enduring* environmental impacts." December Order, Dissenting Statement, R. 961, JA____ (emphasis added).

The December Rehearing order fails to address Commissioner LaFleur and residents ' objections (R. 961, JA____ ) to the Commission's departure from longstanding siting protocols. *American Gas Assoc. v. FERC*, 593 F.3d 14, 20 (D.C. Cir. 2010)(finding that reasoned decision-making requires Commission to address dissenting colleague's concerns). Instead, the gist of the majority's position is that the Commission's siting guidelines and longstanding precedent are unimportant — so long as overall impacts are minimized. Put in colloquial terms, the ends justify the means as the majority sees it.

Consequently, that Millennium's application[37] did not conform to Section 380.15's preference for confining above-ground facilities in unobstrusive areas doesn't matter to the majority, because "mitigating conditions… will make the Minisink location as unobstrusive as possible." December Order, P50, R. 961, JA____. The majority is similarly unconcerned that Millennium's choice to foist a compressor station on 73.4 acres of pristine, undeveloped lands and permanently destroy 10.6 acres of farmland instead of opting for a brownfield site previously occupied by a compressor and within an existing right-of-way (Wagoner/Neversink alternative) violates siting guidelines (Section 380.15 favoring use of existing rights of way) and precedent (improperly equates permanent and temporary impacts)—because with mitigation the environmental impacts are not "objectively unacceptable." December Order, P. 30, R. 961, JA____.

---

[37] Millennium's siting criteria bears no resemblance to the protocol established in Section 380.15: "[Millennium's] primary objective in evaluating alternatives was to avoid, minimize and, if necessary, mitigate adverse environmental effects while at the same time meeting both the economic and engineering criteria of Millennium and its customers. Minisink Compressor Application, Resource Report 1, Section 1-4.3.2, R.____, JA____.

The majority errs. The Commission's siting practices reflect deliberate policymaking intended to encourage prudent siting decisions, take account of landowner concerns (which are stripped of protection in the pipeline siting because the Natural Gas Act preempts local zoning law) and avoid permanent and irreparable harm. Mitigation, while theoretically desirable as a last resort, simply does not satisfy the intended goals of the Commission's siting policy, and as such, does not excuse the majority's departure.

Ironically, even as the majority shrugs aside the Commission's siting guidelines, it boasts of the Commission's "consistency" in adhering to procedures "well-known to the industry" that results in a process that weeds out "marginal projects" as efficiently as well-oiled machine. December Order, at P45, R. 961, JA____.

Consistency is paramount in the Commission certificate process—not just for the industry but for all impacted parties. For that reason, we ask this Court to find that the Commission's departure from its own longstanding siting practices was arbitrary and capricious and vacate the orders below.

63

IV.    **THE COMMISSION VIOLATED THE ADMINISTRATIVE PROCEDURE ACT AND DUE PROCESS RIGHTS OF MREPS MEMBERS.**

A.    **The Commission refused to hold an evidentiary hearing to resolve whether the Neversink segment would require an upgrade in violation of the Administrative Procedure Act and Natural Gas Act**

The Natural Gas Act prohibits the Commission from issuing a Section 7 certificate without first providing notice and an opportunity for hearing. *See* Natural Gas Act, 15 U.S.C. § 717f(a). Although the Commission is not obligated to hold a hearing in all instances, an on- the-record hearing is required when a genuine issue of material fact exists that cannot be resolved from the written submissions. *See Cajun Elec. Coop. v. FERC*, 28 F.3d 173, 177 (D.C. Cir. 1994). The Commission recognizes that trial type hearings can "help citizens better evaluate a project." *Louisiana Ass'n. of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d 1101, 1109 (D.C. Cir. 1992). Thus, the Commission held a ten-day hearing in the certificate proceeding for Iroquois Gas pipeline to address conflicting factual assumptions and data regarding the anticipated need for power. *Id.* (involving review of certificate issued to Iroquois).

64

MREPS argued that a hearing would have resolved several key factual disputes, most significantly the question of Millennium's intentions regarding the Neversink upgrade. MREPS Request for Rehearing, R. 880, JA_____; MREPS Motion for Hearing, R. 834, JA_____. Millennium's plans for Neversink are material because if based on a hearing, the Commission were to conclude that Millennium has an upgrade to Neversink in the works, then the claimed impacts that the majority claims would occur only under the Wagoner/Neversink Alternative (December Order, at P67, R. 961, JA_____) would take place under the Minisink option as well, thus neutralizing any of its perceived advantages.

The majority rejected MREPS hearing request, finding that "there is no material issue of fact that we cannot resolve on the basis of the written proceeding" (July Order, P86, R. 870, JA_____) and did not revisit the issue on rehearing. Still, it's not clear that question of a future Neversink upgrade was resolved at all, given the conflicts between the Commission's findings and the evidence. For example, in the rehearing order, the Commission states: "There is no indication that Millennium conceptualized all three projects as an integrated whole that would progress in phases."

65

December Order at P45, R. 961, JA____. But the Currie Report shows just

that. R. 837, JA____.  Further, in November 2011, Joseph Shields,

Millennium's Chief Operating Officer, told the Minisink Planning Board

that "sometime after the compressor station is built, there will be a need for

a bigger pipe." Planning Board Minutes, Accession No. 20120416-5259, R.

833, JA___.

In the face of Millennium's earlier representations, its denials of

intent to replace Neversink in the near future lack credibility. *See Exxon Co.

v. FERC*, 182 F. 3d 30, 47 (D.C. Cir. 1999)("FERC may resolve factual issues

on a written record unless motive, intent, or credibility are at issue…."[in

which case live testimony is appropriate]). Moreover, to the extent that

Millennium now claims its plans to upgrade Neversink have changed, the

facts show that Millennium may have no choice. A report submitted by

Kuprewicz, an expert proffered by MREPS, found that the Minisink

Compressor Station will inject such high gas velocities into the aging

Neversink line as to necessitate its replacement for safety considerations.

Kuprewicz Report, R. 943, JA____.

At a minimum, a hearing would have provided a basis on which to reasonably resolve these disputed issues and would likely have exposed Millennium's plans to upgrade Neversink. In addition, a hearing would have also helped residents "better evaluate the project" consistent with *Louisiana Ass'n of Indep. Producers & Royalty Owners*, 958 F.2d at 1109. How so? The Commission's hearing procedures allow for discovery—which would have afforded residents to file data requests and promptly access (subject to necessary non-disclosure agreements) all of the flow diagrams, hydraulic studies and other data that Millennium submitted in order to independently evaluate and meaningfully challenge Millennium's proposal. 18 C.F.R. § 385.402 (2012). In the absence of a hearing, MREPS and its members have been forced to seek information through a protracted and still-ongoing FOIA process that does not adequately substitute for discovery procedures, *See Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974)(observing that discovery for litigation purposes is not an indicated purpose of FOIA) and has stymied residents' ability to fully evaluate the project as they would during a hearing process.

**B.    The Commission violated MREPS members due process rights by relying on evidence that was neither available to petitioners for meaningful  comment nor included in the record for review by this Court.**

Both the Administrative Procedure Act and NEPA require the Commission to "identify and make available technical studies and data that it has employed" in reaching its decisions. *Conn. Light and Power Co. v. Nuclear Reg. Com'n*, 673 F. 2d 525, 530 (D.C. Cir 1982). An "agency commits serious procedural error when it fails to reveal portions of the technical basis" for its decision. *Id.* Denial of access to data violates parties' due process rights to meaningful comment. *Gerber v. Norton*, 294 F.3d 173 (D.C. Cir. 2002).

The July certificate order expressly stated that the Commission staff:

independently evaluated the hydraulic feasibility of the Minisink Compressor Station and completed an engineering analysis of Millennium's pipeline system to conclude that Millennium's pipeline system, with the inclusion of the Minisink Compressor Station, is capable of providing the capacity required by the project's shippers.

July Order, at ¶ 68;  R.870, JA____.  The July Order demonstrates that the Commission expressly relied on the hydraulic studies to determine if

68

there was a need for the Compressor Station. Because the Commission

relied on those studies, it should have made them available to the public. It

did not.  Nor has the Commission included in the Certificate of Record the

studies or "independent verifications" that support its orders.

On rehearing, the Commission reiterated that "we see no unfairness

or denial of due process of law in the processing of the landowners' request

for information." December Order, P71, R. 961, JA____.   But even though

MREPS and its members did obtain CEII information, eventually, other

materials classified as "privileged," such as the Commission's studies and

Millennium's submissions, remain cloistered.[38] As impacted parties and

intervenors, MREPS and its members were entitled to service of all of

Millennium's filings under the Commission's regulations, (*see* 18 C.F.R. §

385.2010), but because Millennium classified its information as privileged,

the Commission excused it from disclosure obligations.

---

[38]  The Commission omits reference to the "technical glitch" where it
lost petitioner Gartenberg's and Mojica's CEII request, delaying receipt of
information by close to a month.  They were required to file separate CEII
requests because the Commission did not permit Mr. Odland to share the

69

The Commission's failure to make the studies that it relied on available to the public, the Commission committed a serious error. Instead of soliciting and receiving meaningful public comment that could have analyzed and rebutted the studies, the Commission only had information from Millennium, which not surprisingly, supported Millennium's proposal. Holding back the studies means that the Commission prevented the possibility of obtaining more information from interested parties who would have demonstrated that the Wagoner alternative, and not the Minisink site, was the better site for the compressor station

FOIA, while useful, offers an imperfect solution to non-disclosure. MREPS members Mojica and Odland have been embroiled in the FOIA process since March 2012, and have been forced to file multiple FOIA and CEII requests and appeals, as well as a FOIA lawsuit in federal district court.[39] By the time the FOIA case is resolved, MREPS' opportunity for meaningful input may have passed. As a result of this non-disclosure, the

---

information he received with others in MREPS.  *See* MREPS Request for Rehearing, R. 880, JA_____.

Commission violated MREPS' due process rights to meaningfully comment

on the Minisink Compressor Station proceedings.  Accordingly, the Court

should vacate the orders below.

## IV.   THE COMMISSION ERRED BY REFUSING TO REOPEN THE RECORD TO CONSIDER EXPERT TESTIMONY THAT COMPELLED A DIFFERENT RESULT THAN THAT REACHED BY THE MAJORITY

### A.   The Kuprewicz Report compels a different result by showing that the Minisink Compressor will necessitate replacement of Neversink to avoid potently high gas velocities in excess of prudent design standards

The Commission must consider new evidence that "persuades or

compels" a contrary result to the initial decision. *Friends of the River v.*

*FERC*, 720 F.2d 93, 98 n. 6 (D.C. Cir. 1983)(establishing standard for

reopening the record). To do otherwise constitutes an abuse of discretion,

exposing the Commission to reversal on judicial review. *E. Carolinas*

*Broadcasting Co. v. FCC*, 762 F.2d 95, 103 (D.C. Cir. 1985) ("[We] normally

_____

[39] MREPS FOIA suit is still pending before the District of D.C. *See MREPS v. FERC*, Case No. 13-cv-141(D.D.C. March 4, 2013).

reverse an agency's decision not to reopen the record only for abuse of discretion.").

An agency is not "excused from donning blinders…to a new situation" or correcting known errors in the record irrespective of whether good cause supports the untimely submission of new evidence.[40] *Hudson River Fishermen's Ass'n v. Federal Power Com'n*, 498 F. 2d 827, 833 (2d Cir 1974)(finding abuse of discretion where Commission will not correct findings in light of late submitted evidence).  Further, Commission's obligation to reopen the record is heightened where, as in this case, "public interest and concern is so great…" that refusal to reopen the record "exhibits a disregard of the statute and of judicial mandates instructing the Commission to probe all feasible alternatives." *Scenic Hudson Preservation Conf. v. Federal Power Comm.*, 354 F.2d 608, at 624-625 (2d Cir 1965).

---

[40]  In any event, MREPS had good reason for submitting the Kuprewicz Report three and half months after the rehearing deadline because it was unable to obtain timely release of Millennium's studies and hydraulic reports which were classified as confidential and privileged.  *See* R. 4,6, JA____.

The Kuprewicz Report compels and persuades a different result from that reached by the Commission. Kuprewicz found that the 24-inch Neversink segment of Millennium's overall 182-mile 30-inch pipe rather than the lack of compression is the critical constraint to Millennium's ability to expand delivery options because of its smaller MAOP (920 psi compared to the 1200 psi at which the rest of the system operates). Kuprewicz also explained that the Neversink constraints also lead to potently high gas velocities that exceed prudent design capacity which would necessitate its replacement,[41] even for the Minisink Compressor.

Thus, the Report undermines the reasons given by the majority for choosing the Minisink Compressor over the Wagoner Alternative. Describing the reason for approving the Minisink Compressor over

---

[41] Mr. Kuprewicz explained how the Neversink pipeline constrains Millennium's entire system.  For example, if the Neversink 24-inch pipe did not have the 920 MAOP max the operator could raise the pressure much higher than 920 psig to reduce higher gas velocities introduced by Minisink on the downstream side of this segment.  Kuprewicz Report, R.943, JA____.

Wagoner, the majority treated Neversink as the tie breaker, finding the

Minisink Compressor environmentally preferable because it would not

require replacement of Neversink, whereas the Wagoner Alternative

would.  July Order, R. 870, JA____. But if the Minisink Compressor also

requires replacement of Neversink, as Kuprewicz contends, then there is

no tie to break. In an apples-to-apples competition between the

Minisink/Neversink combination versus the Wagoner/Neversink

combination, the Wagoner Alternative emerges as the unequivocal victor.

In addition, the Report also calls into question the Commission's (or

EA staff) conclusions regarding safety impacts. Environmental Assessment,

at 38, R. 298, JA_____. The Report shows that the increased very high-speed

velocities of 60 ft/sec will exceed the Neversink design capacity. In fact in

another certificate case, *Tennessee Gas Pipeline, Co.,* 139 FERC ¶ 61,161

(2012), the Commission considered and ultimately rejected as infeasible a

system alternative to the proposed pipeline project because:

> It would have potentially resulted in a situation where the
> velocity of the natural gas in the single 24-inch diameter
> pipeline across the Delaware Water Gap NRA would have to

> exceed design standards to transport the same volume of
> natural gas that would be carried by the existing pipeline and
> proposed larger diameter loop.

*Tennessee Gas*, at P 86. There in contrast, the Commission determined,

based on its engineering review, that that the proposed project will not

result in an increase of natural gas velocity above safety design standards

in the existing or proposed pipelines.

*Tennessee Gas* involved a 24-inch pipe segment, just like Neversink,

and shows that the Commission views high gas velocities in excess of

design capacity as a deal-breaker. Here, the Commission's "independent

verification" apparently did not address gas velocity, because if it had, the

Commission's ruling in *Tennessee Gas* would have compelled rejection of

the Minisink Compressor.

### B.    The Commission abused its discretion in refusing to consider the Kuprewicz Report.

The Commission abused its discretion in refusing to consider the

Kuprewicz Report. As a preliminary matter, the speed with which the

Commission dispatched the Report—MREPS filed it on Friday, November

30, 2012 and the December Order decision not to reopen the record issued

just a week later—evinces less than the degree of measured analysis

ordinarily entitled to deference.[42] As to the substance, the Commission

criticized Mr. Kuprewicz's assumption that gas velocity in Neversink

would be constant—though the Commission offers no evidence to show

otherwise, and further, concedes that at least on some days, gas velocities

will reach the 60 ft/s levels.

The Commission also claims that *Tennessee Gas* is inapposite and that

the velocity design criteria and concerns that led the Commission to reject

an alternative route proposal do not apply to "the portion of Millennium's

system under consideration here."   January Order, R. 977, JA____.  But the

Commission never explains why it found velocities of 40 ft/s in a 24-inch

pipeline unacceptably high in *Tennessee Gas*, but had no concern about the

---

[42]  Ironically, the Kuprewicz Report faulted the Commission for its cursory review of project safety issues remarking that: "such high gas velocities raise serious questions as to the adequacy or completeness of any previous hydraulic studies or decisions that may have been used to justify approval of the Minisink Compressor project." Kuprewicz Report at P2; R. 943, JA_____.

60ft/s velocities in the 24-inch Minisink segment.

The Kuprewicz Report shows that whether Millennium were to build the Minisink Compressor or the Wagoner alternative, a Neversink upgrade would be required, thereby decimating any perceived advantage that Minisink might have over Wagoner. Because Kuprewicz's report compels a result different from that reached by the Commission, it was error for the Commission to not consider it.

## CONCLUSION

WHEREFORE for the foregoing reasons, MREPS and the individual petitioners ask this Court to:

1.     Vacate the Commission order as arbitrary, capricious and unlawful and order Millennium to decommission the Compressor station or in the alternative,

2.     Remand the case to the Commission for additional proceedings consistent with this Court's ruling, and

3.    Award any and all other relief that this court deems

appropriate.

_____

Carolyn Elefant

Melissa Alfano

LAW OFFICES OF CAROLYN ELEFANT

2200 Pennsylvania Avenue N.W.

Fourth Floor East

Washington D.C. 20037

(202) 297-6100

Carolyn@carolynelefant.com

## CERTIFICATE OF COMPLIANCE

I certify that Petitioners' Initial Brief is in compliance with Fed. R. App. P. 28(a)(11); and Fed. R. App. P. 32(a)(7)(C). The brief was prepared using 14-point Palantino, a serif font. As shown below in a screen shot of my word processor, the brief contains 12,813 words.

Respectfully submitted,

_____

Carolyn Elefant

LAW OFFICES OF CAROLYN ELEFANT

2200 Pennsylvania Avenue N.W.

Fourth Floor East

Washington D.C. 20037

(202) 297-6100

Carolyn@carolynelefant.com



## CERTIFICATE OF SERVICE

I certify that on July 19, 2013, I caused the Minisink Residents for Environmental Preservation and Safety's Initial Brief to be served electronically through the ECF system. I also caused five copies of this brief to be hand delivered to the Court. The following participants in this case will be served by first class mail:

Robert Solomon, Solocitor
Federal Energy Regulatory Commission
888 First St., NE
Washington, DC 20002

Joseph S. Koury
Wright & Talisman, P.C.
1200 G Street, NW
Suite 600
Washington, DC 20005-3814

_____

Carolyn Elefant
LAW OFFICES OF CAROLYN ELEFANT
2200 Pennsylvania Avenue N.W.

Fourth Floor East

Washington D.C. 20037

(202) 297-6100

Carolyn@carolynelefant.com

# AFFIDAVITS

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Minisink Residents for Environmental Preservation and Safety, et. al.** ) ) ) ) ) | |
| **PETITIONERS** ) ) | |
| **vs.** ) ) | **Docket No. 12-1481** |
| **Federal Energy Regulatory Commission** ) ) ) | |
| **RESPONDENTS** ) | |
| _____) | |

## DECLARATION OF LAURIE ARIAS

My name is Laurie Arias.  I am over the age of eighteen and competent to testify.  I have personal knowledge of all of the events discussed below.  Under penalty of perjury, I state the following:

1. My name is Laurie Arias and I am a resident of Minisink, NY, a part of the Minisink Residents for Environmental Preservation and Safety (MREPS), a petitioner in this case. I am providing this declaration in support of jurisdiction and standing in this case.

2. I live 1 mile from the compressor station.  In or around June 2013, I was interviewed for a video segment for Environmental

1

TV regarding the impacts of the Minisink Compressor on my home, my family and community.

3. This declaration verifies that I am the Laurie Arias seen on the video.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

Executed by:

_____        7/17/2013

Laurie Arias                              Date

3

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Minisink Residents for Environmental Preservation and Safety, et. al. ) ) ) ) ) | |
| PETITIONERS ) ) | |
| vs. ) ) | Docket No. 12-1481 |
| Federal Energy Regulatory Commission ) ) ) | |
| RESPONDENTS ) _____) | |

## DECLARATION OF ASHA CANALOS

My name is Asha Canalos. I am over the age of eighteen and competent to testify. I have personal knowledge of all of the events discussed below. Under penalty of perjury, I state the following:

1. My name is Asha Canalos and I am a resident of Minisink, NY, and part of the Minisink Residents for Environmental Preservation and Safety (MREPS), a petitioner in this case. I am providing this declaration in support of jurisdiction and standing in this case.

2. I live .25 miles from the compressor station. In or around June 2013, I was interviewed for a video segment for Environmental

TV regarding the impacts of the Minisink Compressor on my home, my family and community.

3. This declaration verifies that I am the Asha Canalos seen on the video.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

Executed by:


_____   7/17/2013

Asha Canalos                          Date

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Minisink Residents for** ) | |
| **Environmental** ) | |
| **Preservation and Safety,** ) | |
| **et. al.** ) | |
| ) | |
| **PETITIONERS** ) | |
| ) | |
| **vs.** ) | **Docket No. 12-1481** |
| ) | |
| **Federal Energy Regulatory** ) | |
| **Commission** ) | |
| ) | |
| **RESPONDENTS** ) | |
| _____) | |

## DECLARATION OF LEANNE BAUM

My name is Leanne Baum. I am over the age of eighteen and competent to testify. I have personal knowledge of all of the events discussed below. Under penalty of perjury, I state the following:

1. My name is Leanne Baum and I am a resident of Minisink, NY, and part of the Minisink Residents for Environmental Preservation and Safety (MREPS), a petitioner in this case. I am providing this declaration in support of jurisdiction and standing in this case.

2. I live 650 feet from the compressor station. In or around June 2013, I was interviewed for a video segment for Environmental

TV regarding the impacts of the Minisink Compressor on my home, my family and community.

3. This declaration verifies that I am the Leanne Baum seen on the video.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

Executed by:


_Leanne Baum_     7/16/2013
Leanne Baum           Date

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Minisink Residents for** | ) | |
| **Environmental** | ) | |
| **Preservation and Safety,** | ) | |
| **et. al.** | ) | |
| | ) | |
| **PETITIONERS** | ) | |
| | ) | |
| **vs.** | ) | **Docket No.  12-1481** |
| | ) | |
| **Federal Energy Regulatory** | ) | |
| **Commission** | ) | |
| | ) | |
| **RESPONDENTS** | ) | |
| _____ | ) | |

### DECLARATION OF Karen Gartenberg

My name is Karen Gartenberg.  I am over the age of eighteen and competent to testify.  I have personal knowledge of all of the events discussed below.  Under penalty of perjury, I state the following:

1. My name is Karen Gartenberg and I am a resident of Minisink, NY, a part of the Minisink Residents for Environmental Preservation and Safety (MREPS), and an individual petitioner in this case. I am providing this declaration in support of jurisdiction and standing in this case.

2. I live .7 miles from the compressor station.  In or around June 2013, I was interviewed for a video segment for Environmental

1

TV regarding the impacts of the Minisink Compressor on my home, my family and community.

3. This declaration verifies that I am the Karen Gartenberg seen on the video.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

Executed by:

Karen Gartenberg                                    7/16/13
                                                    Date

3

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Minisink Residents for Environmental Preservation and Safety, et. al.** ) ) ) ) ) | |
| **PETITIONERS** ) ) | |
| **vs.** ) ) | **Docket No. 12-1481** |
| **Federal Energy Regulatory Commission** ) ) ) | |
| **RESPONDENTS** ) | |
| _____ ) | |

### DECLARATION OF PRAMILLA MALICK

 My name is Pramilla Malick. I am over the age of eighteen and competent to testify. I have personal knowledge of all of the events discussed below. Under penalty of perjury, I state the following:

1. My name is Pramilla Malick and I am a resident of Minisink, NY, a part of the Minisink Residents for Environmental Preservation and Safety (MREPS), and an individual petitioner in this case. I am providing this declaration in support of jurisdiction and standing in this case.

2. I live .2 miles from the compressor station. In or around June 2013, I was interviewed for a video segment for Environmental

TV regarding the impacts of the Minisink Compressor on my home, my family and community.

3. This declaration verifies that I am the Pramilla Malick seen on the video.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate.

Executed by:

_____     7/18/13

Pramilla Malick                          Date

# ADDENDUM

# Addendum

## Table of Contents

Intervenor List .......................................................................................................... 1

Natural Gas Act, 15 U.S.C. § 717r (2006) ......................................................... 2

18 C.F. R. § 380.15 (2012) .................................................................................. 5

*Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶61,227 (1999), *clarified*, 90 FERC ¶61,128, *further clarified*, 92 FERC ¶61,094 (2000)(Certificate Policy Statement) ....................................................... 7

# Intervenor List

| Submission Date | First Name | Last Name | E-mail | Approximate Proximity to FERC Adopted Site: | Intervention Filed | If yes, date intervention was filed |
|---|---|---|---|---|---|---|
| 2012-04-12 23:56:27 | Pramilla | Malick | psrivas@yahoo.com | .2 miles | Yes | 09/06/2011 |
| 2012-04-12 17:05:43 | Carolyn | Petschler | capetschler@hotmail.com | 1 mile | Yes | 03/07/2012 |
| 2012-04-11 17:39:27 | Asha | Canalos | ashacanalos@gmail.com | .25 mile | Yes | 03/06/2012 |
| 2012-04-11 16:33:32 | Misael | Mojica | MichaelMojica@hotmail.com | .2 mile | Yes | 20111012-0055 |
| 2012-04-11 13:50:43 | Thomas | Salamone | tsalamone@me.com | 3.8miles | Yes | March 2012 |
| 2012-04-11 10:28:47 | Deborah | Lain | deblain28@yahoo.com | 1 mile | Yes | 3/12/12 |
| 2012-04-10 23:19:41 | Laurie | Arias | lauriearias@hotmail.com | 1 mile | Yes | 9/6/2011 |
| 2012-04-10 22:19:23 | John | Odland | jna115@optonline.net | .8 miles | Yes | March 7th, 2012 |
| 2012-04-10 19:41:32 | Karen | Gartenberg | jkjaflash@optimum.net | 0.7 miles | Yes | 3/15/12 |
| 2012-04-10 16:18:14 | Leanne and Robert | Baum | rnl99@optonline.net | 650 ft | Yes | 3/6/2012 (both) |

UNITED STATES CODE SERVICE
Copyright © 2013 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM)
All rights reserved.

*** Current through PL 113-15, approved 6/25/13 ***

TITLE 15. COMMERCE AND TRADE
CHAPTER 15B. NATURAL GAS

**Go to the United States Code Service Archive Directory**

*15 USCS § 717f*

§ 717f.  Construction, extension, or abandonment of facilities

(a) Extension or improvement of facilities on order of court; notice and hearing.  Whenever the Commission, after notice and opportunity for hearing, finds such action necessary or desirable in the public interest, it may by order direct a natural-gas company to extend or improve its transportation facilities, to establish physical connection of its transportation facilities with the facilities of, and sell natural gas to, any person or municipality engaged or legally authorized to engage in the local distribution of natural or artificial gas to the public, and for such purpose to extend its transportation facilities to communities immediately adjacent to such facilities or to territory served by such natural-gas company, if the Commission finds that no undue burden will be placed upon such natural-gas company thereby: *Provided,* That the Commission shall have no authority to compel the enlargement of transportation facilities for such purposes, or to compel such natural-gas company to establish physical connection or sell natural gas when to do so would impair its ability to render adequate service to its customers.

(b) Abandonment of facilities or services; approval of Commission.  No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

(c) Certificate of public convenience and necessity.
  (1) (A) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: *Provided, however,* That if any such natural-gas company or predecessor in interest was bona fide engaged in transportation or sale of natural gas, subject to the jurisdiction of the Commission, on the effective date of this amendatory Act, over the route or routes or within the area for which application is made and has so operated since that time, the Commission shall issue such certificate without requiring further proof that public convenience and necessity will be served by such operation, and without further proceedings, if application for such certificate is made to the Commission within ninety days after the effective date of this amendatory Act. Pending the determination of any such application, the continuance of such operation shall be lawful.
    (B) In all other cases the Commission shall set the matter for hearing and shall give such reasonable notice of the hearing thereon to all interested persons as in its judgment may be necessary under rules and regulations to be

2

prescribed by the Commission; and the application shall be decided in accordance with the procedure provided in subsection (e) of this section and such certificate shall be issued or denied accordingly: *Provided, however,* That the Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this section temporary acts or operations for which the issuance of a certificate will not be required in the public interest.

(2) The Commission may issue a certificate of public convenience and necessity to a natural-gas company for the transportation in interstate commerce of natural gas used by any person for one or more high-priority uses, as defined, by rule, by the Commission, in the case of--

(A) natural gas sold by the producer to such person; and

(B) natural gas produced by such person.

(d) Application for certificate of public convenience and necessity.  Application for certificates shall be made in writing to the Commission, be verified under oath, and shall be in such form, contain such information, and notice thereof shall be served upon such interested parties and in such manner as the Commission shall, by regulation, require.

(e) Granting of certificate of public convenience and necessity.  Except in the cases governed by the provisos contained in subsection (c)(1) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act [*15 USCS §§ 717* et seq.] and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the isssuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.

(f) Determination of service area; jurisdiction of transportation to ultimate customers.

(1) The Commission, after a hearing had upon its own motion or upon application, may determine the service area to which each authorization under this section is to be limited. Within such service area as determined by the Commission a natural-gas company may enlarge or extend its facilities for the purpose of supplying increased market demands in such service area without further authorization; and

(2) If the Commission has determined a service area pursuant to this subsection, transportation to ultimate consumers in such service area by the holder of such service area determination, even if across State lines, shall be subject to the exclusive jurisdiction of the State commission in the State in which the gas is consumed. This section shall not apply to the transportation of natural gas to another natural gas company.

(g) Certificate of public convenience and necessity for service of area already being served.  Nothing contained in this section shall be construed as a limitation upon the power of the Commission to grant certificates of public convenience and necessity for service of an area already being served by another natural-gas company.

(h) Right of eminent domain for construction of pipelines, etc.  When any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas, and the necessary land or other property, in addition to right-of-way, for the location of compressor stations, pressure apparatus, or other stations or equipment necessary to the proper operation of such pipe line or pipe lines, it may acquire the same by the exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts. The practice and procedure in any action or proceeding for that purpose in the district court of the United States shall conform as nearly as may be with the practice and procedure in similar action or proceeding in the courts of the State where the property is situated: *Provided,* That

15 USCS § 717f

the United States district courts shall only have jurisdiction of cases when the amount claimed by the owner of the property to be condemned exceeds $ 3,000.

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2013, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This section is current through the July 2, 2013 ***
*** issue of the Federal Register ***

TITLE 18 -- CONSERVATION OF POWER AND WATER RESOURCES
CHAPTER I -- FEDERAL ENERGY REGULATORY COMMISSION, DEPARTMENT OF ENERGY
SUBCHAPTER W -- REVISED GENERAL RULES
PART 380 -- REGULATIONS IMPLEMENTING THE NATIONAL ENVIRONMENTAL POLICY ACT

**Go to the CFR Archive Directory**

*18 CFR 380.15*

§ 380.15 Siting and maintenance requirements.


(a) Avoidance or minimization of effects. The siting, construction, and maintenance of facilities shall be undertaken in a way that avoids or minimizes effects on scenic, historic, wildlife, and recreational values.

(b) Landowner consideration. The desires of landowners should be taken into account in the planning, locating, clearing, and maintenance of rights-of-way and the construction of facilities on their property, so long as the result is consistent with applicable requirements of law, including laws relating to land-use and any requirements imposed by the Commission.

(c) Safety regulations. The requirements of this paragraph do not affect a project sponsor's obligations to comply with safety regulations of the U.S. Department of Transportation and recognized safe engineering practices for Natural Gas Act projects and the National Electric Safety Code for section 216 Federal Power Act projects.

(d) Pipeline and electric transmission facilities construction.

(1) The use, widening, or extension of existing rights-of-way must be considered in locating proposed facilities.

(2) In locating proposed facilities, the project sponsor shall, to the extent practicable, avoid places listed on, or eligible for listing on, the National Register of Historic Places; natural landmarks listed on the National Register of Natural Landmarks; officially designated parks; wetlands; and scenic, recreational, and wildlife lands. If rights-of-way must be routed near or through such places, attempts should be made to minimize visibility from areas of public view and to preserve the character and existing environment of the area.

(3) Rights-of-way should avoid forested areas and steep slopes where practical.

(4) Rights-of-way clearing should be kept to the minimum width necessary.

(5) In selecting a method to clear rights-of-way, soil stability and protection of natural vegetation and adjacent resources should be taken into account.

(6) Trees and vegetation cleared from rights-of-way in areas of public view should be disposed of without undue

18 CFR 380.15

delay.

(7) Remaining trees and shrubs should not be unnecessarily damaged.

(8) Long foreground views of cleared rights-of-way through wooded areas that are visible from areas of public view should be avoided.

(9) Where practical, rights-of-way should avoid crossing hills and other high points at their crests where the crossing is in a forested area and the resulting notch is clearly visible in the foreground from areas of public view.

(10) Screen plantings should be employed where rights-of-way enter forested areas from a clearing and where the clearing is plainly visible in the foreground from areas of public view.

(11) Temporary roads should be designed for proper drainage and built to minimize soil erosion. Upon abandonment, the road area should be restored and stabilized without undue delay.

(e) Right-of-way maintenance.

(1) Vegetation covers established on a right-of-way should be properly maintained.

(2) Access and service roads should be maintained with proper cover, water bars, and the proper slope to minimize soil erosion. They should be jointly used with other utilities and land-management agencies where practical.

(3) Chemical control of vegetation should not be used unless authorized by the landowner or land-managing agency. When chemicals are used for control of vegetation, they should be approved by EPA for such use and used in conformance with all applicable regulations.

(f) Construction of aboveground facilities.

(1) Unobtrusive sites should be selected for the location of aboveground facilities.

(2) Aboveground facilities should cover the minimum area practicable.

(3) Noise potential should be considered in locating compressor stations, or other aboveground facilities.

(4) The exterior of aboveground facilities should be harmonious with the surroundings and other buildings in the area.

(5) For Natural Gas Act projects, the site of aboveground facilities which are visible from nearby residences or public areas, should be planted in trees and shrubs, or other appropriate landscaping and should be installed to enhance the appearance of the facilities, consistent with operating needs.

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*42 U.S.C. 4321*-4370h, 7101-7352; E.O. 12009, 3 CFR 1978 Comp., p. 142.

UNITED STATES OF AMERICA88 FERC ¶ 61,227
FEDERAL ENERGY REGULATORY COMMISSION


Before Commissioners:   James J. Hoecker, Chairman;
                        Vicky A. Bailey, William L. Massey,
                        Linda Breathitt, and Curt Hébert, Jr.


Certification of New Interstate                    Docket No. PL99-3-000
Natural Gas Pipeline Facilities


STATEMENT OF POLICY

(Issued September 15, 1999)


In the Notice of Proposed Rulemaking (NOPR) in Docket No. RM98-10-000[1] and the Notice of Inquiry (NOI) in Docket No. RM98-12-000,[2] the Commission has been exploring issues related to the current policies on certification and pricing of new construction projects in view of the changes that have taken place in the natural gas industry in recent years.

In addition, on June 7, 1999, the Commission held a public conference in Docket No. PL99-2-000 on the issue of anticipated natural gas demand in the northeastern United States over the next two decades, the timing and the type of growth, and the effect projected growth will have on existing pipeline capacity.  All segments of the industry presented their views at the conference and subsequently filed comments on those issues.

---

[1]Notice of Proposed Rulemaking, Regulation of Short-term Natural Gas Transportation Services, 63 Fed. Reg. 42982, 84 FERC ¶ 61,087 (1998).

[2]Notice of Inquiry, Regulation of Interstate Natural Gas Transportation Services, 63 Fed. Reg. 42974, 84 FERC ¶ 61,087 (July 29, 1998).

Docket No. PL99-3-000                                                                    –2–

Information received in these proceedings as well as recent experience evaluating proposals for new pipeline construction persuade us that it is time for the Commission to revisit its policy for certificating new construction not covered by the optional or blanket certificate authorizations.[3]  In particular the Commission's policy for determining whether there is a need for a specific project and whether, on balance, the project will serve the public interest.  Many urge that there is a need for the Commission to authorize new pipeline capacity to meet the growing demand for natural gas.  At the same time, others already worried about the potential for capacity turnback, have urged the Commission to be cautious because of concerns about the potential for creating a surplus of capacity that could adversely affect existing pipelines and their captive customers.

Accordingly, the Commission is issuing this policy statement to provide the industry with guidance as to how the Commission will evaluate proposals for certificating new construction.  This should provide more certainty about how the Commission will evaluate new construction projects that are proposed to meet growth in the demand for natural gas at the same time that some existing pipelines are concerned about the potential for capacity turnback.   In considering the impact of new construction projects on existing pipelines, the Commission's goal is to appropriately consider the enhancement of competitive transportation alternatives, the possibility of overbuilding, the avoidance of unnecessary disruption of the environment, and the unneeded exercise of eminent domain.  Of course, this policy statement is not a rule.  In stating the evaluation criteria, it is the Commission's intent to evaluate specific proposals based on the facts and circumstances relevant to the application and to apply the criteria on a case-by-case basis.

I.      Comments Received on the NOPR

In the NOPR the Commission explained  that it wants to assure that its policies strike the proper balance between the enhancement of competitive alternatives and the possibility of over building.  The Commission asked for comments on whether proposed projects that will establish a new right-of-way in order to compete for existing market share should be subject to the same considerations as projects that will cut a new right-of-way in order to extend gas service to a frontier market area.  Also, in reassessing project need, the Commission said that it was considering how best to balance demonstrated

---

[3]This policy statement does not apply to construction authorized under 18 CFR Part 157, Subparts E and F.

Docket No. PL99-3-000                                                                                 −3−

market demand against potential adverse environmental impacts and private property
rights in weighing whether a project is required by the public convenience and necessity.

     The Commission asked commenters to offer views on three options:  One option
would be for the Commission to authorize all applications that at a minimum meet the
regulatory requirements, then let the market pick winners and losers.  Another would be
for the Commission to select a single project to serve a given market and exclude all other
competitors.  Another possible option would be for the Commission to approve an
environmentally acceptable right-of-way and let potential builders compete for a
certificate.

     In addition, the Commission asked commenters to consider the following
questions:   (1) Should the Commission look behind the precedent agreement or contracts
presented as evidence of market demand to assess independently the market's need for
additional gas service? (2) Should the Commission apply a different standard to precedent
agreements or contracts with affiliates than with non-affiliates?  For example, should a
proposal supported by affiliate agreements have to show a higher percentage of
contracted-for capacity than a proposal supported by non-affiliate agreements, or, should
all proposed projects be required to show a minimum percent of non-affiliate support? (3)
Are precedent agreements primarily with affiliates sufficient to meet the statutory
requirement that construction must be required by the public convenience and necessity,
and, if so, (4) Should the Commission permit rolled-in rate treatment for facilities built to
serve a pipeline affiliate?  (5) Should the Commission, in an effort to check overbuilding
and capacity turnback, take a harder look at proposals that are designed to compete for
existing market share rather than bring service to a new customer base, and what
particular criteria should be applied in looking at competitive applications versus new
market applications? (6) Should the Commission encourage pre-filing resolution of
landowner issues by subjecting proposed projects to a diminished degree of scrutiny
where the project sponsor is able to demonstrate it has obtained all necessary right-of-way
authority? (7) Should a different standard be applied to project sponsors who do not plan
to use either federal or state-granted rights of eminent domain to acquire right-of-way?

    A.    <u>Reliance on Market Forces to Determine Optimal Sizing and
           Route for New Facilities</u>

     PG&E, Process Gas Consumers (PGC), Tejas Gas, Washington Gas, Columbia,
Market Hub Partners, and Ohio PUC agree that the Commission should continue to let the
market decide which projects to pursue.  PG&E states that the Commission should
authorize all projects that meet minimum regulatory requirements, looking at whether the
project will serve new or existing markets, the firmness of commitments and
environmental and property right issues.  PGC urges the Commission to refrain from

Docket No. PL99-3-000                                                                  –4–

second guessing customers' decisions. Tejas suggests that the Commission rely on the market to the maximum extent; regulatory changes that affect risk/reward allocation will increase regulatory risk and deter new investment. Washington Gas suggests letting the market decide on new construction with market based rates subject only to environmental review and landowner concerns. Columbia comments that it would not be economically efficient to protect competitors from the competition created by new capacity. Market Hub Partners specifies that, when there is no eminent domain involved, the focus should be on competition, not protecting individual competitors from overbuilding. Ohio PUC supports authorizing all applications for new capacity certification which meet the minimum regulatory requirements. Ohio PUC does not support approving a single pipeline's application while excluding all others.

The Regulatory Studies Program of the Mercatus Center, George Mason University suggests allowing projects to be proposed with no certification requirements, but allowing competitors to challenge the need. Investors would be at risk for all investments. Tejas proposes holding pipelines at risk for reduced throughput, thereby avoiding shifting the risk to customers.

On the issue of overbuilding, Millennium, Enron, PGC, Columbia, and Wisconsin PSC disagree with the presumption that overbuilding must be avoided. Millennium asserts that all competitive markets have excess capacity. Enron urges the Commission to be receptive to overbuilding in areas of rapid growth, difficult construction, and environmental sensitivity. PGC agrees that some capacity in excess of initial demand may make environmental and economic sense in that it will reduce the need for future construction, but argues that the pipelines be at risk for those facilities. Columbia alleges that the concern about overbuilding is misguided. Wisconsin PSC contends that concerns of overbuilding should not operate to limit the availability of competitive alternatives to customers currently without choices of pipeline provider. Wisconsin PSC believes the elimination of the discount adjustment mechanism and the imposition of reasonable at risk provisions for new construction will deter pipelines from overbuilding.

On the other hand, UGI recommends that overbuilding be minimized. UGI states that the Commission should ensure a reasonable fit between supply and demand. The Commission should limit certification of new projects to ones which demonstrate unmet demand or demand growth over 1-3 years.

Coastal stresses that competition should not be the only or primary factor in deciding the public convenience and necessity.

Amoco contends that, if the Commission chooses the right-of-way, it will in many cases have chosen the parties that will ultimately build the pipeline. Amoco urges the

Docket No. PL99-3-000                                                                    −5−

Commission not substitute its judgement for that of the marketplace unless there are
overwhelming environmental concerns.  Tejas also objects to the option of the
Commission approving an environmentally acceptable right-of-way and letting potential
builders compete for a certificate because it believes it would be difficult for the
Commission to implement.

    Colorado Springs supports the concept of having the Commission select a single
project in a given corridor rather than letting the market pick winners and losers.

    PGC and Ohio PUC recommend that the Commission authorize all construction
applications meeting certain threshold requirements, leaving the market to decide winners
and losers.  PGC urge the Commission to facilitate construction of new pipelines that will
increase the potential for gas flows.  Under no circumstances should the Commission
deny a certificate based on a complaint by an LDC or a competing pipeline that new
construction will hurt their market position or ability to recover costs.  The Commission
should not afford protection to traditional suppliers or transporters by constraining the
development of new pipeline capacity.

    PGC believes that only in unusual situations, where insuperable environmental
barriers cannot be resolved through normal mitigation measures, should the Commission
select an acceptable right-of-way.  Ohio PUC does not support approving a single
pipeline's application while excluding all others.  Ohio PUC recommends having market
forces guide construction projects unless or until obvious shortcomings begin to emerge.
In such instances, the option of designating a single right-of-way with competition for the
certificate could be used to spur needed construction.

    B.    Reliance on Contracts to Demonstrate Demand

    A number of parties comment that there is no reason to change the current policy
regarding certificate need (AlliedSignal, Millennium, Southern Natural, Tejas, Williston,
Columbia).  National Fuel Gas Supply believes the Commission should keep shipper
commitment as the test because it is more accurate than market studies.  National Fuel
Gas Supply further believes the Commission's present reliance on market forces to
establish need, and its environmental review process, form the best approach to reviewing
certificate applications.  Foothills agrees, but states that a new, flexible regulatory
structure for existing pipelines is needed.  Indicated Shippers also wants to keep the
current policy, but stresses that expedition in processing is needed to lower entry barriers.

    Amoco, Consolidated Natural, and Columbia urged the Commission to continue
requiring sufficient binding long-term contracts for firm capacity.  Millennium and Tejas
stated that there is no need to develop different tests for different markets.  Columbia also

Docket No. PL99-3-000                                                     –6–

argued that there is no need to look behind contracts.  Williams argues that the
Commission should not second guess contracts or make an independent market analysis.
Williston alleges that reviewing the firmness of private contracts is ineffectual and futile.
 Market Hub Partners cautions the Commission not to substitute its judgement for that of
the marketplace.

        PGC argues that there should be no change to current policy where construction
affects landowners.  Eminent domain is a necessary tool to delivering clean burning
natural gas to growing markets; no individual landowners should be given a veto over
pipeline construction.  PGC adds that the absence of prefiling right-of-way agreements
does not mean that a project is less good or necessary or should be treated more harshly.
Southern Natural, Millennium, and National Fuel Gas Supply agree that no market
preference should be given for projects that do not use eminent domain.  National Fuel
Gas Supply agrees that such a preference would tilt the power balance to landowners.
Millennium argues that the Commission should not establish certificate preferences for
pipelines that do not require eminent domain; such preferences are not needed because a
pipeline that does not want to use eminent domain can already build projects under
Section 311.

        On the other hand, Amoco, El Paso/Tennessee, ConEd, and Wisconsin PSC
recommend modifying the current policy.  El Paso/Tennessee recommend that the
Commission look behind all precedent agreements to see if real markets exist.  ConEd
suggests considering forecasts for market growth; if there is a disparity with the proposal,
the Commission should look at all circumstances.  Wisconsin PSC urges the Commission
to consider market saturation and growth prospects by looking at market power (HHIs)
and the degree of rate discounting in a market.  Amoco suggests that the Commission
analyze all relevant data. Peco Energy believes the current Commission policy, which
provides for minimal market justification for authorizing construction of incremental
facilities, coupled with its presumption in favor of rolled-in rate treatment, has
contributed to discouraging existing firm shippers from embracing longer term capacity
contracts.

        Consolidated Natural recommends creating a settlement forum for market demand
and reverse open season issues.  Washington Gas urges the Commission to adopt an open
entry, "let the market decide" policy.  IPAA supports a need analysis focusing on the
ability of existing capacity to handle projected demand.  IPAA alleges that the overall
infrastructure is already in place to supply current demand projections.

        Some commenters support a sliding scale approach to determine need.  ConEd
states that the Commission should determine need on a case-by-case basis, using different
standards for large or small projects.  Enron advocates use of a sliding scale, requiring

Docket No. PL99-3-000                                                                        −7−

more market support for projects with more landowner and/or environmental impact. Enron supports requiring no market showing for projects using existing easements or mutually agreed upon easements. Enron also suggests, in addition to requiring that at least 25% of the precedent agreements supporting a project be with non-affiliates, that the Commission relax its market analysis if 75% or more of those agreements are with non-affiliates. Enron would require more market data for an affiliate-backed project. American Forest & Paper would allow negotiation of risk if there is no subsidy by existing customers. Sempra and UGI urge the Commission to look at whether projects serve identifiable, new or growing markets. NARUC states that each state is unique and that the Commission should consider those differences. Market Hub Partners believes that a project which is at risk, requires little or no eminent domain authority, and has potential to bring competition to a market that is already being served by pipelines and storage operators with market power should be expedited.

The development in recent years of certificate applicants' use of contracts with affiliates to demonstrate market support for projects has generated opposition from affected landowners and competitor pipelines who question whether the contracts represent real market demand. ConEd, Ohio PUC, and Enron believe that a different standard should be applied to affiliates. ConEd argues that the at risk condition is inadequate when a pipeline serves a market served by an affiliate; risk is shifted. Ohio PUC states that pipelines should shoulder the increased risk and that the Commission should look behind contracts with affiliates. Enron would require more market data for affiliate-backed projects and would require that all projects be supported by precedent agreements at least 25% of which are with non-affiliates.

Nevertheless, most of the commenters support applying the same standard to contracts for new capacity with affiliates as non-affiliates. Amoco, Coastal, Millennium, National Fuel, Southern Natural, Tejas, Texas Eastern, Columbia, Market Hub Partners, El Paso/Tennessee, and PGC all support applying the same standard to affiliates as non-affiliates. Market Hub argues that a contract is a contract; treating affiliates differently would be in the interest of incumbent monopolists. El Paso/Tennessee agree that affiliate precedent agreements are sufficient as long as they are supported by market demand. PGC agrees that the same standard should apply as long as the proposed capacity is offered on a non-discriminatory basis to all in an open season. Amoco makes an exception for marketing affiliates, arguing that they do not represent new demand. Columbia also makes an exception for affiliates that are created just to show market for a project.

Other parties also offered comments on affiliate issues. PGC recommends addressing affiliate issues on a case-by-case basis. Exxon supports offering comparable deals to non-affiliates. If there is insufficient capacity, it should be prorated. AGA

Docket No. PL99-3-000                                              −8−

supports prohibiting discount adjustments connected with new construction by pipelines or affiliates. National Fuel Gas Supply and Tejas support permitting rolled-in rates for facilities to serve affiliates. PGC argues that there should be no presumption of rolled in rates for affiliates.

The commenters also express concern with the current policy's effect on existing pipelines and their captive customers when the Commission approves pipeline projects proposed to serve the same market. In those cases, they believe that need should be measured differently by, for example, assessing the impact on existing capacity or requiring a strong incremental market showing and more scrutiny of the net benefits. They urge the Commission to balance all the relevant factors before issuing a certificate. A number of parties argued that need should be measured differently when a project is proposed to serve an existing market. UGI urges requiring a strong market showing for such projects. Coastal proposes that the Commission fully integrate the standards announced by the courts [4] with its certificate construction policies, balancing all the relevant factors including the ability of the existing provider to provide the service. El Paso/Tennessee would require more scrutiny of the net benefit. Sempra would require that, prior to construction, all shippers be given the opportunity to turn back capacity. Similarly, Texas Eastern would require the pipeline to use unsubscribed capacity before construction (e.g., a reverse auction).

Other commenters oppose a policy requiring a harder look at projects proposed to serve existing markets. They maintain that market demand for service in order to escape dependence on a dominant pipeline supplier should be accorded the same weight as demand by new incremental load growth. They contend that the benefits of competition and potentially lower gas prices for consumers should control over claims that an existing pipeline needs to be insulated from competition because its revenues may decrease. National Fuel Gas Supply, PGC, Florida Cities, Market Hub Partners, and Southern Natural in particular object to having different policies for new or existing pipelines.

---

[4] Citing FPC v. Transcontinental Gas Pipeline Corp., 365 U.S. 1, 23 (1961) and Scenic Hudson Preservation Conference v. FERC, 354 F.2d. 608, 620 (2nd Cir. 1965)

Docket No. PL99-3-000                                                    −9−

National Fuel Gas Supply contends that generally the policies on new construction and existing pipelines should match. PGC opposes any policy that protects incumbents by requiring a harder look at projects proposed to serve existing markets rather than new demand. Many existing markets have unmet demand. Likewise, Florida Cities is concerned that the NOPR is intended to elicit a new policy where the import and influence of competition is downplayed to minimize or eliminate the risk of unsubscribed capacity on existing pipelines. Florida Cities supports pipeline-on-pipeline competition as a primary factor in determining which new capacity projects receive certificate authority and are constructed. Florida Cities believes that additional pipeline competition would benefit customers and any generic policy that would decrease or inhibit pipeline competition would not be in the best interest of the consumers the Commission is obliged to protect. Market Hub Partners urges the Commission to attempt to limit market incumbents' ability to forestall competition by defeating the efforts of new market entrants to build or operate new capacity. Market Hub Partners contend that incumbents protest on the basis of project safety and environmental concerns when they are primarily concerned with their own welfare and market share. Southern Natural contends the NGA does not permit a rule disfavoring projects that enhance competitive alternatives. Taking a harder look at competitive proposals would effect a preference for monopoly, clearly not endorsed by the NGA or the Courts of Appeal.

Wisconsin Distributor Group believes that meaningful pipe-on-pipe competition can only exist where there are choices among or between pipelines and unsubscribed firm capacity exists. Wisconsin Distributor Group argues the Commission should view favorably new pipeline projects that propose to create competition by introducing an alternative pipeline to markets where no choices exist. Wisconsin Distributor Group contends the Commission's policy should not be driven by self-protective arguments but by the need for competitive alternatives. Wisconsin Distributor Group supports the Commission's analysis in Alliance and Southern because it considers the benefits of competition and potentially lower gas prices for consumers as controlling over claims that an existing pipeline needs to be insulated from competition because its revenues may decrease. Market demand for service in order to escape dependence on a dominant pipeline supplier should be accorded the same weight as demand by new incremental load growth.

UGI, Sempra, and El Paso/Tennessee would require assessing the impact on existing capacity. Sempra states that if existing rates are below the maximum rate, new capacity may not be needed. Sempra adds that the Commission should look at whether expansion capacity can stand on its own without rolled-in treatment. Texas Eastern believes the Commission must consider how best to use existing unsubscribed capacity and capacity that has been turned back to pipelines.

Docket No. PL99-3-000                                                      −10−

### C.    The Pricing of New Facilities

A number of commenters submit that the existing presumption in favor of rolled-in rates for pipeline expansions sends the wrong price signals with regard to pricing new construction.  They urge the Commission to adopt policies such as incremental pricing for pipeline projects or placing pipelines at risk for recovery of the costs of construction. They submit that such a policy would reveal the true value of existing capacity and properly allocate costs and risks.  A number of parties also raised issues concerning rate design in general, but the Commission is deferring for now consideration of those kinds of issues which also affect the Commission's policies for existing pipelines in order to focus on issues concerning the certification of new pipeline construction.

AGA, ConEd, and Michigan Consolidated stress the importance of ensuring the right price signals.  AGA urges the Commission to adopt policies that reveal the true value of existing capacity.  ConEd states that rate policies should send proper price signals by properly allocating costs and risks.

AGA contends that the Commission's certification policies should protect recourse shippers.  AGA and BG&E recommend that the Commission ensure that pipelines are not able to impose the costs of new capacity or the costs of consequent unsubscribed existing capacity on recourse shippers.  Amoco asserts pipelines should be at risk for unsubscribed capacity.  Similarly, AGA and Philadelphia Gas Works urge the Commission to ensure that pipelines are at risk for unsubscribed capacity relating to construction projects by the pipeline or its affiliate.  However, Tejas believes that treatment of any under recovery must address the unique circumstances of deepwater pipelines.

APGA argues that, if the Commission allows initial rates based on the life of the contract rather than the useful life of facilities, the Commission must at least require a uniform contract with the same terms and conditions for all customers involved in the expansion.

The Williams Companies recommend that all new capacity be subject to market-based rates.  The Williams Companies argue that, for new capacity priced on an incremental basis rather than a rolled-in basis, competitive circumstances in the industry support the use of market-based rates and terms of service.

AlliedSignal contends depreciation should be based on the life of the facilities not the life of a contract.  If the Commission were to promulgate a general rule, it should state that depreciation rates for pipeline facilities in rate and certificate cases should be set at 25 years unless factors are brought to the Commission's attention justifying a lesser or longer time period.  NGSA believes that the Commission's current depreciation

Docket No. PL99-3-000                                                     −11−

methodology is appropriate.  NGSA also urges that the appropriate asset life of new facilities be determined when the facilities are constructed and adhered to for the life of the asset.  On the other hand, the Williams Companies point out that market-based rates would negate the need for the Commission to approve depreciation rates.

Coastal believes pipelines should have the flexibility to address new facility costs in certificate applications and in rate cases.  The Commission should not establish hard and fast rules as to how a facility should be treated in a pipeline's rates over its entire life. Rather, costs should be dealt with in accordance with Commission policies from time to time in pipeline rate cases.

Enron Pipelines contend that the rate treatment for capacity additions should continue to be determined on a case-by-case basis using the system benefits test.

Louisville contends that the Commission should address the question of whether its pricing policies for new capacity provide appropriate incentives at the same time as it considers auctions and negotiated rates and services and that all of these issues should be the subject of a new NOPR.

PGC suggest that initial rates be based on a presumed level of contract commitment (e.g., 80-90%) so the pipeline bears the risks of uncommitted capacity but reaps a reward if it sells at undiscounted rates.  Another option  would be for the Commission to put at risk only that portion of the proposed facilities for which the pipeline has not obtained firm contracts of a minimum duration.  Where an existing pipeline constructs new facilities, PGC support the Commission's current policy favoring rolled-in rates if certain conditions are met.

Williston Basin argues that fixed rates for long-term contracts would create a relatively risk-free contract for shippers while creating a total-risk contract for pipelines.

 Arkansas, IPAA, Indicated Shippers, National Fuel Gas Supply, NGSA, Peoples Energy, PGC, and the Williams Companies support the Commission's current policy with its presumption in favor of rolled-in pricing for new capacity only when the impact of new capacity is not more than a 5% increase to existing rates and results in system-wide benefits.  AGA, Amoco, IPAA, Philadelphia Gas Works, PGC, and UGI recommend that the Commission more rigidly apply its pricing policy and more closely review claims pertaining to the 5% threshold test and/or system benefits.  Nicor urges that pipelines should not be allowed to segment construction with the goal of falling below the 5% pricing policy threshold.

Docket No. PL99-3-000                                                    –12–

APGA and Consolidated Edison recommend that the Commission adopt a presumption of incremental pricing for pipeline certificate projects.  APGA would allow limited exceptions such as when the project would lower rates to existing customers or when the benefits of the project would fully offset the costs of the roll-in.  Koch Gateway and Pennsylvania Consumer Advocate also recommend incremental pricing for new capacity.

Arkansas and Brooklyn Union contend that pipelines should be at risk for the recovery of the costs of incremental facilities.  Brooklyn Union urges the Commission to eliminate the presumption in favor of rolled-in pricing for new capacity and require pipelines to show the benefits of each new project are proportionate to the total rate increase sought.

El Paso/Tennessee recommend that only fully subscribed projects with revenues equaling or exceeding project costs and supported by demonstrated market need should be eligible for rolled-in rates.  El Paso/Tennessee believe that projects intended to compete for existing market should not be eligible for rolled-in rates.

New York questions the 5% presumption for rolled-in pricing and argues that a move away from rolled-in pricing would create competitive markets for new pipeline construction.

AlliedSignal believes pipelines should be at risk for costs relative to new services prior to filing a new rate case.  In the new rate case, the burden should be on the pipeline to justify the proper allocation of costs.

Amoco suggests that the pipeline and customer be allowed to enter into any agreement that does not violate existing regulations or statutory requirements, but they must explicitly apportion any risk between themselves.

The Illinois Commerce Commission believes this issue needs more research and should not be addressed until state regulators are consulted further.

Market Hub Partners and PGC contend that rolled-in rate treatment should not be granted for facilities solely or principally being constructed on the basis of affiliate precedent agreements.  On the other hand, Millennium asserts that affiliates and non-affiliates should be treated alike with respect to rate design.  Also, Southern Natural argues that the fact that an affiliate subscribed for capacity on new facilities cannot alone preclude rolled-in pricing for those facilities; the Commission must leave to individual cases the issue of whether to price facilities on a rolled-in or incremental basis.

Docket No. PL99-3-000                                                    −13−

Nicor argues that the Commission cannot, in a competitive marketplace, evaluate the enhancements claimed by the pipeline to determine whether new construction should be incrementally priced or receive rolled-in rate treatment.  Instead of imposing rolled-in rate treatment on the entire system, the Commission should allow individual "old" shippers to decide whether the supposed benefits are worth the costs.

Pipeline Transportation Customer Coalition contends the existing regulatory process does not reflect a reasonable risk-reward balance between industry segments, asserting that pipeline rates are too high given their relatively low risk exposure.

II.    Certificate Policy Goals and Objectives

The comments present a variety of perspectives and no clear consensus on a path the Commission should follow.   Nevertheless, the starting point for the Commission's reassessment of its certificate policy is to define the goals and objectives to be achieved. An effective certificate policy should further the goals and objectives of the Commission's natural gas regulatory policies.  In particular, it should be designed to foster competitive markets, protect captive customers, and avoid unnecessary environmental and community impacts while serving increasing demands for natural gas.  It should also provide appropriate incentives for the optimal level of construction and efficient customer choices.

Commission policy should give the applicant an incentive to file a complete application that can be processed expeditiously and to develop a record that supports the need for the proposed project and the public benefits to be obtained.  Commission certificate policy should also provide an incentive for applicants to structure their projects to avoid, or minimize, the potential adverse impacts that could result from construction of the project.

The Commission intends the certificate policy introduced in this order to provide an analytical framework for deciding, consistent with the goals and objectives stated above, when a proposed project is required by the public convenience and necessity.  In some respects this policy is not a significant change from the kind of analysis employed currently in certificate cases.  By stating more explicitly the Commission's analytical framework, the Commission can provide applicants and other participants in certificate proceedings a better understanding of how the Commission makes its decisions.  By encouraging applicants to devote more effort before filing to minimize the adverse effects of a project, the policy gives them the ability to expedite the decisional process by working out contentious issues in advance.  Thus, this policy will provide more certainty about the Commission's analytical process and provide participants in certificate

Docket No. PL99-3-000                                                  −14−

proceedings with a framework for shaping the record that is needed by the Commission to expedite its decisional process.

III.    Evaluation of Current Policy

    A.    Current Policy

Section 1(b) of the Natural Gas Act (NGA) gives the Commission jurisdiction over the transportation of natural gas in interstate commerce and the natural gas companies providing that transportation.[5]  Section 7(c) of the NGA  provides that no natural gas company shall transport natural gas or construct any facilities for such transportation without a certificate of public convenience and necessity issued by the Commission.[6]

In reaching a final determination on whether a project will be in the public convenience and necessity, the Commission performs a flexible balancing process during which it weighs  the factors presented in a particular application.  Among the factors that the Commission considers in the balancing process are the proposal's market support, economic, operational, and competitive benefits, and environmental impact.

Under the Commission's current certificate policy, an applicant for a certificate of public convenience and necessity to construct a new pipeline project must show market support through contractual commitments for at least 25 percent of the capacity for the application to be processed by the Commission.  An applicant showing 10-year firm commitments for all of its capacity, and/or that revenues will exceed costs is eligible to receive a traditional certificate of public convenience and necessity.

An applicant unable to show the required level of commitment may still receive a certificate but it will be subject to a condition putting the applicant "at risk."  In other words, if  the project revenues fail to recover the costs, the pipeline rather than its customers will be responsible for the unrecovered costs.  Alternatively, a project sponsor can apply for a certificate under Subpart E of Part 157 of the Commission's regulations for an optional certificate.[7]  An optional certificate may be granted to an applicant without any market showing at all; however, in practice optional certificate applicants

---

[5] 15 USC 717.

[6] 15 USC 717h.

[7] 18 CFR Part 157, Subpart E.

Docket No. PL99-3-000                                                              −15−

usually make some form of market showing.  The rates for service provided through facilities constructed pursuant to an optional certificate must be designed to impose the economic risk of the project entirely on the applicant.

The Commission also has certificated projects that would serve no new market, but would provide some demonstrated system-benefit.  Examples include projects intended to provide improved system reliability, access to new supplies, or more economic operations.

Generally, under the current policy, the Commission does not deny an application because of the possible economic impact of a proposed project on existing pipelines serving the same market or on the existing pipelines' customers.  In addition, the Commission gives equal weight to contracts between an applicant and its affiliates and an applicant and unrelated third parties and does not look behind the contracts to determine whether the customer commitments represent genuine growth in market demand.[8]

Under section 7(h) of the NGA, a pipeline with a Commission-issued certificate has the right to exercise eminent domain to acquire the land necessary to construct and operate its proposed new pipeline when it cannot reach a voluntary agreement with the landowner.[9]  In recent years, this has resulted in landowners becoming increasingly active before the Commission.  Landowners and communities often object both to the taking of land and to  the reduction of their land's value due to a pipeline's right-of-way running through the property.  As part of its environmental review of pipeline projects, the Commission's environmental staff works to take these landowners' concerns into account, and to mitigate adverse impacts where possible and feasible.

Under the pricing policy for new facilities in Docket No. PL94-4-000,[10] the Commission determines, in the certificate proceeding authorizing the facilities' construction, the appropriate pricing for the facilities.  Generally, the Commission applies a presumption in favor of rolled-in rates (rolling-in the expansion costs with the existing

---

[8] See, e.g., Transcontinental Gas Pipe Line Corp., 82 FERC ¶ 61,084 at 61,316 (1998).

[9] 15 USC 717f(h).

[10] See Pricing Policy for New and Existing Facilities  Constructed by Interstate Natural Gas Pipelines, 71 FERC ¶ 61,241 (1995).

Docket No. PL99-3-000                                                                      −16−

facilities' costs) when the cost impact of the new facilities would result in a rate impact on existing customers of five percent or less, and some system benefits would occur. Existing customers generally bear these rate increases without being allowed to adjust their volumes.

When a pipeline proposes to charge a cost-based incremental rate (establishing separate costs-of-service and separate rates for the existing and expansion facilities) higher than its existing generally applicable rates, the Commission usually approves the proposal. However, the Commission generally will not accept a proposed incremental rate that is lower than the pipeline's existing generally applicable Part 284 rate.

B.      Drawbacks of the Current Policy

1.      Reliance on Contracts to Demonstrate Demand

Currently, the Commission uses the percentage of capacity under long-term contracts as the only measure of the demand for a proposed project. Many of the commenters have argued that this is too narrow a test. The reliance solely on long-term contracts to demonstrate demand does not test for all the public benefits that can be achieved by a proposed project. The public benefits may include such factors as the environmental advantages of gas over other fuels, lower fuel costs, access to new supply sources or the connection of new supply to the interstate grid, the elimination of pipeline facility constraints, better service from access to competitive transportation options, and the need for an adequate pipeline infrastructure. The amount of capacity under contract is not a good indicator of all these benefits.

The amount of capacity under contract also is not a sufficient indicator by itself of the need for a project, because the industry has been moving to a practice of relying on short-term contracts, and pipeline capacity is often managed by an entity that is not the actual purchaser of the gas. Using contracts as the primary indicator of market support for the proposed pipeline project also raises additional issues when the contracts are held by pipeline affiliates. Thus, the test relying on the percent of capacity contracted does not reflect the reality of the natural gas industry's structure and presents difficult issues.

In addition, the current policy's preference for contracts with 10-year terms biases customer choices toward longer term contracts. Of course, there are other elements of the Commission's policies that also have this effect. However, eliminating a specific requirement for a contract of a particular length is more consistent with the Commission's regulatory objective to provide appropriate incentives for efficient customer choices and the optimal level of construction, without biasing those choices through regulatory policies.

Docket No. PL99-3-000                                                                    −17−

Finally, by relying almost exclusively on contract standards to establish the market need for a new project, the current policy makes it difficult to articulate to landowners and community interests why their land must be used for a new pipeline project.

All of these concerns raise difficult questions of establishing the public need for the project.

## 2. The Pricing of New Facilities

As the industry becomes more competitive the Commission needs to adapt its policies to ensure that they provide the correct regulatory incentives to achieve the Commission's policy goals and objectives.  All of the Commission's natural gas policy goals and objectives are affected by its pricing policy, but directly affected are the goals of fostering competitive markets, protecting captive customers, and providing incentives for the optimal level of construction and efficient customer choice. The current pricing policy focuses primarily on the interests of the expanding pipeline and its existing and new shippers, giving little weight to the interests of competing pipelines or their captive customers.  As a result, it no longer fits well with an industry that is increasingly characterized by competition between pipelines.

The current pricing policy sends the wrong price signals, as some commenters have argued, by masking the real cost of the expansions.  This can result in overbuilding of capacity and subsidization of an incumbent pipeline in its competition with potential new entrants for expanding markets.  The pricing policy's bias for rolled-in pricing also is inconsistent with a policy that encourages competition while seeking to provide incentives for the optimal level of construction and customer choice.  This is because rolled-in pricing often results in projects that are subsidized by existing ratepayers.  Under this policy the true costs of the project are not seen by the market or the new customers, leading to inefficient investment and contracting decisions.  This in turn can exacerbate adverse environmental impacts, distort competition between pipelines for new customers, and financially penalize existing customers of expanding pipelines and of pipelines affected by the expansion.

Under existing policy, shippers' rates may change for a number of reasons.  These include rolling-in of an expansion's costs, changes in the discounts given other customers, or changes in the contract quantities flowing on the system.  As a customer's rates change in a rate case, it is generally unable to change its volumes, even though it may be paying more for capacity.  This results in shippers bearing substantial risks of rate changes which they may be ill equipped to bear.

Docket No. PL99-3-000                                                                –18–

III.    The New Policy

        A.  Summary of the Policy

        As a result of the Commission's reassessment of its current policy, the Commission has decided to announce the criteria, set forth below, that it will use in deciding whether to authorize the construction of major new pipeline facilities.  This section summarizes the analytical steps the Commission will use under this policy to balance the public benefits against the potential adverse consequences of an application for new pipeline construction.  Each of these steps is described in greater detail in the later sections of this policy statement.

        Once a certificate application is filed, the threshold question applicable to existing pipelines is whether the project can proceed without subsidies from their existing customers.  As discussed below, this will usually mean that the project would be incrementally priced, if built by an existing pipeline, but there are cases where rolled in pricing would prevent subsidization of the project by the existing customers.[11]

        The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the existing customers of the pipeline proposing the project, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline.  These three interests are discussed in more detail below.  This is not intended to be a decisional step in the process for the Commission.  Rather, this is a point where the Commission will review the efforts made by the applicant and  could assist the applicant in finding ways to mitigate the effects, but the choice of how to structure the project at this stage is left to the applicant's discretion.

        If the proposed project will not have any adverse effect on the existing customers of the expanding pipeline, existing pipelines in the market and their captive customers, or the economic interests of landowners and communities affected by the route of the new pipeline, then no balancing of benefits against adverse effects would be necessary.  The Commission would proceed, as it does under current practice, to a preliminary

——————————————

        [11]This policy does not apply to construction authorized under 18 CFR Part 157, Subparts E and F.

Docket No. PL99-3-000                                                          −19−

determination or a final order depending on the time required to complete an environmental assessment (EA) or environmental impact statement (EIS)(whichever is required in the case).

If residual adverse effects on the three interests are identified, after efforts have been made to minimize them, then the Commission will proceed to evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will the Commission then proceed to complete the environmental analysis where other interests are considered.  It is possible at this stage for the Commission to identify conditions that it could impose on the certificate that would further minimize or eliminate adverse impacts and take those into account in balancing the benefits against the adverse effects.   If the result of the balancing is a conclusion that the public benefits outweigh the adverse effects then the next steps would be the same as for a project that had no adverse effects.  That is, if the EA or EIS would take more than approximately 180 days then a preliminary determination could be issued, followed by the EA or EIS and the final order.  If the EA would take less time, then it would be combined with the final order.

      B.     The Threshold Requirement - No Financial Subsidies

The threshold requirement in establishing the public convenience and necessity for existing pipelines proposing an expansion project is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers.[12]   This does not mean that the project sponsor has to bear all the financial risk

---

[12]Projects designed to improve existing service for existing customers, by replacing existing capacity, improving reliability or providing flexibility, are for the benefit of existing customers.  Increasing the rates of the existing customers to pay for these improvements is not a subsidy.  Under current policy these kinds of projects are permitted to be rolled in and are not covered by the presumption of the current pricing

Docket No. PL99-3-000                                                          −20−

of the project; the risk can be shared with the new customers in preconstruction contracts, but it cannot be shifted to existing customers.  For new pipeline companies, without existing customers, this requirement will have no application.

The requirement that the project be able to stand on its own financially without subsidies changes the current pricing policy which has a presumption in favor of rolled-in pricing.  Eliminating the subsidization usually inherent in rolled-in rates recognizes that a policy of incrementally pricing facilities sends the proper price signals to the market.  With a policy of incremental pricing, the market will then decide whether a project is financially viable.  The commenters were divided on whether the Commission should change its current pricing policy.  A number of commenters, however,  urged the Commission to allow the market  to decide which projects should be built, and this requirement is a way of accomplishing that result.

The requirement helps to address all of the interests that could be adversely affected.  Existing customers of the expanding pipeline should not have to subsidize a project that does not serve them.  Landowners should not be subject to eminent domain for projects that are not financially viable and therefore may not be viable in the marketplace.  Existing pipelines should not have to compete against new entrants into their markets whose projects receive a financial subsidy (via rolled-in rates), and neither pipeline's captive customers should have to shoulder the costs of unused capacity that results from competing projects that are not financially viable.  This is the only condition that uniformly serves to avoid adverse effects on all of the relevant interests and therefore should be a test for all proposed expansion projects by existing pipelines.  It will be the predicate for the rest of the evaluation of a new project by an existing pipeline.

---

policy.  Great Lakes Gas Transmission Limited Partnership, 80 FERC ¶ 61,105 (1997) (Pricing policy statement not applicable to facilities constructed solely for flexibility and system reliability).

USCA Case #12-1481     Document #1447551       Filed: 07/19/2013      Page 136 of 177

A requirement that the new project must be financially viable without subsidies does not eliminate the possibility that in some instances the project costs should be rolled into the rates of existing customers.  In most instances incremental pricing will avoid subsidies for the new project, but the situation may be different in cases of inexpensive expansibility that is made possible because of earlier, costly construction.  In that instance, because the existing customers bear the cost of the earlier, more costly construction in their rates, incremental pricing could result in the new customers receiving a subsidy from the existing customers because the new customers would not face the full cost of the construction that makes their new service possible.  The issue of the rate treatment for such cheap expansibility is one that always should be resolved in advance, before the construction of the pipeline.

Another instance where a form of rolling in would be appropriate is where a pipeline has vintages of capacity and thus charges shippers different prices for the same service under incremental pricing, and some customers have the right of first refusal (ROFR) to renew their expiring contracts.  Those customers could be allowed to exercise a ROFR at their original contract rate except when the incremental capacity is fully subscribed and there are competing bids for the existing customer's capacity.  In that case, the existing customer could be required to match the highest competing bid up to a maximum rate which could be either an incremental rate or a "rolled-up rate" in which costs for expansions are accumulated to yield an average expansion rate.  Although the focus of this policy statement is the analysis for deciding whether new capacity should be constructed, it is important for the Commission to articulate the direction of its policy on pricing existing capacity where a pipeline has engaged in expansions.  This will enable existing and potential new shippers to make appropriate decisions pre-construction to protect their interests either in the certificate proceeding or in their contracts with the pipeline.

This policy leaves the pipeline responsible for the costs of new capacity that is not fully utilized and obviates the need for an "at risk" condition because it accomplishes the same purpose.  Under this policy the pipeline bears the risk for any new capacity that is under-utilized, unless, as recommended by a number of commenters, it contracts with the new customers to share that risk by specifying what will happen to rates and volumes under specific circumstances.  If the pipeline finds that new shippers are unwilling to share this risk,  this may indicate to the pipeline that others do not share its vision of future demand.  Similarly, the risks of construction cost over-runs should not be the responsibility of the pipeline's existing customers but should be apportioned between the pipeline and the new customers in their service contracts.  Thus, in pipeline contracts for service on newly constructed facilities, pipelines should not rely on standard "Memphis clauses", but should reach agreement with new shippers concerning who will bear the

Docket No. PL99-3-000                                                    –22–

risks of underutilization of capacity and cost overruns and the rate treatment for "cheap expansibility."[13]

In sum, if an applicant can show that the project is financially viable without subsidies, then it will have established the first indicator of public benefit. Companies willing to invest in a project, without financial subsidies, will have shown an important indicator of market-based need for a project. Incremental pricing will also lead to the correct price signals for the new project and provide the appropriate incentive for the optimal level of construction. This can avoid unnecessary adverse impacts on landowners or existing pipelines and their captive customers. Therefore, this will be the threshold requirement for establishing that a project will satisfy the public convenience and necessity standard.

     C.    <u>Factors to be Balanced in Assessing the Public Convenience and Necessity</u>

---

[13]"Memphis clause" refers to an agreement that the pipeline may change the rate during the term of the contract by making rate filings under NGA section 4.

Docket No. PL99-3-000                                                           –23–

Ideally, an applicant will structure its proposed project to avoid adverse economic, competitive, environmental, or other effects on the relevant interests from the construction of the new project, and the Commission would be able to approve such projects promptly. Of course, elimination of all adverse effects will not be possible in every instance. When it is not possible, the Commission's policy objective is to encourage the applicant to minimize the adverse impact on each of the relevant interests. After the applicant makes efforts to minimize the adverse effects, construction projects that would have residual adverse effects would be approved only where the public benefits to be achieved from the project can be found to outweigh the adverse effects. Rather than relying only on one test for need, the Commission will consider all relevant factors reflecting on the need for the project. These might include, but would not be limited to, precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market. The objective would be for the applicant to make a sufficient showing of the public benefits of its proposed project to outweigh any residual adverse effects discussed below.

1.    Consideration of Adverse Effects on Potentially
            Affected Interests

In deciding whether a proposal is required by the public convenience and necessity, the Commission will consider the effects of the project on all the affected interests; this means more than the interests of the applicant, the potential new customers, and the general societal interests.

Depending on the type of project, there are three major interests that may be adversely affected by approval of major certificate projects, and that must be considered by the Commission. These are: the interests of the applicant's existing customers, the interests of competing existing pipelines and their captive customers, and the interests of landowners and surrounding communities. There are other interests that may need to be separately considered in a certificate proceeding, such as environmental interests.

Of course, not every project will have an impact on each interest identified. Some projects will be proposed by new pipeline companies to serve new markets, so that there will be no adverse effects on the interests of existing customers; other projects may be constructed so that there may be no adverse effect on landowner interests.

Docket No. PL99-3-000                                                    −24−

### a. Interests of existing customers of the pipeline applicant

The interests of the existing customers of the expanding pipeline may be adversely affected if the expansion results in their rates being increased or if the expansion causes a degradation in service.

### b. Interests of existing pipelines that already serve the market and their captive customers

Pipelines that already serve the market into which the new capacity would be built are affected by the potential loss of market share and the possibility that they may be left with unsubscribed capacity investment. The Commission need not protect pipeline competitors from the effects of competition, but it does have an obligation to ensure fair competition. Recognizing the impact of a new project on existing pipelines serving the market is not synonymous with protecting incumbent pipelines from the risk of loss of market share to a new entrant, but rather, is a recognition that the impact on the incumbent pipeline is an interest to be taken into account in deciding whether to certificate a new project. The interests of the existing pipeline's captive customers are slightly different from the interests of the pipeline. The interests of the captive customers of the existing pipelines are affected because, under the Commission's current rate model, they can be asked to pay for the unsubscribed capacity in their rates.

### c. Interests of landowners and the surrounding communities

Landowners whose land would be condemned for the new pipeline right-of-way, under eminent domain rights conveyed by the Commission's certificate, have an interest as does the community surrounding the right-of-way. The interest of these groups is to avoid unnecessary construction, and any adverse effects on their property associated with a permanent right-of- way. In some cases, the interests of the surrounding community may be represented by state or local agencies. Traditionally, the interests of the landowners and the surrounding community have been considered synonymous with the environmental impacts of a project; however, these interests can be distinct. Landowner property rights issues are different in character from other environmental issues considered under the National Environmental Policy Act of 1969 (NEPA).[14]

---

[14] 42 USC § 4321 et seq.

Docket No. PL99-3-000                                                                    –25–

## 2. Indicators of Public Benefit

To demonstrate that its proposal is in the public convenience and necessity, an applicant must show public benefits that would be achieved by the project that are proportional to the project's adverse impacts. The objective is for the applicant to create a record that will enable the Commission to find that the benefits to be achieved by the project will outweigh the potential adverse effects, after efforts have been made by the applicant to mitigate these adverse effects. The types of public benefits that might be shown are quite diverse but could include meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives. Any relevant evidence could be presented to support any public benefit the applicant may identify. This is a change from the current policy which relies primarily on one test to establish the need for the project.

The amount of evidence necessary to establish the need for a proposed project will depend on the potential adverse effects of the proposed project on the relevant interests. Thus, projects to serve new demand might be approved on a lesser showing of need and public benefits than those to serve markets already served by another pipeline. However, the evidence necessary to establish the need for the project will usually include a market study. There is no reason for an applicant to do a new market study of its own in every instance. An applicant could rely on generally available studies by EIA or GRI, for example, showing projections of market growth. If one of the benefits of a proposed project would be to lower gas or electric rates for consumers, then the applicant's market study would need to explain the basis for that projection. Vague assertions of public benefits will not be sufficient.

Although the Commission traditionally has required an applicant to present contracts to demonstrate need, that policy, as discussed above, no longer reflects the reality of the natural gas industry's structure, nor does it appear to minimize the adverse impacts on any of the relevant interests. Therefore, although contracts or precedent agreements always will be important evidence of demand for a project, the Commission will no longer require an applicant to present contracts for any specific percentage of the new capacity. Of course, if an applicant has entered into contracts or precedent agreements for the capacity, it will be expected to file the agreements in support of the project, and they would constitute significant evidence of demand for the project.

Eliminating a specific contract requirement reduces the significance of whether the contracts are with affiliated or unaffiliated shippers, which was the subject of a number of comments. A project that has precedent agreements with multiple new customers may

Docket No. PL99-3-000                                                          −26−

present a greater indication of need than a project with only a precedent agreement with an affiliate.  The new focus, however, will be on the impact of the project on the relevant interests balanced against the benefits to be gained from the project.  As long as the project is built without subsidies from the existing ratepayers, the fact that it would be used by affiliated shippers is unlikely to create a rate impact on existing ratepayers.  With respect to the impact on the other relevant interests, a project built on speculation (whether or not it will be used by affiliated shippers) will usually require more justification than a project built for a specific new market when balanced against the impact on the affected interests.

        3.  <u>Assessing Public Benefits and Adverse Effects</u>

     The more interests adversely affected or the more adverse impact a project would have on a particular interest, the greater the showing of public benefits from the project required to balance the adverse impact.  The objective is for the applicant to develop whatever record is necessary, and for the Commission to impose whatever conditions are necessary, for the Commission to be able to find that the benefits to the public from the project outweigh the adverse impact on the relevant interests.

     It is difficult to construct helpful bright line standards or tests for this area.  Bright line tests are unlikely to be flexible enough to resolve specific cases and to allow the Commission to take into account the different interests that must be considered.  Indeed, the current contract test has become problematic.  However, the analytical framework described here should give applicants more certainty and sufficient guidance to anticipate how to structure their projects and develop the record to facilitate the Commission's decisional process.

     Under this policy, if project sponsors, proposing a new pipeline company, are able to acquire all, or substantially all, of the necessary right-of-way by negotiation prior to filing the application, and the proposal is to serve a new, previously unserved market, it would not adversely affect any of the three interests.  Such a project would not need any additional indicators of need and may be readily approved if there are no environmental considerations.  Under these circumstances landowners would not be subject to eminent domain proceedings, and because the pipeline was new, there would be no existing customers who might be called upon to subsidize the project.  A similar result might be achieved by an existing pipeline extending into a new unserved market by negotiating for a right-of-way for the proposed expansion and following the first requirement for showing need, financing the project without financial subsidies.  It would avoid adverse impacts to existing customers by pricing its new capacity incrementally and it is unlikely that other relevant interests would be adversely affected if the pipeline obtained the right-of-way by negotiation.

Docket No. PL99-3-000                                                                –27–

It may not be possible to acquire all the necessary right-of-way by negotiation. However, the company might minimize the effect of the project on landowners by acquiring as much right-of-way as possible. In that case, the applicant may be called upon to present some evidence of market demand, but under this sliding scale approach the benefits needed to be shown would be less than in a case where no land rights had been previously acquired by negotiation. For example, if an applicant had precedent agreements with multiple parties for most of the new capacity, that would be strong evidence of market demand and potential public benefits that could outweigh the inability to negotiate right-of-way agreements with some landowners. Similarly, a project to attach major new gas supplies to the interstate grid would have benefits that may outweigh the lack of some right-of-way agreements. A showing of significant public benefit would outweigh the modest use of federal eminent domain authority in this example.

In most cases it will not be possible to acquire all the necessary right-of-way by negotiation. Under this policy, a few holdout landowners cannot veto a project, as feared by some commenters, if the applicant provides support for the benefits of its proposal that justifies the issuance of a certificate and the exercise of the corresponding eminent domain rights. The strength of the benefit showing will need to be proportional to the applicant's proposed exercise of eminent domain procedures.

Of course, the Commission will continue to do an independent environmental review of projects, even if the project does not rely on the use of eminent domain and the applicant structures the project to avoid or minimize adverse impacts on any of the identified interests. The Commission anticipates no change to this aspect of its certificate policies. However, to the extent applicants minimize the adverse impacts of projects in advance, this should also lessen the adverse environmental impacts as well, making the NEPA analysis easier. The balancing of interests and benefits that will precede the environmental analysis will largely focus on economic interests such as the property rights of landowners. The other interests of landowners and the surrounding community, such as noise reduction or esthetic concerns will continue to be taken into account in the environmental analysis. If the environmental analysis following a preliminary determination indicates a preferred route other than the one proposed by the applicant, the earlier balancing of the public benefits of the project against its adverse effects would be reopened to take into account the adverse effects on landowners who would be affected by the changed route.

In another example of the proportional approach, a proposal that may have adverse impacts on customers of another pipeline may require evidence of additional benefits to consumers, such as lower rates for the customers to be served. The Commission might also consider how the proposal would affect the cost recovery of the existing pipeline,

Docket No. PL99-3-000                                          −28−

particularly the amount of unsubscribed capacity that would be created and who would
bear that risk, before approving the project.  This evaluation would be needed to ensure
consideration of the interests of the existing pipeline and particularly its captive
customers.  Such consideration does not mean that the Commission would always favor
existing pipelines and their captive customers.  For instance, a proposed project may be so
efficient and offer substantial benefits, such as significant service flexibility, so that the
benefits would outweigh the adverse impact on existing pipelines and their captive
customers.

        A number of commenters were concerned that the Commission might give too
much weight to the impact on the existing pipeline and its captive customers and
undervalue the benefits that can arise from competitive alternatives.  The Commission's
focus is not to protect incumbent pipelines from the risk of loss of market share to a new
entrant, but rather to take the impact into account in balancing the interests.   In such a
case the evidence of benefits will need to be more specific and detailed than the
generalized benefits that arise from the availability of  competitive alternatives.  The
interests of the captive customers are slightly different from the interests of the incumbent
pipeline.  The captive customers are affected if the incumbent pipeline shifts to the
captive customers the costs associated with its unsubscribed capacity.  Under the
Commission's current rate model captive customers can be asked to pay for unsubscribed
capacity in their rates, but the Commission has indicated that it will not permit all costs
resulting from the loss of market share to be shifted to captive customers.[15]  Whether and
to what extent costs can be shifted is an issue to be resolved in the incumbent pipeline's
rate case, but the potential impact on these captive customers is a factor to be taken into
account in the certificate proceeding of the new entrant.

        In sum, the Commission will approve an application for a certificate only if the
public benefits from the project outweigh any adverse effects.  Under this policy,
pipelines seeking a certificate of public convenience and necessity authorizing the
construction of  facilities are encouraged to submit applications designed to avoid or
minimize adverse effects on relevant interests including effects on existing customers of
the applicant, existing pipelines serving the market and their captive customers, and
affected landowners and communities.  The threshold requirement for approval, that
project sponsors must be prepared to develop the project without relying on subsidization
by the sponsor's existing customers, protects all of the relevant interests.  Applicants also
must submit evidence of the public benefits to be achieved by the proposed project such

---

[15]El Paso Natural Gas Company, 72 FERC ¶ 61,083 (1995); Natural Gas Pipeline
Company of America, 73 FERC ¶ 61,050 (1995).

Docket No. PL99-3-000                                                    −29−

as contracts, precedent agreements, studies of projected demand in the market to be served, or other evidence of public benefit of the project.

V.     Conclusion

        At a time when the Commission is urged to authorize new pipeline capacity to meet an anticipated increase in the demand for natural gas, the Commission is also urged to act with caution to avoid unnecessary rights-of-way and the potential for overbuilding with the consequent effects on existing pipelines and their captive customers.  This policy statement is intended to provide more certainty as to how the Commission will analyze certificate applications to balance these concerns.  By encouraging applicants to devote more effort in advance of filing to minimize the adverse effects of a project, the policy gives them the ability to expedite the decisional process by working out contentious issues in advance.  Thus, this policy will provide more guidance about the Commission's analytical process and provide participants in certificate proceedings with a framework for shaping the record that is needed by the Commission to expedite its decisional process.

        Finally, this new policy will not be applied retroactively.  A major purpose of the policy statement is to provide certainty about the decisionmaking process and the impacts that would result from approval of the project.  This includes providing participants in a certificate proceeding certainty as to economic impacts that will result from the certificate.  It is important for the participants to know the economic consequences that can result before construction begins.  After the economic decisions have been made it is difficult to undo those choices.  Therefore, the new policy will not be applied retroactively to cases where the certificate has already issued and the investment decisions have been made.

By the Commission.  Chairman Hoecker and Commissioners Breathitt and Hébert
                                   concurred with a separate statement attached.
      ( S E A L )                   Commissioner Bailey dissented with a separate statement
                                    statement attached.

                                            David P. Boergers,
                                               Secretary.

Policy Statement for Certification of New Interstate          Docket No. PL99-3-000
Natural Gas Pipeline Facilities

<div align="center">(Issued September 15, 1999)</div>

HOECKER, Chairman; BREATHITT and HEBERT, Commissioners, <u>concurring</u>;

Our intention is to apply this policy statement to any filings received by the Commission after July 29, 1998 (the issuance date of the Commission's Notice of Proposed Rulemaking regarding the Regulation of Short-term Natural Gas Transportation Services in Docket No. RM98-10-000 and Notice of Inquiry regarding Regulation of Interstate Natural Gas Transportation Services in Docket No. RM98-12-000), and not before.

<div style="margin-left:40%">
_____

James J. Hoecker
Chairman


_____

Linda K. Breathitt
Commissioner


_____

Curt L. Hébert
Commissioner
</div>

Certification of New Interstate Natural
Gas Facilities                                    Docket No. PL99-3-000

(Issued September 15, 1999)

BAILEY, Commissioner, <u>dissenting</u>.


Respectfully, I will be dissenting from this policy statement.

The document puts forth the majority's statement of an analytical framework for use in certificate proceedings. Its goal is to give applicants and other participants in those proceedings a better understanding of how the Commission makes its decisions. This is always a good thing to do. But ultimately, I cannot sign on to this statement as representative of my approach to certificate policy for several reasons.

First and foremost, the document purports that the policy outlined is not a significant departure from the kind of analysis used currently in certificate cases. I do not share this view. I know that it does depart from the way I currently look at certificate issues. For example, I cannot say that the sliding scale evaluation process and the weighing and balancing process described in the statement actually reflects the way I look at things. Further, the pricing changes announced are in fact significant departures from current practice. Thus, the document is as much about pricing policy change as it is about articulating an analytical approach to certification questions. I do not completely agree with the statements regarding pricing contained in this document.

The announced policy will now require that new projects meet a pricing threshold before work can proceed on the application – that is they should be incrementally priced and not subsidized by existing customers. The intent behind this is to enhance our certainty that the market is determining which projects come to the Commission.

I do not disagree with the idea that incremental pricing is consistent with the idea of allowing markets to decide. I also recognize that it can protect existing customers from subsidizing expansions as well as insulate existing pipelines from subsidized competition. However, I find the policy statement to be far too categorical in its approach. I am not persuaded that we should depart from our existing policy statement on pricing that we adopted in 1995.

There is too little recognition here that some types of construction projects are not designed solely for new markets or customers, that existing customers can benefit from some projects, and that rolled-in pricing may still be appropriate. Thus, while I can agree with some of the articulated goals such as pricing should allocate risk appropriately, and

2

that if done properly it can assist in avoiding construction of excess capacity, I would not adopt a threshold requirement that virtually precludes use of rolled-in rates.

Finally, I am at a loss to explain the genesis of this particular outcome. I recognize that certificate policy issues have been problematic for a long time. In attempts to address these issues we have had conferences to explore need issues and we have requested comments on certificate issues in the pending gas Notice of Proposed Rulemaking in Docket No. RM98-10-000 (84 FERC ¶ 61,087 (1998)) and the Notice of Inquiry in Docket No. RM98-12-000 (84 FERC ¶ 61,087 (1998)). The variety of views we have received in these efforts are summarized in the policy statement and it candidly recognizes the lack of clear direction on what path the Commission should follow. Given this lack of industry consensus, I question the advisability of trying to adopt a generic approach at this time. I would prefer to weigh further the relative merits of those comments before embarking on an attempt to articulate a certificate policy.

_____
Vicky A. Bailey
Commissioner

UNITED STATES OF AMERICA 92 FERC ¶ 61,094
FEDERAL ENERGY REGULATORY COMMISSION


Before Commissioners:   James J. Hoecker, Chairman;
                        William L. Massey, Linda Breathitt,
                        and Curt Hébert, Jr.


Certification of New Interstate                    Docket No. PL99-3-002
Natural Gas Pipeline Facilities


ORDER FURTHER CLARIFYING STATEMENT OF POLICY

(Issued July 28, 2000)

On September 15, 1999, the Commission issued a Statement of Policy (Policy Statement) regarding its policy for certificating new pipeline construction. [1] On February 9, 2000, in Docket No. PL99-3-001, the Commission issued an order clarifying the Statement of Policy. [2] Six parties filed requests for rehearing, reconsideration, or clarification of the February 9 order. [3] This order addresses those requests.

I.      Background

---

[1] Certification of New Interstate Natural Gas Pipeline Facilities, Statement of Policy, 88 FERC ¶ 61,227 (1999).

[2] Order Clarifying Statement of Policy, 90 FERC ¶ 61,128 (2000).

[3] American Public Gas Association (APGA); FPL Energy, Inc. (FPL Energy); KeySpan Gas East Corp. and The Brooklyn Union Gas Co., (Keyspan); Pennsylvania Office of Consumer Advocate (Pennsylvania OCA); Process Gas Consumers Group, American Iron and Steel Institute, Georgia Industrial Group, American Forest and Paper Association, Alcoa, Inc., and United States Gypsum Co. (Process Gas); and Texas Eastern Transmission Corp. and Algonquin Gas Transmission Co. (Texas Eastern).

Docket No. PL99-3-002                    - 2 -

     In the Policy Statement, the Commission explained the analytical steps it will use to evaluate proposals for certificating new construction.  In this analysis, the threshold question applicable to an existing pipeline's proposal is whether the project can proceed without subsidies from its existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on its existing customers, existing pipelines in the market and their captive customers, or the economic interests of landowners and communities affected by the route of the new pipeline. Where residual adverse effects on the three interests remain after the pipeline makes an effort to minimize them, the Commission will evaluate the project by balancing the evidence of the project's public benefits against its residual adverse effects.  The Policy Statement set forth in detail the considerations the Commission will apply to each of these steps.  After analyzing the application based on these considerations, the Commission will approve an application for a certificate only if the public benefits outweigh any adverse effect. [4]

     The Commission also stated that customers with a right of first refusal (ROFR) on pipelines with incrementally priced vintages of capacity can exercise their ROFR at their original contract rate except when the pipeline is fully subscribed and there is a competing bid for the capacity which is higher than the existing customer's maximum rate.  In that case, the existing customer could be required to match the highest competing bid up to a maximum rate which could be either an incremental rate or a rolled-up rate in which costs for expansions are accumulated to yield an average expansion rate.

     In the February 9 order clarifying the Policy Statement, the Commission explained that, to adjust the maximum rate applicable to shippers exercising their ROFR, the pipeline must establish a mechanism for reallocating costs between the historic and incremental rates so that all rates remain within the pipeline's cost-of-service. This mechanism can be established either through a general section 4 rate case or through the filing of pro forma tariff sheets to provide the Commission and parties with an opportunity to review the proposal prior to implementation.  Once the review is complete, the pipeline can then implement the mechanism through a limited section 4 rate filing.

---

     [4] If there are no adverse effects on any of these interests, no balancing of benefits against adverse effects would be necessary and the Commission would proceed to a preliminary determination or a final order.

Docket No. PL99-3-002                 - 3 -

The Commission explained that when an existing customer's contract expires, and the conditions established in the Policy Statement exist (fully subscribed expansion subject to incremental rates, at least one bid above the existing rate, and a rate mechanism established in advance), the existing customer should be treated similarly to new customers for pipeline capacity, who face rates higher than the pre-expansion historic rate. When there is insufficient capacity to satisfy all the demands for service on the system, a higher matching rate will improve the efficiency and fairness of capacity allocation by allowing new shippers who place greater value on obtaining capacity than the existing shipper to better compete for the limited capacity that is available. Based on this rationale, the Commission further clarified that it would not mandate a one-time contract renewal for existing ROFR customers at their current maximum rate.

Finally, the February 9 order clarified the effective date of the Policy Statement and the process applicable to a shipper's ROFR at the termination of its existing contract. The requests for rehearing, reconsideration or clarification address the effective date and the ROFR pricing policy.

Contemporaneously with the February 9 Order Clarifying Policy Statement, the Commission issued Order No. 637, the final rule in Docket Nos. RM98-10-000 and RM98-12-000. [5] In Order No. 637, the Commission amended Part 284 of its open access regulations to, among other things, narrow the ROFR to remove economic biases in the current rule, while still protecting captive customers' ability to resubscribe to long-term capacity. The Commission also discussed the interaction of the changes to the ROFR mechanism in Order No. 637 with the ROFR pricing policy set forth in the Policy Statement.

II.    Requests for Rehearing, Reconsideration and/or Clarification

A.    The Effective Date of the Policy Statement

---

[5] Regulation of Short-Term Natural Gas Transportation Services, and Regulation of Interstate Natural Gas Transportation Services, 63 FR 10156 (Feb. 25, 2000), III FERC Stats. & Regs. Preambles ¶ 31,091 (February 9, 2000).

Docket No. PL99-3-002                    - 4 -

Texas Eastern contends that the February 9 order was unresponsive to its request for clarification that the new policy applies to all certificate orders issued after September 15, 1999, regardless of the filing date of the underlying certificate applications.  Texas Eastern states that its confusion arises due to the concurring opinion to the Policy Statement by three Commissioners which states that they would not apply the policy to certificate applications filed before July 29, 1998, the date on which the Commission issued its Notice of Proposed Rulemaking (NOPR) proposing, among other things, to make changes to its policies with respect to certificating pipeline construction activities. [6] Texas Eastern contends that a certificate application's filing date should not determine whether the Policy Statement is applicable; it should apply to all certificate orders issued after September 15, 1999.  To do otherwise, it argues, would result in unduly discriminatory treatment of similarly situated certificate applicants.

        B.        The Right of First Refusal

Because the February 9 order was issued contemporaneously with Order No. 637 and because both orders addressed the ROFR pricing policy, APGA, FPL Energy, Keyspan, and Process Gas filed their petitions in both the Order No. 637 proceeding and in this Policy Statement proceeding.  Philadelphia OCA filed two separate requests for rehearing on the ROFR issue, one in this proceeding and the other, jointly with the National Association of State Utility Consumer Advocates and the Ohio Office of Consumers' Counsel, in the Order No. 637 proceeding.  Its arguments in the two rehearing requests are substantially the same.  These petitioners argue that the ROFR pricing policy is inconsistent with the NGA, the Policy Statement, and Commission regulations.  They also ask the Commission to clarify how the policy will work in specific factual situations.

III.    Discussion

The purpose of the Policy Statement is to provide the natural gas industry with guidance by stating the analytical framework the Commission will use to evaluate proposals for certificating new construction.  In the Policy Statement, the Commission also explains the new pricing policy for capacity subject to the right of first refusal.  A policy statement is not a rule, and generally objections to such a statement are not directly reviewable.  Rather, such review must await implementation of the policy in a specific

---

        [6] Regulation of Short-term Natural Gas Transportation Services 63 Fed. Reg. 42,982 (August 11, 1998), FERC Stats. & Regs., Proposed Regulations 1988-1998 ¶ 32,533 (1998).

Docket No. PL99-3-002                    - 5 -

case. [7]  Therefore, the Commission declines to consider the issues raised in the requests for rehearing and reconsideration, but will consider such issues and arguments in the specific cases in which they arise.

---

[7] See, e.g., Alternatives to Traditional Cost-of-Service Ratemaking for Natural Gas Pipelines, 75 FERC ¶ 61,026 (1996), citing American Gas Assoc. v. FERC, 888 F.2d 136, 151-2(D.C. Cir. 1989).

Docket No. PL99-3-002                    - 6 -

As to Texas Eastern request for clarification of the effective date of the Policy Statement, we note that Texas Eastern among others raised this issue on rehearing in Independence Pipeline Company, Docket Nos. CP97-315-000 et al., in which the certificate applications were filed prior to issuance of the NOPR. [8]  The Commission found that it would be unfair to apply the new Policy Statement to the underlying certificate applications since the applicants had no notice that the Commission was considering a change in its certificate policy at the time they filed their applications. Thus, the issue raised by Texas Eastern in its rehearing request regarding the effective date of the Policy Statement in this proceeding was raised in a specific case, the appropriate forum for such review.

In Order No. 637-A, issued May 19, 2000, the Commission responded to the issues raised by the petitioners in this proceeding with respect to the ROFR pricing policy. [9] Since the Commission addressed at length certain generally applicable concerns raised by the petitioners, we need not repeat our responses here.  A number of the petitioner's questions about the ROFR pricing policy do not have general application but are specific to the factual circumstances on a particular pipeline system.  As we stated in Order No. 637-A, such complex factual situations should be addressed as they arise in individual pipeline proceedings to implement the ROFR pricing policy.

By the Commission.

( S E A L )


Linwood A. Watson, Jr.,
Acting Secretary.

---

[8]91 FERC ¶ 61,102 (2000).

[9]Regulation of Short-term Natural Gas Transportation Services, Order No. 637-A, 65 Fed. Reg. 35,705 (June 5, 2000), III FERC Stats. & Regs. Regulations Preambles ¶ 31,099 (slip op. at 234-254)(May 19, 2000).

UNITED STATES OF AMERICA 90 FERC ¶ 61,128
FEDERAL ENERGY REGULATORY COMMISSION


Before Commissioners:   James J. Hoecker, Chairman;
                        William L. Massey, Linda Breathitt,
                        and Curt Hébert, Jr.


Certification of New Interstate                    Docket No. PL99-3-001
    Natural Gas Pipeline Facilities


ORDER CLARIFYING STATEMENT OF POLICY

(Issued February 9, 2000)

On September 15, 1999, the Federal Energy Regulatory Commission (Commission) issued a Statement of Policy (Policy Statement) revisiting its policy for certificating new construction not covered by the optional or blanket certificate authorizations.  The purpose of the Policy Statement was to provide the industry with guidance as to the analytical framework the Commission will use to evaluate proposals for certificating new construction.

The Policy Statement sets out the analytical steps the Commission will use.  It provides that when a certificate application is filed, the threshold question applicable to existing pipelines is whether the project can proceed without subsidies from their existing customers.  The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the existing customers of the pipeline proposing the project, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline.  If the proposed project will not have any adverse effect on the existing customers of the expanding pipeline, existing pipelines in the market and their captive customers, or the economic interests of landowners and communities affected by route of the new pipeline, then no balancing of benefits against adverse effects would be necessary.  The Commission would proceed to a preliminary determination or a final order.  If residual adverse effects on the three interests are identified, after efforts have been made to minimize them, then the Commission will proceed to evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects.  The Policy Statement sets forth in detail the considerations that the Commission

will apply to each of these steps.  At the end of the analysis, the Commission will approve an application for a certificate only if the public benefits from the project outweigh any

45

Docket No. PL99-3-001                - 2 -

adverse effects.  This policy approach strives to advance development of a sustainable energy infrastructure that supports economic growth, environmental protection and other social benefits over the life of the projects.

Twelve parties sought rehearing or clarification of the Policy Statement.  The issues raised by these parties include application of the Policy Statement to optional certificates, the application of the threshold no-subsidy requirement, issues relating to some of the factors to be considered in the balancing test, and the application of the policy to projects preceding its issuance.   These issues are discussed in turn below.

I.      Application of Policy Statement to Optional Certificates

The Policy Statement indicated that this policy does not apply to construction authorized under 18 CFR Part 157, Subparts E and F (optional and blanket certificates).

The Coastal Companies request that the Commission clarify that the Policy Statement will apply the public interest balancing factors to pipeline projects that are filed under the optional certificate regulations.  The Coastal Companies contend that this clarification is necessary to ensure that there is no major policy gap in the Commission's administration of section 7 of the NGA between traditional and optional certificate applicants, and that both types of applicants will be entitled to a certificate of public convenience and necessity only to the extent that such applicants clearly demonstrate that the project's benefits exceed its economic and social costs.

Public Service Company of Colorado (PSCO) and El Paso concur that the Policy Statement should apply to projects filed under the optional certificate regulations, as well as to traditional applicants.  It notes that the overarching standard applicable to all requests for certificate authority under NGA section 7, regardless of whether the certificate is sought under traditional or optional certificate procedures, is the requirement that a certificate applicant show that its proposal is required by the present or future public convenience and necessity.

Enron requests that the Commission either require that optional certificates make the same showing of public benefits and mitigation of adverse effects that is required of traditional section 7(c) applicants, or eliminate this requirement for traditional certificates.

The optional certificate regulations establish procedures whereby an eligible applicant may obtain, for the purposes of providing new service, a certificate authorizing: the transportation of natural gas; sales of natural gas; the construction and operation of natural gas facilities; the acquisition and operation of natural gas facilities; and

Docket No. PL99-3-001                - 3 -

conditional pre-granted abandonment of such activities and facilities. If an applicant complies with the requirements set forth in the Commission's regulations for optional certificates, it is presumed, subject to rebuttal, that the proposed new service is or will be required by the present or future public convenience and necessity.

The optional certificate procedures were established to provide expedited treatment of applications for service under section 7 of the NGA. A certificate and pre-granted abandonment are available under the optional certificate procedures to allow any applicant to institute jurisdictional service and to construct and operate facilities for such services. To qualify, the applicant must agree to comply with certain terms and conditions, the most important of which is that the applicant must accept the full risk of the proposed venture. The applicant's willingness to assume the full risk of the project is critical to the presumption that the project is in the public interest.

In the Policy Statement, the Commission explained that as the natural gas marketplace has changed, the Commission's traditional factors for establishing the need for a project, such as contracts and precedent agreements, may no longer be a sufficient indicator that a project is in the public convenience and necessity. The Commission, therefore, changed its policy regarding the pricing of construction projects so that market decisions by pipelines and shippers, as opposed to regulatory tests, would better reveal whether there is sufficient support for the project and whether the project is financially viable. The Commission established a threshold requirement that the pipeline must be prepared to financially support the project without subsidy from its existing shippers. This will usually mean that the pipeline would have to price the project using incremental rates in which the full costs of the project are recovered solely from the shippers subscribing to the new capacity. Under this policy, the pipeline and its expansion customers could share the risks of the project, but they could not shift any of those risks onto existing customers.

Upon further review of the issue, the Commission concludes that the policies set forth in the Policy Statement have converged with the policies underlying the optional certificate program. Specifically, both the Policy Statement and the optional certificate procedures are intended to place the risk of a new project on the pipeline and the customers for the new project and to protect existing customers from bearing the risk of a project that was not designed for their benefit. Accordingly, the Commission is issuing a notice of proposed rulemaking in Docket No. RM00-5-000 contemporaneously with this order that proposes to remove the optional certificate procedures from the Commission's regulations. Pending a final rule on that issue, however, the Commission concludes that the balancing outlined in the Policy Statement should apply to any new applications for optional certificates.

Docket No. PL99-3-001                    - 4 -

 Section 157.104(c) of the Commission's Regulations provides:

(c) *Presumption.* If an application complies fully with the requirements of §157.102 and §157.103, it is presumed, subject to rebuttal, that:

(1) The applicant is qualified to perform all the activities for which certificate authorization is requested;

(2) The applicant is willing and able to perform acts and provide service, as proposed, and to comply with the Natural Gas Act and any applicable regulations thereunder; and

(3) The proposed new service is or will be required by the present or future public convenience and necessity.

Until the Commission issues a rule in Docket No. RM00-5-000, applications for optional certificates filed after the issuance of this order will continue to have the regulatory presumption.  However, if the record shows that under the Policy Statement analysis, the adverse effects of the proposed project outweigh the benefits of the project, then the presumption that the proposed new service is or will be required by the present or future public convenience and necessity will be deemed to have been rebutted and the certificate will not issue.

II.    The Threshold Requirement of No Financial Subsidies

The Policy Statement changed the Commission's previous policy of giving a presumption for rolled-in rate treatment for pipeline expansions.  The Commission found that rolled-in pricing sends the wrong price signals by masking the true cost of capacity expansions to the shippers seeking the additional capacity.  Sending the wrong price signals to the market can lead to inefficient investment and contracting decisions which can cause pipelines to build capacity for which there is not a demonstrated market need. Such overbuilding, in turn, can exacerbate adverse environmental impacts, distort competition between pipelines for new customers, and financially penalize existing customers of expanding pipelines and customers of the pipelines affected by the expansion.

The Commission noted, however, that its new policy would not eliminate the possibility that some or all of a project's costs could be included in determining existing shippers' rates.  The Commission stated that rolled-in pricing could still be appropriate when initial costly expansion results in cheap expansibility.  The Commission indicated that project expansion costs could still be included in existing shippers' rates when

Docket No. PL99-3-001                    - 5 -

construction projects are designed to improve service for existing customers.  The Commission also stated that a form of rolled-in pricing could be applied as shippers exercise their right of first refusal, although the Commission did not describe specifically the process that would be followed.[1]

While the new policy initially places the pipeline at risk for the financial consequences of an expansion decision, expansion customers may agree to share the risk with the pipeline by specifying what will happen to rates under certain circumstances, such as anticipated volumes that do not develop or cost overruns.  The Commission encouraged pipelines not to rely on standard "Memphis clauses,"[2] but to reach agreement with new shippers concerning specific elements of risk.

Requests for rehearing and clarification were filed with respect to a number of these issues: the adoption of the no-subsidy test for pricing expansions, the pricing of capacity during the right of first refusal, and the policy regarding Memphis clauses.

A.      Adoption of the No-Subsidy Test

American Forest and Paper Association (AFPA), Indicated Shippers, and Paiute Pipeline Company (Paiute) sought rehearing and clarification regarding the adoption of the no-subsidy test for pipeline expansion projects.  They contend the Commission should continue to apply its current policy permitting rolled-in pricing, particularly in situations when the increase in price to existing customers will not amount to a greater than 5%

---

[1]Under the right of first refusal, a shipper is entitled to continue service by matching the highest bid for that capacity up to the maximum rate.

[2]A "Memphis clause" refers to an agreement between a shipper and a pipeline providing that the  pipeline may change a rate during the term of the contract by making a rate filing under section 4 of the NGA.  See United Gas Pipeline Co. v. Memphis, 358 U.S. 103 (1958).

Docket No. PL99-3-001                    - 6 -

increase in their rates.  AFPA and Indicated Shippers contend that the Commission's prior policy is correct because under this policy existing shippers' rates increase only when they receive some benefit from the construction project.  They also contend that permitting rolled-in pricing sends accurate price signals and avoids discrimination because rolled-in pricing ensures that all customers receiving the same transportation service pay the same rates for that service.  AFPA maintains that rolled-in pricing will better promote competition by ensuring a level playing field among competitors purchasing natural gas supplies.  AFPA and Paiute maintain that incremental pricing is not needed to protect against overbuilding because the Commission can exercise its oversight role to ensure that there is sufficient market need for a project.

AFPA and Paiute argue that if the Commission does not retain its current pricing policy, it should at least modify that policy.  AFPA and Paiute argue that the Commission should not establish the no-subsidy criteria as a threshold test, but consider a proposal for rolled-in rates in the context of the second prong of the test in which the Commission weighs all the benefits of the construction and the adverse impacts.  As another alternative, AFPA argues the Commission could adopt a commensurate benefits test in which rolled-in pricing is permitted when the increase in rates to existing customers is commensurate with the benefits they receive.

The Commission concludes that, in the current market, its threshold requirement that pipeline expansions should not be subsidized by existing customers is necessary to enable a finding of a market need for a project.  There are three different types of projects: an expansion project to provide additional service, a project to improve service to existing customers by replacing existing facilities, improving reliability, or providing additional flexibility, and a project that combines an expansion for new service with improvements for existing customers.[3]  Under the Commission's no-subsidy policy, existing shippers should not have the rates under their current contracts changed because the pipeline has built an expansion to provide service to new customers.  Existing customers' rates can be increased for projects that improve their service.  And, as explained below, where a project combines an expansion with improvements to existing services, a pipeline can file to increase existing customers' rates when the pipeline can demonstrate that the new facilities are needed to improve service to existing customers.

---

[3]The term expansion as used here includes the extension of existing facilities to serve new customers.

Docket No. PL99-3-001                - 7 -

The Commission has a two-step process for determining whether the market finds an expansion project economically viable. The first step, which occurs prior to the certificate application, is for the pipeline to conduct an open season in which existing customers are given an opportunity to permanently relinquish their capacity.[4] This first step ensures that a pipeline will not expand capacity if the demand for that capacity can be filled by existing shippers relinquishing their capacity. The open season policy was not changed by the recent Policy Statement. The second step is that the expansion shippers must be willing to purchase capacity at a rate that pays the full costs of the project, without subsidy from existing shippers through rolled-in pricing.

The removal of the subsidy is necessary to ensure that the market finds the project is viable because either the pipeline or its expansion shippers are willing to fully fund the project. Having lower prices subsidized by existing customers can lead to overbuilding as new customers are willing to subscribe to the capacity only because the price of the capacity is subsidized.

This no-subsidy requirement also is needed to ensure existing pipelines do not receive unfair advantage in competition for new construction projects with new entrant pipelines. The new entrant, by virtue of having no existing customers, must fully support a proposed project. In contrast, if the existing pipeline can receive a partial subsidy from its existing customers, this would create a bias favoring the expansion of existing facilities even where the pipeline of the new entrant would be more efficient. A rolled-in subsidy paid by the customers of the existing pipeline, therefore, may result in potential shippers favoring the less efficient project over the more efficient one.

AFPA and Paiute contend that the Commission need not rely on incremental pricing to establish market need, but can continue to rely upon its current regulatory requirements, such as relying on executed long-term contracts or binding precedent agreements for the capacity. But, as the Commission found in the Policy Statement, reliance on contractual agreements cannot be a substitute for reliance on proper pricing

---

[4]Pricing Policy for New and Existing Facilities Constructed by Interstate Natural Gas Pipelines, 71 FERC ¶ 61,241, at 61,917 (1995), reh'g denied, 75 FERC ¶ 61,105 (1996).

Docket No. PL99-3-001                    - 8 -

signals.  A pipeline, for instance, may be able to provide precedent agreements for 100% of a project when it offers new shippers rolled-in rates subsidized by existing shippers. But that level of support could well disappear if the subsidy were removed and the new shippers had to fully support the costs of the project.

Indicated Shippers, AFPA, and Paiute contend that incremental pricing creates price discrimination because the existing and expansion shippers are paying different rates for the same service.  Indicated Shippers maintain that all shippers should pay the same rate because both existing and expansion shippers are responsible for the demand creating the need for the expansion.  Indicated Shippers quotes <u>Southeastern Michigan Gas Company v. FERC</u>, to the effect that:

> Because every shipper is economically marginal the costs of increased demand may equitably be attributed to every user, regardless when it first contracted with the pipeline.[5]

There are legitimate bases for charging existing and expansion shippers different rates.  One of the Commission's regulatory goals is to protect captive customers from rate increases during the terms of their contracts that are unrelated to the costs associated with their service.  The existing shippers sign long-term contracts with the pipelines with the expectation that increases in their rates will be related to the costs and usage of the system for which they subscribe and not based on construction needed to serve other shippers. One of the benefits generally associated with long-term contracts is that they reduce the buyer's risk by providing greater price certainty.  Raising the rates of existing shippers during the term of their long-term contracts in order to subsidize expansions for new shippers reduces rate certainty and increases contractual risk.  Existing shippers, therefore, should not be subject to increases in rates during the term of their existing contracts to reduce the rates faced by new shippers subscribing to expansion capacity.

It is not necessarily true, as AFPA suggests, that all companies should pay the same prices for the same good or service regardless of when they contract for the good or service.  In an unregulated market, an established firm may be able to lock-in a low price for goods or services through a long-term contract when demand is weak relative to available supply, while a new entrant contracting for the same good or service at a later time when supply and demand conditions have changed, may have to pay higher prices.[6]

---

[5]133 F.3d 34, 41 (D.C. Cir. 1998).

[6]By the same token, during periods when demand is greater relative to available supply, customers may enter into high priced contracts for the future, while customers

Docket No. PL99-3-001                        - 9 -

     Moreover, charging expansion customers rolled-in prices at the onset of a project is not, as AFPA and Indicated Shippers suggest, the most efficient pricing solution because rolled-in pricing may result in undervaluing the costs of the expansion, which, in turn, results in overbuilding.  An alternative to the approach adopted in the Policy Statement  would be for the Commission to revamp its current pricing system so that all shippers pay incremental prices or prices based on replacement as opposed to historic costs.  Such an approach would avoid the pricing distortions that accompany rolled-in pricing for new facilities while charging both expansion and existing shippers the same rate.  But moving to such a pricing system would require a complete reevaluation of the Commission's current ratemaking method, which the Commission is not prepared to make at this point.  Indeed, neither AFPA nor Indicated Shippers support such an approach, and AFPA, in fact, objects to any approach that would permit a pipeline to overrecover its cost-of-service based on historic costs.  Thus, while no ratemaking policy is perfect, the Commission concludes that, within the confines of the existing ratemaking policy, the no-subsidy policy is superior to the use of rolled-in pricing in establishing the proper pricing signals for new construction, without creating undue discrimination between pipeline customers.

---

entering the market later when conditions have changed pay lower prices.

Docket No. PL99-3-001                    - 10 -

      Several of the comments raise questions about the application of the Commission's policy to expansion projects which may provide some benefit to existing customers. AFPA contends that rolled-in pricing should be permitted if the existing customer receives some benefit from the project. Paiute similarly contends that integrated expansions generally provide a positive benefit to all shippers and, therefore, should be priced on a rolled-in basis. Indicated Shippers contends that rolled-in pricing creates no subsidy when existing shippers bear a portion of the expansion costs reflective of the benefits they receive from the expansion. Indicated Shippers, in particular, contend that the construction of supply laterals should qualify for rolled-in pricing, because supply laterals frequently benefit all shippers on a system by providing access to new gas supply sources. Amoco[7] asks the Commission to clarify what constitutes a subsidy. Amoco maintains there may be some projects, such as the addition of compression, that have the effect of both expanding system capacity and also improving the reliability of and flexibility to existing customers at a cost lower than could be achieved without the capacity expansion.

---

[7] Amoco Energy Trading Corporation, Amoco Production Company, and Burlington Resources Oil & Gas Company.

Docket No. PL99-3-001                - 11 -

The Commission's no-subsidy policy recognizes that existing customers should pay the costs of projects designed to improve their service by replacing existing capacity, improving reliability, or providing additional flexibility. An example of the application of that policy is <u>Great Lakes Gas Transmission</u>,[8] in which the Commission permitted the pipeline to raise rates for all customers for a looping project where the pipeline demonstrated that the project provided increased reliability and flexibility and was not tied to the provision of service to specific customers. But this approach does not justify rolling-in the entire costs of an expansion simply because the existing customers receive "some benefit from the construction of the new facilities," as AFPA suggests[9] or because shippers receive some positive benefit as Paiute recommends. Nor is there a presumption favoring rolled-in rates. Pipelines can file to include additional costs in calculating the rates charged existing customers if the facilities are needed to improve service for existing customers, the increase in rates is related to the improvements in service, and raising existing customers' rates does not constitute a subsidy of an expansion by the existing customers.

B.      Right of First Refusal

Process Gas Consumers,[10] Florida Cities,[11] and Amoco raise questions about the statement in the Policy Statement which would permit a form of rolled-in pricing when the contracts of existing shippers expire and they seek to exercise their right of first refusal (ROFR). Process Gas Consumers and Florida Cities maintain that the Commission cannot legally permit a pipeline to change the maximum rate for ROFR in a policy statement and that such an action must take place through either a rulemaking or a section 4 filing. Both Florida Cities and Process Gas Consumers request clarification that pipelines cannot incorporate the ROFR policy <u>sua sponte</u> without making a general section 4 rate filing.

---

[8]80 FERC ¶ 61,105 (1997).

[9]AFPA Rehearing, at 6.

[10]Process Gas Consumers Group, American Iron and Steel Institute, Georgia Industrial Group, United States Gypsum Company, and Alcoa, Inc.

[11]Orlando Utilities Commission, Cities of Lakeland and Tallahassee, Florida, City of Gainesville d/b/a Gainesville Regional Utilities, Jacksonville Electric Authority, and Florida Gas Utility.

Docket No. PL99-3-001                  - 12 -

Florida Cities further contends that charging shippers whose contracts expire a rate higher than the current maximum rate for that capacity fails to provide sufficient protection to existing shippers.  They contend that an existing shipper is no less an existing shipper when its contract expires and that it should, accordingly, be entitled to the same rate protection.  Florida Cities also contends that raising existing shippers' rates upon contract renewal would run afoul of an existing rate settlement on Florida Gas.  If the Commission determines to continue with its policy, Florida Cities proposes that existing shippers should not be subject to the policy until they have had at least one opportunity to recontract for capacity at their existing rate so that they can choose a contract term with full appreciation for the pricing risks attendant to signing a short-term contract.

While supporting the policy, Amoco requests clarification of the rate that existing customers would have to match.  Amoco maintains that existing shippers should not have to match a bid up to the highest incremental rate, but instead should be required to pay no more than the system-wide rolled-in rate in order to prevent the pipeline from overrecovering its cost-of-service.

In the Policy Statement, the Commission did not fully describe how the ROFR process would operate but will clarify that process here.  The Commission's ROFR regulations provide that a shipper whose contract is expiring is entitled to renew that contract by matching the highest bid made for the capacity up to the maximum rate.[12] The Commission clarifies that under the policy described in the Policy Statement, a shipper exercising its ROFR could be required to match a bid up to a maximum rate higher than the historic maximum rate applicable to its capacity in certain limited circumstances: when a pipeline expansion has been completed and an incremental rate exists on the system; the pipeline is fully subscribed; and there is a competing bid above the maximum pre-expansion rate applicable to existing shippers.[13]  To adjust the maximum rate applicable to shippers exercising their ROFR in these circumstances, the pipeline would  have to establish a mechanism for reallocating costs between the historic and incremental rates so all rates remain within the pipeline's cost-of-service.[14]  The

---

[12]18 C.F.R. § 284.221(d) (1999).

[13]Under this procedure, the pipeline cannot require the existing shipper to pay a rate higher than that of the competing bidder.  For example, if the  historic maximum rate is $1/MMBtu, the maximum rate the existing shipper has to match  is $2/MMBtu, and the competing bid is $1.50/MMBtu, the pipeline must sell the capacity to the existing shipper if it is willing to match the $1.50 bid.

[14]Cf. Viking Gas Transmission Company, 89 FERC ¶ 61,204 (1999) (rejecting

Docket No. PL99-3-001                    - 13 -

mechanism can be established either through a general section 4 rate case or through the filing of pro forma tariff sheets which would provide the Commission and the parties with an opportunity to review the proposal prior to implementation. The Commission would review the proposed mechanism to determine how well it achieves the following objectives: capacity pricing that permits as efficient an allocation of capacity as is possible under cost-of-service ratemaking; protection against the exercise of market power by the pipeline (through withholding of capacity, for example, or the potential for skewed bidding); protection against the pipeline's overrecovery of its revenue requirement; and equity of treatment between shippers with expiring contracts and new shippers to the system seeking comparable service.

Application of this approach could lead to rates for shippers exercising their ROFR that are higher than their existing vintaged rate. But this will occur only if the preconditions are met -- the pipeline is full and there is a competing bid higher than the pre-expansion rate so that a higher rate is needed to allocate available capacity -- and the Commission has accepted the pipeline's mechanism for determining rates as just and reasonable.

The Commission recognizes there is tension between sending efficient pricing signals to expansion customers and to customers whose contracts are expiring, while remaining within the pipeline's revenue requirement. There may be a number of ways to recompute rates to effectively balance these interests. Amoco, for example, has suggested that the maximum matching rate for shippers exercising a ROFR should be the system average rate. The Appendix to this order provides two examples of potential approaches to the recomputation of rates, one in which the expansion rate is recomputed to establish the maximum matching rate and the other where the system average rate is used as the matching rate. Under these approaches, as contracts of existing shippers expire, the costs and contract demand represented by these contracts are reallocated between the existing and expansion service without changing the pipeline's overall revenue requirement.

---

tariff filing to raise matching rates under a ROFR where the filing did not readjust existing and expansion rates and was inconsistent with a rate settlement).

Docket No. PL99-3-001                 - 14 -

The rehearing requests question the appropriateness of requiring an existing customer to pay a rate higher than its historic rate to continue service beyond the term of its contract. As discussed above, there is a reasonable basis for not having existing shippers subsidize expansion projects during the remaining term of their current contracts. However, when the existing customer's contract expires, the existing customer could be treated similarly to new customers for pipeline capacity, who face rates higher than the pre-expansion historic rate.[15]   Under the policy conditions established by the Commission (fully subscribed expansion, at least one bid above the existing rate, and a rate mechanism established in advance), there would be insufficient capacity to satisfy all the demands for service on the system. When insufficient capacity exists, a higher matching rate will improve the efficiency and fairness of capacity allocation, within the limits imposed by cost-of-service ratemaking, by allowing new shippers who place greater value on obtaining capacity than the existing shipper to better compete for the limited capacity that is available.

The Commission does not agree with Florida Cities that an existing customer must be provided with one opportunity to renew at its current maximum rate. When there is insufficient capacity to satisfy all demands for capacity, an efficient system of capacity allocation would award the capacity to the shipper placing the greatest value on obtaining capacity. Adoption of Florida Cities' proposal for a one-time mandatory renewal would conflict with that policy by permitting the existing shipper to continue service at a rate less than the highest rate bid.

Process Gas Consumers maintains that the restructuring of rates should be implemented in a general section 4 rate case in which the Commission could examine all the pipeline's costs and revenues. A full section 4 rate case is one option a pipeline can use to establish the reallocation mechanism. However, a full section 4 rate case can be a cumbersome way of implementing this mechanism because it examines cost and revenue items and other issues unrelated to the more limited cost allocation and rate design changes needed to readjust rates at contract expiration. Pipelines, therefore, also can establish the reallocation mechanism by filing pro forma tariff sheets, which will provide the Commission and the parties with sufficient opportunity to review the filing prior to implementation. Once the review is completed, the pipeline can then implement the mechanism through a limited section 4 rate filing. Issues regarding case-specific

---

[15] Cf. PG&E Gas Transmission, Northwest Corporation, 82 FERC ¶ 61,289, at 62,124-26 (1998), affirmed, Washington Water Power Co. v. FERC, No. 98-1245 (D.C. Cir., February1, 2000). (for permanent releases of capacity taking place after an expansion, the replacement shippers should pay the same rate as the expansion shippers).

Docket No. PL99-3-001                  - 15 -

settlement conditions, such as those referenced by Florida Cities, can be addressed in the section 4 rate case or pro forma tariff proceeding.

     C.     Memphis Clause

     El Paso Energy Corporation Interstate Pipelines (El Paso) requests clarification of the Commission's policy towards the use of Memphis clauses.  Under the Policy Statement, the pipeline is responsible for financially supporting the project unless it contracts with new customers to share that risk.  Similarly, the risks of construction cost overruns would rest with the pipeline unless apportioned between the pipeline and the new customers by contract.  In apportioning such risks, the Commission stated that pipelines should not rely on standard Memphis clauses which would permit the pipeline to change the rate during the term of a contract by making a new rate filing under section 4 of the NGA.  Instead, the Commission stated that pipelines should reach more explicit agreements with new shippers concerning who will bear the risks of underutilization of capacity and cost overruns and the rate treatment for cheap expansibility.[16]

     El Paso requests clarification that the Commission's comment on Memphis clauses does not signify that Memphis clauses will no longer be considered a viable contractual method to allocate risk between pipelines and shippers.  El Paso maintains that a Memphis clause evidences the customer's agreement to an increase in rates, but only if the pipeline can satisfy the burden of showing that the increase is just and reasonable.

     Memphis clauses can continue to be used in expansion contracts if the pipelines and shippers choose to use this method for allocating risk.  While Memphis clauses may be an acceptable means of allocating the risks of difficult to predict events, the Commission does not find them a good method of allocating the risks of anticipated events such as cost overruns, underutilization of capacity, and cheap expansibility.  The parties are in the best position to allocate these risks at the time of contracting, rather than leaving such issues for litigation at the Commission.[17]  The Commission strongly

---

[16]Cheap expansibility refers to the fact that pipeline construction projects sometimes make further expansion relative inexpensive, for instance, because all that is needed to create extra capacity is the addition of greater compression.

[17]See, e.g., El Paso Natural Gas Company, 79 FERC ¶ 61,028, reh'g denied, 80 FERC ¶ 61,084 (1997), remanded Southern California Edison Company v. FERC, 162 F.3d 116 (D.C. Cir. 1999); Natural Gas Pipeline Company of America, 73 FERC ¶ 61,050, at 61,128-29 (1995)(whether it is just and reasonable to allocate costs of underutilized capacity to existing shippers).

Docket No. PL99-3-001                    - 16 -

encourages pipelines and shippers to specifically provide in their contracts for the allocation of such anticipated risks even if they choose to include a <u>Memphis</u> clause to deal with unanticipated risks.

III.     Factors to Balance in Assessing Public Convenience and Necessity

After satisfaction of the threshold no-subsidy requirement, the Commission will determine whether a project is in the public convenience and necessity by balancing the public benefits against the adverse effects of the project.  The public benefits could include, among other things, meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives.  Among the adverse effects the Commission will consider are the effects on existing customers of the applicant, the interests of existing pipelines and their captive customers, and the interests of landowners and the surrounding community, including environmental impacts.  The Commission will approve a project where the public benefits of the project outweigh the project's adverse impacts.

Several requests for rehearing raise issues relating to some of the factors to be considered in the balancing process: the consideration of effects on existing pipelines and their captive customers, the timing of the consideration of environmental impacts, and the ability of an applicant to acquire the necessary rights-of-way without the need to use eminent domain to obtain rights from landowners.

A.     <u>Impacts on Competing Pipelines and Customers</u>

In the Policy Statement, the Commission listed as one factor to be balanced in assessing public convenience and necessity the impact of the project on existing pipelines and the captive customers of these pipelines.  The Commission stated that its focus is not on protecting incumbent pipelines from the risks of competition, but that the impact on existing pipelines and their shippers is one factor that should be taken into account in balancing all the relevant interests.

Indicated Shippers maintain the Commission should not take the financial effect on existing pipelines into consideration because such a policy is at odds with the Commission's goal of allowing the market to decide whether an expansion is necessary and would have the effect of reducing competition and maintaining pipelines' market power.  Indicated Shippers maintains that taking into account the effect on competing pipelines would harm, rather than help, captive customers because competition from alternative pipelines may be the only way to provide such shippers with alternatives that would free a customer from reliance on a single pipeline.  AFPA agrees with the

Docket No. PL99-3-001                    - 17 -

Commission that the impact of the expansion on captive customers should be taken into account, but it contends that the impact of a project on the revenue of an existing pipeline should not be part of the consideration.

The effect of a project on an existing pipeline and its customers is only one factor to be considered in assessing need and will not be dispositive.  As the Commission explained in the Policy Statement, it will be employing a proportional approach in which the quantum of evidence necessary to establish need will depend on an overall assessment of all relevant factors.  In this analysis, the creation of greater competition would be considered a positive benefit.  For example, as the Commission explained in the Policy Statement, a project that has negative impacts on an existing pipeline and its shippers may still be approved if it has positive public benefits, such as increasing competitive alternatives or lowering rates, that outweigh the negative impacts.  Generally, this means that construction of a pipeline whose rates are unsubsidized will not be considered to have an adverse effect on an existing pipeline.  The purpose of examining the effect of projects on existing pipelines is not to protect incumbent pipelines from competition, but to evaluate all relevant factors to determine if a project is needed.  However, there may be cases in which service on an existing pipeline is an alternative to construction and the cumulative adverse impacts on an existing pipeline and its customers as well as on landowners and the environment are significant enough that the balance would tip against certification.

AFPA asks for clarification as to whether the Commission's balancing policy will apply to pipeline projects that bypass LDCs or other pipelines.  AFPA contends that bypass enhances competition and that the Commission should not consider the adverse effects on customers of the existing or expanding pipeline in determining whether to approve the bypass.  AFPA recognizes, however, that the Commission previously has permitted an LDC being bypassed to reduce its contract demand on the bypassing pipeline so that the pipeline is not collecting twice for the same contract demand.[18]

The same public convenience and necessity test applies to bypass construction as to other construction, and, therefore, the same basic balancing test should be applied to bypass cases.  The Commission will need to weigh whether the benefits of a bypass, including enhanced competitive options, outweigh potential adverse effects of the bypass.  It may well be that in many bypass projects, the amount of construction is minimal with little impact on landowners or the environment which would militate in favor of permitting the construction project if it provided additional competition or lower prices.

---

[18]AFPA cites to Paiute Pipeline Company, 68 FERC ¶ 61,064 (1994).

Docket No. PL99-3-001                    - 18 -

There also may be other means, such as  measures taken by the LDC or state regulatory agencies to mitigate the effect of a bypass on the bypassed pipeline or LDC.

      B.    <u>Environmental Review of Projects</u>

      The Policy Statement set forth the analytical steps the Commission will use to balance the public benefits against the potential adverse consequences of an application for new pipeline construction.  In discussing the role that the environmental analysis of a project plays in the Commission's evaluation of proposals for certificating new construction, the Policy Statement stated that "[o]nly when the benefits outweigh the adverse effects on economic interests will the Commission then proceed to complete the environmental analysis where other interests are considered." [19]  This statement has given rise to confusion about the timing of the Commission's environmental review of projects.

      Enron is concerned that the Policy Statement may suggest that the environmental review process for traditional certificate applications will not commence with the filing of the application.   El Paso likewise requests clarification that the environmental and economic reviews will proceed concurrently, as in current practice, and that the NEPA process will not be postponed until the Commission reaches a resolution of the balance of benefits and effects.  Paiute too is concerned that the Commission will delay its initiation of its environmental review until after economic tests are met.  Paiute proposes merging the various steps for review and processing pipeline construction applications that are outlined in the Policy Statement to avoid delays.

      Raising a different issue, AF&PA states that in considering the potential adverse environmental impact of a project, the Commission should take into account the overall benefits to the environment of natural gas consumption, particularly when, as a result of the new facilities, natural gas will displace fuels that are more harmful to the environment.

      As has been the Commission's practice, the Commission will begin its environmental review at the time an application is filed with the Commission; environmental and economic review of a proposed project will continue to proceed concurrently.  The Policy Statement does not alter this process.  The quoted statement from the Policy Statement was only intended to indicate that if the economic analysis

---

     [19]Policy Statement at 19.

Docket No. PL99-3-001                    - 19 -

concluded that the adverse effects outweighed the benefits then there would be no need to complete the environmental analysis.

Similarly, in considering the potential adverse environmental impact of a project, the Commission will continue to take into account as a factor for its consideration the overall benefits to the environment of natural gas consumption.

C.       Eminent Domain Considerations

The Policy Statement notes that, as part of its environmental review of projects, the Commission will work to take landowners' concerns into account, and to mitigate adverse impacts where possible and feasible.

AFPA states that whether, and to what extent, new facilities may affect the property of landowners on the proposed route are significant factors for the Commission to consider in weighing public benefits against adverse impacts.  Noting, however, that if eminent domain proceedings are necessary to obtain rights-of-way, the landowners will receive proper compensation for such rights-of-way, AFPA concludes that the compensation that a landowner would receive in such a proceeding should be considered by the Commission in its analysis of the economic impacts on the landowners that would result from the construction of new pipeline facilities.

The Policy Statement encouraged project sponsors to acquire as much of the right-of-way as possible by negotiation with the landowners and explained how successfully doing so influences the Commission's assessment of public benefits and adverse consequences.  The Policy Statement nonetheless recognized that, under section 7(h) of the NGA, a pipeline with a Commission-issued certificate has the right to exercise eminent domain to acquire the land necessary to construct and operate its proposed new pipeline when it cannot reach a voluntary agreement with the landowner.  Even though the compensation received in such a proceeding is deemed legally adequate, the dollar amount received as a result of eminent domain  may not provide a satisfactory result to the landowner and this is a valid factor to consider in balancing the adverse effects of a project against the public benefits.

VI.       Retroactive Application of the Policy

Northern Border, Texas Eastern, and Enron assert that the Policy Statement may not be applied to proposals filed before the date it issued.  The Commission  disagrees.  It is within the Commission's discretion to determine to apply its current policies in certificate orders when it acts.

Docket No. PL99-3-001                  - 20 -

PSCO, while concluding that the Policy Statement should not be applied retroactively where construction has begun or where a pipeline applicant has undertaken financial commitments necessary to proceed with construction, contends that the Policy Statement should be applied in situations where the certificate has expired and a pipeline is requesting an extension of the certificate.  This approach  could have harsh results depending on the circumstances.  Therefore, the Commission will address such matters as they arise based on the facts of the individual case.

El Paso requests clarification that the Policy Statement does not constitute a significantly changed circumstance that deprives certificate holders of predeterminations of rolled-in pricing in subsequent rate cases.  The Commission clarifies the intent of the Policy Statement, as requested by El Paso.  Issuance of the Policy Statement will not constitute "changed circumstances" for projects that were previously given a predetermination that rolled in rates would be appropriate.

The Policy Statement is clarified in accordance with the discussion herein.

By the Commission.  Commissioner Hébert concurred with a separate
                          statement attached.
( S E A L )

                          Linwood A. Watson, Jr.,
                          Acting Secretary.

64

Docket No. PL99-3-001                    - 21 -

## APPENDIX

Two Possible Methods for Reallocating Costs
Between Existing and Expansion Service

**Method 1 -- Recomputation of the Expansion Rate as the Matching Rate**

Under this method, the pipeline would recompute the expansion rate by applying the contract demand of the expiring contract and the costs represented by that demand to the expansion rates, thus reducing the expansion rates so the pipeline remains within its overall revenue requirement  Under this approach, the pipeline would add the expiring shipper's contract demand and its cost-of-service (in an amount proportionate to the contract demand) to the expansion cost-of-service to create a new expansion rate. Correspondingly, the contract demand and cost-of-service allocated to existing customers would be decreased proportionately, so the historic rate would be unchanged.  Because the cost-of-service allocated to the expiring contract is less on a per unit basis than the incremental cost-of-service, this approach will reduce the expansion rate, but, due to the larger amount of contract demand allocated to the expansion rate, the pipeline's revenue requirement remains the same.  The following example shows how this method would work where a contract for 20,000 MMBtu of existing contract demand (CD) expires resulting in a reduction to the expansion rate (from $25 to $22) while the rate for existing customers remains the same ($10) and the pipeline recovers the same revenue requirement.

|  | Existing Service | Expansion Service | Revenue Requirement |
|---|---|---|---|
| COS | $1,000,000 | $2,000,000 | $3,000,000 |
| CD (MMBtu/Year) | 100,000 | 80,000 | |
| Rate/MMBtu/Year | $10 | $25 | |
| New CD (MMBtu/Year) | 80,000 | 100,000 | |
| New COS | $800,000 | $2,200,000 | $3,000,000 |
| New Rate/MMBtu/Year | $10 | $22 | |

Other details, such as the applicable rates for capacity release and interruptible transportation would be established as part of the pipeline's filing.

**Method 2 -- System-Wide Cost-of-Service as the Matching Rate**

Under this approach, the existing shipper would have to match a bid only up to the system-wide average rate.  The added revenue derived from the higher system average

Docket No. PL99-3-001                    - 22 -

rate would reduce the expansion rate, with no change to the pipeline's revenue requirement.  Using the same numbers as Method 1, this approach would result in the existing shipper whose contract is expiring having to match a rate no higher than $16.67. The expansion rate would decline (from $25 to $23.33), but less than what would occur under Method 1 ($22), and the pipeline would remain within its cost-of-service.

|  | Existing Service | Expiring Contract | Expansion Service | System Average Rate | Revenue Requirement |
|---|---|---|---|---|---|
| COS | $1,000,000 |  | $2,000,000 | $3,000,000 | $3,000,000 |
| CD (MMBtu) | 100,000 |  | 80,000 | 180,000 |  |
| Rate/MMBtu/Year | $10.00 |  | $25.00 | $16.67 |  |
| New CD (MMBtu) | 80,000 | 20,000 | 80,000 |  |  |
| New COS | $800,000 | $333,333 | $1,866,667 |  | $3,000,000 |
| New Rate/MMBtu/Year | $10.00 | $16.67 | $23.33 |  |  |

The rates paid by new shippers to the system as well as the rates for capacity release and interruptible transportation would have to be addressed as part of the filing.

The following charts show that both methods eventually would converge in a system-wide average rate.  The difference between the two is the maximum rate the shipper exercising its ROFR has to pay and how quickly the expansion service rate

declines as contracts expire.

Certification of New Interstate Natural                    Docket No. PL99-3-001
    Gas Pipeline Facilities

(Issued February 9, 2000)


HÉBERT, Commissioner, *concurring*

I write separately to explain briefly my position on one of the issues presented in this proceeding.

In the Policy Statement – which I supported – the Commission stated explicitly that its policy on pipeline certification does not apply to optional certificates. 88 FERC at 61,737 & n.3. In today's clarifying order, however, the Commission reverses course and decides that its policy does indeed apply to optional certificates. Specifically, the Commission explains that it will apply the provisions of the Policy Statement to any "applications for optional certificates filed after the issuance of this order" and "until the Commission issues a rule in Docket No. RM00-5-000." Slip op. at 4. (In a notice of proposed rulemaking, issued contemporaneously with this order in Docket No. RM00-5-000, the Commission proposes to remove the optional certificate procedures from the Commission's regulations.)

My preference would be to stick with our earlier decision and to confine the Policy Statement to traditional applications for pipeline certification filed under section 7 of the Natural Gas Act. I do not view the policies underlying the Commission's optional application procedures as entirely redundant to, and entirely subsumed by, the policies underlying the Commission's Policy Statement. As today's order recognizes, the optional regulations do not provide for consideration and weighing of public interest factors. (And for similar reasons, my preference would not be to proceed immediately to a rulemaking that proposes to abandon altogether the Commission's optional regulations.)

But my concerns are mitigated by the Commission's decision to pursue a cautious approach as to the applicability of the Policy Statement to applications for optional certificates. Pending application for optional certificates will continue to be processed under the Commission's existing optional regulations. And the Commission continues to remain receptive – at least for the time being – to applications for optional certificates. The Commission explains, slip op. at 4, that it will continue to presume that an application for an optional certificate satisfies all of the Commission's requirements, and that the Policy Statement is limited only to the purpose of rebutting that presumption.

-2-

In light of this limitation, I do not view the Commission's action today as effectively eliminating, without prior notice, the ability of pipelines to apply for optional certificates.

(As a final matter, I add that the optional certificates used to be commonly known as optional "expedited" certificates.  Presumably, the promised speed of Commission action on applications for optional certificates – at least in comparison to the slower pace of Commission action on traditional applications – once provided much of the motivation to pipeline certificate applicants, filing under optional procedures, that were confident that there was a market for additional capacity.  Alas, as the Commission explains in its proposed rulemaking in a related docket, optional certificates today provide none of the expedition contemplated at the time of promulgation of optional certificate regulations in 1985.  This is because "[e]nvironmental review is the driving force in total processing time, and environmental review requirements are the same under either program."  Hopefully, there will not be a delay in the future.)

Therefore, I respectfully concur.

_____

Curt L. Hébert, Jr.
Commissioner