**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### Nos. 12-1481 and 13-1018

**Minisink Residents for Environmental Preservation and Safety, *et al.***
***Petitioner.***

**v.**

**Federal Energy Regulatory Commission,**
***Respondent.***

**On Petition for Review of Orders of the**
**Federal Energy Regulatory Commission**

### BRIEF OF INTERVENOR
### MILLENNIUM PIPELINE COMPANY, L.L.C.
### IN SUPPORT OF RESPONDENT

Gary A. Kruse
Vice President - General Counsel &
Secretary
Millennium Pipeline Company, L.L.C.
One Blue Hill Plaza, Seventh Floor
P.O. Box 1565
Pearl River, New York 10965
Tel: (845) 620-1300
Fax: (845) 620-1320
kruse@millenniumpipeline.com

Joseph S. Koury
Ryan J. Collins
Wright & Talisman, P.C.
1200 G Street N.W., Suite 600
Washington, D.C. 20005
Tel: (202) 393-1200
Fax: (202) 393-1240
koury@wrightlaw.com
collins@wrightlaw.com

Attorneys for
Millennium Pipeline Company, L.L.C.

**Corrected Final Brief: November 14, 2013**

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

A.     Parties and Intervenors

All parties and intervenors appearing before this Court and in the proceedings below before Respondent Federal Energy Regulatory Commission ("FERC") are listed in the Initial Brief of the Petitioners.

B.     Rulings Under Review

Petitioners seek review of the following three FERC orders:

1.     *Millennium Pipeline Co., L.L.C.*, "Order Issuing Certificate," Docket No. CP11-515-000, 140 FERC ¶ 61,045 (July 17, 2012);

2.     *Millennium Pipeline Co., L.L.C.*, "Order Denying and Dismissing Requests for Rehearing, Denying Request to Reopen and Supplement the Record, and Denying Requests for Stay," Docket Nos. CP11-515-001 and -002, 141 FERC ¶ 61,198 (December 7, 2012); and

3.     *Millennium Pipeline Co., L.L.C.*, "Order Denying Rehearing," Docket No. CP11-515-003, 142 FERC ¶ 61,077 (January 31, 2013).

C.     Related Cases

Petitioner previously sought a stay of construction of implementation of the underlying orders on review:  *In re Minisink Residents for Preservation of the Environment and Safety*, Order Denying Motion to Stay, No. 12-1390 (D.C. Cir. Oct. 11, 2012).

i

## CORPORATE DISCLOSURE STATEMENT OF
## MILLENNIUM PIPELINE COMPANY, L.L.C.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Circuit Rules of this Court, Intervenor Millennium Pipeline Company, L.L.C. (Millennium), states that it is a limited liability company organized and existing under the laws of the State of Delaware and has its principal place of business at One Blue Hill Plaza, P.O. Box 1565, Pearl River, New York, 10965. Millennium is a natural gas company that is primarily engaged in the business of transporting natural gas in interstate commerce under authorizations granted by and subject to the jurisdiction of the Federal Energy Regulatory Commission.

Millennium is owned by subsidiaries of the following entities: (i) 47.5 percent by NiSource Inc.; (ii) 26.25 percent by DTE Energy Company; and (iii) 26.25 percent by National Grid plc.  Each of the parent companies of Millennium's members is a publicly traded company on the New York Stock Exchange.

# TABLE OF CONTENTS

                                                                              **PAGE**

SUMMARY OF ARGUMENT ............................................................1

ARGUMENT ...........................................................................................4

I.    FERC Supported Its Public Convenience And Necessity
Finding With Substantial Evidence; Petitioners' Arguments
Otherwise Are Without Merit.................................................................4

    A.    The Record Supports FERC's Findings That The Project Has
Significant Public Benefits And Minimal Impacts .....................4

    B.    FERC Fully Considered And Properly Rejected The Wagoner
Alternative ...................................................................................7

        1.    The Wagoner alternative is not environmentally
preferable ........................................................................8

        2.    FERC's rejection of the Wagoner alternative is
consistent with FERC's prior findings that Neversink
replacement should be avoided if a less environmentally
intrusive means of meeting objectives is available ...........11

        3.    The Wagoner alternative is not economically preferable...13

        4.    The Wagoner alternative would not meet Project
objectives ........................................................................14

        5.    Petitioners erroneously attempt to attribute adverse
impacts of the Wagoner alternative to the Project..............15

        6.    FERC exceeded normal procedures to fully consider the
Wagoner alternative...........................................................16

    C.    Petitioners' Reliance On The Dissents Fails To Advance Their
Arguments ...................................................................................17

1. The majority properly addressed the Chairman's arguments .........................................................17

2. The majority properly addressed Commissioner LaFleur's arguments ........................................20

D. FERC Considered The Future Public Convenience And Necessity ...............................................................22

II. FERC Satisfied Its NEPA Obligations; Petitioners' Arguments Otherwise Are Without Merit ..................................................23

A. FERC Properly Evaluated Costs And Benefits............................24

B. FERC Properly Considered Impacts On Property Values............25

C. FERC Properly Evaluated The Project's Cumulative Impacts ......................................................................27

III. FERC Correctly Followed Its Siting Guidelines; Petitioners' Criticisms To The Contrary Are Off Base .............................................28

IV. Petitioners' Due Process Complaints Are Meritless ...............................32

A. FERC Properly Found That Its Written Record Was Adequate...32

B. Petitioners Were Provided An Opportunity To Comment On Relevant Hydraulic Analyses........................................................34

V. FERC Properly Denied Petitioners' Request To Reopen The Record To Receive Petitioners' Flawed And Late-Filed Evidence....................36

CONCLUSION ......................................................................39

## TABLE OF AUTHORITIES

**COURT CASES**                                                    **PAGE**

*Baltimore Gas & Electric v. Natural Resources Defense Council, Inc.*,
    462 U.S. 87 (1983)..................................................................................24

*Blumenthal v. FERC*,
    613 F.3d 1142 (D.C. Cir. 2010).............................................................33

*Citizens Against Burlington, Inc. v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991).........................................................13, 14

*City of Alexandria v. Slater*,
    198 F.3d 862 (D.C. Cir. 1999)................................................................13

*City of Pittsburgh v. Federal Power Commission*,
    237 F.2d 741 (D.C. Cir. 1956)................................................................22

*CNG Transmission Corp. v. FERC*,
    40 F.3d 1289 (D.C. Cir. 1994)................................................................33

*Cooley v. FERC*,
    843 F.2d 1464 (D.C. Cir. 1988)..............................................................36

*Corridor H Alternatives, Inc. v. Slater*,
    166 F.3d 368 (D.C. Cir. 1999)................................................................12

*Exxon Co., USA v. FERC*,
    182 F.3d 30 (D.C. Cir. 1999)..................................................................10

*Federal Power Commission v. Hope Natural Gas Co.*,
    320 U.S. 591(1944)................................................................................13

*Florida Gas Transmission Co. v. FERC*,
    604 F.3d 636 (D.C. Cir. 2010)................................................................37

*Grapevine v. Department of Transportation*,
    17 F.3d 1502 (D.C. Cir. 1994)................................................................14

*Authorities upon which we chiefly rely are marked with asterisks.

*In re Minisink Residents for Preservation of the Environment and Safety*,
    No. 12-1390 (D.C. Cir. Oct. 11, 2012)...........................................................1

*Marsh v. Oregon Natural Resources Council*,
    490 U.S. 360 (1989)....................................................................................10

*Minisink Residents for Environmental Preservation and Safety v. FERC*,
    No. 12-1481 (D.C. Cir. Mar. 5, 2013)...........................................................1

*Midcoast Interstate Transmission, Inc. v. FERC*,
    198 F.3d 960 (D.C. Cir. 2000)........................................................8, 10, 24

*Moreau v. FERC*,
    982 F.2d 556 (D.C. Cir. 1993)....................................................................33

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v.*
    *State Farm Mutual Automobile Insurance Co.*,
    463 U.S. 29 (1983)........................................................................................7

*National Committee for the New River, Inc. v. FERC*,
    373 F.3d 1323 (D.C. Cir. 2004)..............................................7, 14, 15, 24, 36

*Roberston v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)................................................................................8, 24

*Tejas Power Corp. v. FERC*,
    908 F.2d 998 (D.C. Cir. 1990)....................................................................13

## ADMINISTRATIVE CASES

*Certification of New Interstate Natural Gas Pipeline Facilities*,
    88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*,
    92 FERC ¶ 61,094 (2000)....................................................................2, 4, 5

*East Tennessee Natural Gas Co.*,
    101 FERC ¶ 61,188 (2002)..........................................................................14

*Independence Pipeline Co.*,
    91 FERC ¶ 61,102 (2000)............................................................................14

*Iroquois Gas Transmission System LP*,
  101 FERC ¶ 61,131 (2002)..........................................................................29

*Millennium Pipeline Co.*,
  97 FERC ¶ 61,292 (2001)............................................................................11

*Millennium Pipeline Co.*,
  117 FERC ¶ 61,319 (2006)..........................................................................11

*Millennium Pipeline Co., L.L.C.*,
  140 FERC ¶ 61,045 (2012)................................... 2, 3, 5, 6, 7, 10, 14, 20, 22,
                                                      24, 25, 26, 27, 28, 30, 33

*Millennium Pipeline Co., L.L.C.*,
  141 FERC ¶ 61,198 (2012)................. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15,
                                                16, 17, 18, 19, 20, 21, 22, 23, 24, 26,
                                                27, 28, 30, 31, 32, 34, 35, 36, 37, 38

*Millennium Pipeline Co., L.L.C.*,
  142 FERC ¶ 61,077 (2013)......................................................................2, 38

*Millennium Pipeline Co., L.L.C.*,
  145 FERC ¶ 61,007 (2013) ...........................................................................28

*SG Resources Mississippi, L.L.C.*,
  119 FERC ¶ 61,257 (2007) ..........................................................................26

*Tennessee Gas Pipeline Co.*,
  139 FERC ¶ 61,161 (2011)...........................................................................38

*Turtle Bayou Gas Storage Company, LLC*,
  135 FERC ¶ 61,233 (2011).......................................................................20-21

## STATUTES

15 U.S.C. § 717 ...............................................................................................2

15 U.S.C. § 717f...............................................................................................32

15 U.S.C. § 717f(e) ..................................................................................22

15 U.S.C. § 717r(b) ...............................................................................7, 21

42 U.S.C. § 4321 ......................................................................................2

## **REGULATIONS**

40 C.F.R § 1502.23 ...................................................................................25

18 C.F.R § 380.12(k)(4)(v)(A) .................................................................26

18 C.F.R § 380.15(b) ................................................................................31

18 C.F.R § 380.15(f) .................................................................................29

18 C.F.R § 380.113 ...................................................................................35

# GLOSSARY

| | |
|---|---|
| CEII | Critical Energy Infrastructure Information |
| Certificate Order | *Millennium Pipeline Co.*, 140 FERC ¶ 61,045 (July 17, 2012) |
| Certificate Policy Statement | *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) |
| EA | Environmental Assessment |
| EPA | Environmental Protection Agency |
| FERC, Commission or Respondent | Federal Energy Regulatory Commission |
| Kuprewicz Report | Late-filed report of Petitioners' engineer |
| Millennium | Millennium Pipeline Company, L.L.C.. |
| MREPS | Minisink Residents for Environmental Preservation and Safety |
| NEPA | National Environment Policy Act |
| Neversink segment | 7.2-mile, 24-inch segment of pipeline along Millennium's mainline |
| Petitioners | Minisink Residents for Environmental Preservation and Safety and three individual members |
| Project | Minisink Compressor Project, consisting of a 12,260 horsepower compressor station and appurtenant facilities located in Minisink, New York |
| Rehearing Order | *Millennium Pipeline Co.*, 141 FERC ¶ 61,198 (Dec. 7, 2012) |

Second Rehearing Order             *Millennium Pipeline Co.*, 142 FERC
                                   ¶ 61,077 (Jan. 31, 2013)

Wagoner alternative                Project alternative composed of: (1) a
                                   5,100 horsepower compressor station; and
                                   (2) replacement of the 24-inch Neversink
                                   segment with 30-inch pipeline

**BRIEF OF INTERVENOR**
**MILLENNIUM PIPELINE COMPANY, L.L.C.**
**IN SUPPORT OF RESPONDENT**

Intervenor Millennium Pipeline Company, L.L.C. (Millennium) submits this brief supporting Respondent Federal Energy Regulatory Commission (FERC or Commission) and answering the brief of the Minisink Residents for Environmental Preservation and Safety and three individual members (collectively, MREPS or Petitioners). Millennium adopts the Statement of the Issue and Statement of Facts in Respondent's brief. Additionally, all applicable statutes and regulations are contained in Respondent's brief.

## SUMMARY OF ARGUMENT

This is the third time this Court has considered the merits of Petitioners' case. Twice, in the context of denying Petitioners' stay requests, the Court found that Petitioners failed to show a likelihood of success on the merits.[1] Petitioners' case should again be denied.

Petitioners are a group of residents that oppose the FERC orders under review granting Millennium a certificate of public convenience and necessity under the Natural Gas Act to construct the Minisink Compressor Project (Project).

---

[1] *In re Minisink Residents for Preservation of the Environment and Safety*, Order Dissolving Administrative Stay, Case No. 12-1390 (D.C. Cir. Oct. 11, 2012); *Minisink Residents for Environmental Preservation and Safety v. FERC*, Order Denying Motion to Stay, Case No. 12-1481 (D.C. Cir. Mar. 5, 2013).

*Millennium Pipeline Co., L.L.C.*, 140 FERC ¶ 61,045 (Certificate Order), *reh'g denied*, 141 FERC ¶ 61,198 (2012) (Rehearing Order), *reh'g denied*, 142 FERC ¶ 61,077 (2013) (Second Rehearing Order).  The Project, which went into service on June 1, 2013, allows Millennium's pipeline system to transport needed gas supplies to northeast markets.  Certificate Order PP 3-4, 13, JA2-3, 5.  In approving the Project, FERC considered all factors bearing on the public interest, including those raised by Petitioners, in compliance with the Natural Gas Act, 15 U.S.C. § 717, *et seq.*, the National Environmental Policy Act of 1969, 42 U.S.C. § 4321, *et seq.* (NEPA), and FERC's Certificate Policy Statement regarding natural gas projects.  *Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92 FERC ¶ 61,094 (2000) (Certificate Policy Statement).

Petitioners' opposition is based on exaggerated claims of Project impacts and mischaracterizations of FERC's review process.  Based on an extensive record including a thorough environmental assessment, FERC found that the Project has significant public benefits and minimal impacts.  Certificate Order PP 13, 15, 83, JA5, 6, 29.  The Project does not directly impact any landowner since the Project site is owned by Millennium.  *Id.* P 14, JA6.  While Petitioners claim that FERC did not seriously consider its arguments, FERC exceeded normal procedures in addressing Petitioners' concerns, for example, by issuing a special notice to

2

consider Petitioners' preferred alternative, adopting numerous certificate conditions to mitigate impacts on surrounding landowners (including the strictest noise requirement in any order to date), and requiring consultations with Minisink Town officials that resulted in additional accommodations for the community. *See infra* sections I.B.6 and II.B.

Petitioners' central claim is that FERC should have rejected the Project in favor of Petitioners' preferred alternative (the "Wagoner" alternative). However, FERC fully considered and properly rejected the Wagoner alternative because it would have substantially greater impacts on the environment and landowners, Rehearing Order P 40, JA73, and would not meet Project objectives. Certificate Order P 27 n.28, JA11. While the Project consists of a single compressor station on a site owned entirely by Millennium, the Wagoner alternative would require *both* constructing a new compressor station *and* replacing over 7 miles of pipeline crossing an environmentally sensitive river and 58 parcels of privately-owned land. *Id.* P 27, JA10-11.

In sum, the Project provides an undisputed public benefit—expanding Millennium's ability to serve the demonstrated need for additional gas transportation capacity—with minimal adverse environmental impact. FERC's approval of the Project is supported by substantial evidence and satisfies all legal

3

standards.  FERC also faithfully applied its siting guidelines and precedent, and afforded all parties due process.  Accordingly FERC's orders should be affirmed.

## ARGUMENT

I. **FERC Supported Its Public Convenience And Necessity Finding With Substantial Evidence; Petitioners' Arguments Otherwise Are Without Merit.**

A. **The Record Supports FERC's Findings That The Project Has Significant Public Benefits And Minimal Impacts.**

FERC found that the "public benefits of the proposed project outweigh the project's minimal adverse impacts on both economic interests and the environment, thus ... the proposed project is required by the public convenience and necessity."  Rehearing Order P 22, JA62.[2]

Petitioners allege that FERC misapplied its Certificate Policy Statement and that its analysis inherently favors the pipeline applicant.  Petitioners 37, 7-8.  These claims are contradicted by the record and ignore that a major purpose of the Certificate Policy Statement was to prevent overbuilding of pipeline infrastructure and thereby "avoid unnecessary adverse impacts on landowners."  Certificate Policy Statement, 88 FERC at 61,747.  To advance this objective, the Certificate Policy Statement established threshold economic tests to ensure that a project is

---

[2]     Additionally, the Public Service Commission of the State of New York stated that "the Project will greatly assist the reliability of the New York City natural gas supply, which feeds much of the electrical power in a highly compressed market."  Comments of The State of New York Department of Public Service Commission, at 2 (2/7/2012), R.639, JA421-423.

financially supported without subsidies and that the project's benefits outweigh any residual impacts after mitigation.  *Id*., 88 FERC at 61,745-47; *see also* Rehearing Order PP 18-19, JA59-60.  Applications that cannot satisfy these tests are denied.  *Id.* P 14, JA58.  If these tests are satisfied, FERC proceeds to a NEPA environmental review.  *Id.* P 15, JA58-59.

Here, FERC identified the Project's substantial benefits–firm service contracts for 100% of new capacity, enabling bi-directional flow on Millennium's system, providing the market needed additional gas supplies, and enhancing supply options for Millennium shippers.  Certificate Order PP 13, 15, JA5, 6; Rehearing Order P 22, JA62.  FERC found adverse economic impacts to neighboring landowners to be "localized and relatively minimal, though not non-existent," Rehearing Order P 22, JA62, and that Millennium had "minimize[d] any adverse economic impacts on landowners and surrounding communities by acquiring all property necessary for its project from a willing seller."  Rehearing Order P 20, JA60; Certificate Order P 14, JA6.

Petitioners never contest the Project's benefits and concede the absence of direct landowner impacts, but claim that nearby landowners suffer "other far worse, adverse economic impacts."  Petitioners 38 (alleging impacts on property values).  However, FERC imposed strict conditions to protect neighboring landowners and mitigate any such impacts. Rehearing Order PP 20, 56-63, JA60,

81-83; *see also* section II.B.  Moreover, FERC balanced these factors and found

that "the public benefits of the proposed project outweigh the project's minimal

adverse impacts."  Rehearing Order P 22, JA62; *see also* Certificate Order P 15,

JA6.

FERC's public interest evaluation also included an environmental

assessment of the Project, including alternatives (discussed in section I.B), which

showed that the Project's environmental impacts are minimal.[3]  Certificate Order

P 83, JA29; Rehearing Order P 22, JA62.  The Project permanently impacts only

4.5 acres, Rehearing Order P 36, JA70, produces a noise level "barely, if at all,

noticeable," *id.* P 30, JA67, is only a "minor source" of air emissions, Certificate

Order PP 42-48, JA16-18, is barely visible for most of the year, *id.* P 71, JA26, and

minimizes visual impacts through visual screening and building design plans, *id.* at

Conditions 13 and 14, JA39, and impacts no waterbodies and minimal wetlands

(0.09 acres on Millennium's property), EA 12, R.654, JA447, requires de minimis

---

[3]     As part of its environmental analysis, FERC Staff reviewed over 600
comments submitted by interested parties, participated in public meetings
near the project site, submitted over 80 data requests to Millennium, and
issued a supplemental notice soliciting comments regarding the Wagoner
alternative.   Certificate Order PP 21-24, JA8-10.   The environmental
assessment considered the Project's impact on geology, soils, water
resources, vegetation, wildlife, cultural resources, land use, recreation, visual
resources, socioeconomics, air quality, noise, reliability, and safety, and
considered cumulative impacts and potential alternatives.  Environmental
Assessment for Minisink Compressor Project (2/29/2012) (EA), R.654,
JA427-506; Certificate Order PP 21-26, JA8-10.

tree clearing (0.36 acres on Millennium's land), and further protects the neighboring community through land use agreement with the Town of Minisink that allows most of the approximately 70-acre buffer around the Project to be used for farming or allowed to return to its natural state.  Rehearing Order PP 36, 50, 60, JA70, 77, 82.

Thus, FERC concluded that, given the Project's significant public benefits and minimal economic and environmental impacts, "the public convenience and necessity requires approval of [the Project.]"  Certificate Order P 15, JA6.  As fully discussed in Respondent's brief (20-21), the "court cannot substitute its judgment for that of the Commission," yet that is exactly what Petitioners ask this Court to do here.  *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004); *see also Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("a court is not to substitute its judgment for that of the agency.")  Additionally, FERC's findings, "as to the facts, if supported by substantial evidence, shall be conclusive."  15 U.S.C. § 717r(b).

**B.    FERC Fully Considered And Properly Rejected The Wagoner Alternative.**

Petitioners claim that FERC should have rejected the Project in favor of the Wagoner alternative and make the wholly unsubstantiated claim that FERC "fail[ed] to look at alternatives."  Petitioners 26.  To the contrary, FERC considers

7

alternatives in evaluating the public convenience and necessity under the Natural Gas Act, and thoroughly did so here. Rehearing Order P 43, JA74. Yet, FERC has no authority to compel companies to construct gas facilities and it has broad discretion to approve a proposal that meets the relevant statutory standard even if another reasonable alternative is available. *Midcoast Interstate Transmission, Inc. v. FERC*, 198 F.3d 960, 967-68 (D.C. Cir. 2000); Rehearing Order P 43, JA74. In addition, under NEPA, FERC is required to take a "hard look" at project environmental impacts and alternatives, but NEPA requires no particular substantive result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). FERC fully satisfied its Natural Gas Act and NEPA obligations.

### 1.     The Wagoner alternative is not environmentally preferable.

Despite Petitioners' repeated claims to the contrary, the Petitioners' proposed alternative is not environmentally preferable and FERC fully supported its finding that the Project is preferable. While the Project involves constructing a single new compressor station, the Wagoner alternative would require a new compressor station **and** replacement of over 7 miles of pipeline that would cross the environmentally sensitive Neversink River. Based on the extensive record, FERC concluded that, "[a]s set forth in the EA and the [Certificate] Order and affirmed below, [it] does not find that the Minisink Compressor Project will result in significant environmental impacts, nor does it find the Wagoner Alternative to

8

be preferable, on an environmental basis, to the proposed project, as conditioned."
Rehearing Order P 27, JA66. *See also id.* P 51 ("[T]he record does not indicate
that the benefits of the Wagoner Alternative outweigh its potential adverse
impacts."), JA78; *id.* P 52 ("[W]e find that Millennium has proposed an
environmentally acceptable means of meeting the demands of its shippers that will
not result in any significant adverse environmental impacts.  Environmental issues
associated with the replacement of the Neversink Segment have long been
recognized."), JA78.  These findings are consistent with FERC's prior findings that
Neversink replacement should not be undertaken if a less environmentally
intrusive means to meet shipper demands is available.  *See infra* section I.B.2.

FERC summarized its comparison of the Project and the Wagoner
alternative as follows:

> Construction of the Wagoner Alternative would impact
> more than 10 times as much land as the Minisink
> Compressor Project; require the clearance of 47.61 acres
> of trees (as opposed to 0.4 acres for the Minisink project)
> and the use of 22 acres of cleared agricultural land
> (compared with 9.8 acres for Minisink); would directly
> impact some 58 properties with residences (Minisink
> would affect none); would cross eleven wetlands and
> twelve waterbodies (as opposed to none for Minisink);
> and could impact five special species, instead of one.  In
> light of these facts, we think that selection of the
> Minisink Alternative as opposed to the Wagoner
> Alternative is eminently reasonable.

Rehearing Order P 67 (citing Certificate Order P 27), JA85. Further, these adverse impacts of the Wagoner alternative are *direct* impacts to *other* people's property, while the Project is entirely on Millennium's land and thus has no direct landowner impacts. Thus, FERC's finding that the Wagoner alternative is not preferable to the Project is fully supported by substantial evidence and should be approved. *See Exxon Co., USA v. FERC*, 182 F.3d 30, 37-38 (D.C. Cir. 1999) ("Where, as in the instant case, the analysis to be performed 'requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies.'") (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989)).

Moreover, even had FERC somehow found the Wagoner alternative environmentally preferable, FERC could still approve the Project. *See Midcoast*, 198 F.3d at 967-68 (upholding FERC's approval of project, notwithstanding existence of an environmentally superior alternative.); *see also* Rehearing Order P 46 ("even if it were the case that the Wagoner Alternative would result in fewer environmental impacts, which we do not find that it is, the Commission is not required to reject the environmentally acceptable Minisink Compressor proposal."), JA76. Indeed, the Natural Gas Act gives FERC broad discretion to weigh a variety of interests in determining whether a Project serves the public interest. *Midcoast*, 198 F.3d at 968.

10

**2.    FERC's rejection of the Wagoner alternative is consistent with FERC's prior findings that Neversink replacement should be avoided if a less environmentally intrusive means of meeting objectives is available.**

The environmental problems of replacing the Neversink segment as required by the Wagoner alternative were well known to FERC.  FERC previously considered proposals to replace the smaller-diameter Neversink segment when Millennium's system was originally certificated and ultimately concluded that such replacement should not be undertaken if a less environmentally intrusive means of meeting market demand was available.  *Millennium Pipeline Co.*, 97 FERC ¶ 61,292, 62,333 and Environmental Conditions 33 and 34 (2001) (Interim Order); *Millennium Pipeline Co.*, 117 FERC ¶ 61,319, PP 242, 297, 309, and Environmental Condition 19 (2006); *see also* Millennium Comments on Wagoner alternative, at 14-18 (1/6/2012), R.567, JA401-405.  Petitioners' statement that FERC "previously approved" replacement of the Neversink segment is misleading. Petitioners 31.

FERC's "Interim Order" authorizing a broad plan that included Neversink replacement was conditioned on an environmentally acceptable means of boring the Neversink River.  Rehearing Order P 52 (citing *Millennium Pipeline Co.*, 97 FERC ¶ 61,292, Environmental Conditions 33 and 34 (2001)), JA78.  However, after eight years (1998-2005) of study and consultation with responsible agencies and interested parties (including FERC staff, U.S. Fish and Wildlife Service, New

11

York State Department of Environmental Conservation, and the Nature Conservancy[4]), an acceptable means for crossing the Neversink River was never achieved.  Thus, Millennium submitted an amended proposal that contemplated using the existing Neversink segment, as acquired from Millennium's affiliate, Columbia Gas Transmission Corporation.  Rehearing Order P 52, JA78.

FERC approved the amended proposal, finding it "to be in the public interest, recognizing that it would 'avoid direct disturbance to the Neversink River, which is considered a sensitive waterbody due to the possible presence of federally endangered species.'"  *Id*.  FERC even conditioned its approval on Millennium acquiring and continuing to use the smaller-diameter existing Neversink pipe.  *Id*.

The current record contains no new evidence that would justify departing from FERC's prior determinations that Neversink replacement should be avoided if Millennium can reasonably meet shipper demands through a less environmentally intrusive means.  On the strength of those prior findings alone, FERC could have dismissed the Wagoner alternative as unreasonable.[5]

---

[4]     The Nature Conservancy, which owns the Neversink Preserve along the river, describes the Neversink River as "a pristine ecological jewel — 60 miles of rushing waters brimming with an outstanding array of life." http://www.nature.org/ourinitiatives/regions/northamerica/unitedstates/newy ork/placesweprotect/easternnewyork/wherewework/eastern-neversink-preserve.xml.

[5]     *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 374 (D.C. Cir. 1999) ("a 'rule of reason' applies both to an agency's identification of the available alternatives and to its examination of their relative merits, and we have

Nonetheless, FERC and its Staff gave full consideration to the Wagoner alternative.

### 3.     The Wagoner alternative is not economically preferable.

FERC found, and the record shows, that the cost of constructing the Wagoner alternative would be more than double the cost of the Project. Rehearing Order P 40, JA73; Millennium Response 11 to FERC Staff 11/23/2011 Data Request (estimated cost of the Wagoner alternative "is approximately 102% greater than the [Project]"), R.524, JA363.[6]  FERC recognized that cost is a relevant factor when evaluating alternatives, given FERC's obligation under the Natural Gas Act to ensure that "consumers [] hav[e] access to an adequate supply of gas at a reasonable price." *Tejas Power Corp. v. FERC*, 908 F.2d 998, 1003 (D.C. Cir 1990) (citing *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610 (1944)). *See* Rehearing Order P 40 ("[T]he EA indicates that the Wagoner alternative would cost approximately double that of the Millennium's proposal and that no customers

---

declared that we will defer to its conclusions 'so long as the alternatives are reasonable and the agency discusses them in reasonable detail.'") (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991)); *City of Alexandria v. Slater*, 198 F.3d 862, 869 (D.C. Cir. 1999) ("a 'reasonable alternative' is defined by reference to a project's objectives") (internal citations omitted).

[6]     The EA (50, R.654, JA485) incorrectly references Millenniums' cost estimate for the Wagoner alternative as at least "50 percent" more costly than the Project. The Rehearing Order (P 40, JA73) correctly identifies the increase as "approximately double."

have indicated a willingness to subscribe to a level of service that would warrant replacement of the Neversink Segment"), JA73.

### 4.    The Wagoner alternative would not meet Project objectives.

It is well established that the applicant has the "prerogative ... to determine the project's goals and the means of achieving them."  *New River*, 373 F.3d at 1332 (citing *East Tenn. Natural Gas Co.*, 101 FERC ¶ 61,188, 61,750 (2002); *Independence Pipeline Co.*, 91 FERC ¶ 61,102, 61,345 (2000)); *accord Grapevine v. DOT*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) ("where a federal agency is not the sponsor of a project, 'the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project.'") (quoting *Citizens Against Burlington*, 938 F.2d at 197-98).

Millennium designed the Project to economically add capacity to meet shipper demands.  FERC found that the Project was an economically supported and environmentally acceptable means of meeting that objective, while the Wagoner alternative was not preferable and would not meet project objectives.  Those findings are fully supported in the record.  *See supra* sections I.A-I.B.3; Certificate Order P 27 n.28, JA11; *see also* EA 54, R.654, JA489.  Even putting cost considerations aside, given that eight years of negotiation with responsible agencies involved in Millennium's original certification failed to produce a

14

consensus regarding Neversink replacement, it is unrealistic to believe that such an

undertaking could have been achieved in a time frame to meet the 2012-2013

demands of Millennium's shippers.  *See supra* section I.B.2.  Thus, the Wagoner

alternative would not meet the Project objectives and would not have been built as

a substitute for the Project.  Millennium Comments on Wagoner alternative, at 21-

22, R.567, JA408-409.

### 5. Petitioners erroneously attempt to attribute adverse impacts of the Wagoner alternative to the Project.

Petitioners persist in asserting that the adverse impacts of the Neversink

replacement should be attributed to the Project, allegedly because either the

Neversink segment must be replaced for safety reasons to be operated with the

Project or that in any event Millennium plans to soon replace the Neversink

segment.  Petitioners 30-33.  FERC properly rejected these contentions.

Regarding the alleged safety concern, FERC reviewed and rejected

Petitioners' evidence, finding that it "suffers from several flaws."  Rehearing Order

PP 76-79, JA90-92; *see infra* section V.  Rather, FERC concluded "there is no

evidence that the existing Neversink Segment cannot continue to be operated

safely in conjunction with the Minisink Compressor Station."  Rehearing Order

P 40, JA73.  FERC's findings with regard to pipeline operations and safety are

matters "within its technical expertise" and accordingly are afforded "an extreme

degree of deference."  *New River*, 373 F.3d at 1327 (citations omitted).

15

Similarly, FERC inquired into and rejected Petitioners' claim that Millennium has plans to replace the Neversink segment. Petitioners' assertion was based solely on a 2011 marketing presentation, which FERC found to have "little substantive weight here" because "[t]here is no indication that Millennium had or has actual customers (and hence, plans) for such a system expansion." Rehearing Order P 32 n.41, JA68. FERC's finding is supported by the record. *See* Millennium Response 1 to FERC Staff 12/7/2011 Data Request ("no one has yet stepped forward willing to pay for additional capacity from Millennium at a level that would require Millennium to replace the Neversink segment."), R.525, JA369. Thus, the adverse impacts of Neversink replacement are inherent in the Wagoner alternative, but not the Project.

### 6.    FERC exceeded normal procedures to fully consider the Wagoner alternative.

To ensure full consideration of the Wagoner alternative, FERC took the unusual step of a issuing a supplemental notice to solicit comments regarding that alternative including replacement of the Neversink segment. FERC Notice regarding the Wagoner/Neversink Alternative (12/22/2011), R.552, JA371-380. As FERC recognized, the efficacy of the responses was limited by the fact "that the alternative was not before the Commission as a proposed project to be approved or disapproved." Rehearing Order P 66, JA85. Nonetheless, FERC's supplemental

notice is further evidence of the "hard look" given the Wagoner alternative by FERC and its Staff.

> **C.    Petitioners' Reliance On The Dissents Fails To Advance Their Arguments.**

Petitioners rely heavily on the opinions of the dissenting Commissioners. Petitioners 20-21, 23-25, 33, 38-40, 42-43, 50.  However, the Rehearing Order thoroughly disposed of not only Petitioners' objections, but also the arguments of the dissents.  In fact, the dissenting statement accompanying the Rehearing Order largely concedes that the remaining objection of the dissenters is the manner in which FERC "exercised its discretion" with respect to the Project.  Rehearing Order, Dissent, JA95.  Disagreement over how FERC should exercise its discretion is no evidence that the majority abused its discretion or violated any legal standards, particularly where the majority thoroughly and reasonably addressed the Wagoner alternative.  Petitioners' misplaced reliance on the dissents is discussed below.

> **1.    The majority properly addressed the Chairman's arguments.**

Petitioners incorrectly assert that FERC failed to consider Chairman Wellinghoff's view that the Wagoner alternative is overall a more efficient means of expanding Millennium's capacity.  Petitioners 42-43.  To the contrary, as shown in sections I.B.1-I.B.6 above, FERC thoroughly reviewed the Wagoner alternative in comparison with the Project regarding economic and environmental factors and concluded that the alternative was not preferable.  Stated another way, while the

17

Chairman would have preferred that Millennium take on replacement of the Neversink segment as part of this expansion, FERC found that it was reasonable for Millennium to avoid, at this time, the adverse environmental impacts and other issues associated with Neversink replacement. Rehearing Order P 52 ("In light of this history, we do not agree that it is somehow unreasonable for Millennium not to have chosen this proceeding as the one in which to address the constraint at Neversink."), JA78. The fact that the Chairman would have exercised his discretion differently does not show any legal error in the majority decision, which is based on substantial record evidence after thorough consideration of the issue.

Petitioners also incorrectly claim that FERC's cost-benefit analysis was deficient because it failed to adequately consider fuel use, as suggested by the Chairman's dissent to the Certificate Order.[1] To the contrary, FERC considered the Chairman's analysis and found that it relies on incorrect assumptions and otherwise would not show the Wagoner alternative to be preferable. *See* Rehearing Order P 66 n.92, JA84; *see also* Millennium Response 2.a to FERC Staff 9/14/2011 Data Request, Attachment DR-AR-2 n.5, R.203, JA343. Indeed, it appears that the Chairman's fuel analysis is based entirely on non-record assumptions and ignores the record evidence. *See, e.g.*, Millennium Response 2.c to FERC Staff 9/14/2011 Data Request (even considering the additional fuel for

---

[1]     Chairman Wellinghoff has dissented from 177 FERC decisions from the time he was seated on FERC in 2006.

the Project, it is expected that the Project "will result in *an overall reduction in the*

*fuel rate* associated with system compression.") (emphasis added), R.203, JA342.

*See also* Rehearing Order P 20 ("Expenses for compressor fuel usage will be borne

by Millennium's customers, none of whom have protested the project."), JA61.

Even assuming the Chairman's fuel analysis had merit, the Project would

still be preferable, given that the Wagoner alternative would have more than

double the capital costs and significantly greater environmental impacts than the

Project.  Rehearing Order P 66 ("[T]he Wagoner Alternative would still involve

significantly greater capital investment and we note the customers of Millennium

have not commented negatively about the associated cost of the proposed

compressor station."), JA84-85; *id.* P 66 n.93 ("finding that the Wagoner

Alternative is not an environmentally preferable alternative to the [Project]"),

JA85; *see also supra* sections I.B.1 and I.B.3.

Finally, Petitioners cite the Chairman's dissent for the proposition that

FERC did not adequately consider the Project's impact on farmland.  Petitioners

50.[2]  However, the Project will protect more farmland than it impacts.  While the

Project will permanently impact only 4.05 acres of farmland (entirely on

---

[2]    Petitioner incorrectly references a "permanent loss of 10 acres" of farmland,
      an amount never quantified by the Chairman and inconsistent with the
      record.  The EA shows that, while approximately 10 acres were temporarily
      impacted during construction, only 4.05 acres of farmland are permanently
      impacted.  Total impacts to all vegetative habitats (farmlands, woodlands,
      wetlands, etc.) is only 4.49 acres.  EA Table 2, R.654, JA448.

Millennium's property), EA 13 & Table 2, R.654, JA448, Millennium agreed with the Town of Minisink to land use restrictions for the approximately 70 acres of buffer on the parcel owned by Millennium around the Project, most of which is reserved for farming or will be allowed to revert to its natural state.[3]  Rehearing Order PP 36, 50, 60, JA70, 77, 82; *see* Millennium Request for Authorization to Construct, Attachment C (8/24/2012) (outlining land use agreement with Town and accompanying map), R.884, JA639-645.  Regardless, the farmland issue is a red herring, given that, absent the Certificate Order, Millennium would be free, as any landowner, to prohibit farming on the entire 73.4-acre parcel.

Thus, the Chairman's dissent fails to show that FERC acted arbitrarily and capriciously in approving the Project.

### 2.    The majority properly addressed Commissioner LaFleur's arguments.

Petitioners claim that FERC misapplied its Certificate Policy Statement because "there is no need for this 'specific project' given the existence of the environmentally, economically, and operationally preferable Wagoner alternative," as argued by Commissioner LaFleur in her dissent to the Certificate Order. Petitioners 36; *see* Certificate Order, LaFleur dissent at 2 (citing *Turtle Bayou Gas*

---

[3]     Additionally, the prior owner stated that, absent Millennium's purchase, the parcel would soon have become residences, thus resulting in a much greater loss of farmland.  Comment of Dean Ford (2/21/2012), R.648, JA424-426.

*Storage Co., LLC*, 135 FERC ¶ 61,233, P 33 (2011)), JA45.  FERC fully addressed this argument.

Initially, the argument is circular in that it assumes what it attempts to prove, i.e., the superiority of the Wagoner alternative.  However, after thorough review, FERC found that the Wagoner alternative is not environmentally or economically preferable to the Project, a finding that is supported by substantial evidence and thus conclusive.  15 U.S.C. § 717r(b); *see supra* sections I.B.1-I.B.3.

Additionally, the argument incorrectly claims that FERC misapplied the Certificate Policy Statement because in balancing Project benefits against residual impacts, FERC did not consider the Wagoner alternative.  Petitioners 38-39, citing LaFleur dissent.  First, as previously shown, FERC did fully consider the Wagoner alternative.  Second, however, "[a]pplication of the Certificate Policy Statement involves an examination solely of the economic effects of a proposed project," and "[o]nly if the public benefits are found to outweigh any negative effects on economic interests" will FERC perform an environmental analysis and review alternatives.  Rehearing Order P 18, JA59.  Here, FERC properly conducted the analysis required by the Certificate Policy Statement and then proceeded to review environmental impacts and alternatives.  *Id.* P 26, JA65; *see supra* section I.A.

Finally, FERC distinguished *Turtle Bayou*, the sole precedent Commissioner LaFleur relied on for her claim that this "specific project" is not "needed in light of

the availability of [the Wagoner alternative]." Certificate Order, LaFleur dissent at

2, JA45.  In *Turtle Bayou*, FERC rejected a proposed project where the applicant

had not established a need for the project (i.e., had no contracts) and would have

required use of eminent domain to take virtually all the needed property rights

from an unwilling landowner.   Rehearing Order P 14 n.18, JA58.   Here, by

contrast, the Project is fully subscribed under firm contracts and Millennium owns

the Project site in fee and thus does not need to use eminent domain.  *Id.* P 20,

JA60-61.

### D.    FERC Considered The Future Public Convenience And Necessity.

Petitioners incorrectly claim that FERC failed to consider the "future" public

convenience and necessity as required by the Natural Gas Act because FERC did

not consider "Millennium's future plans to upgrade Neversink."  Petitioners 31-32

(citing *City of Pittsburgh v. FPC*, 237 F.2d 741 (D.C. Cir. 1956)).

Initially, the Natural Gas Act states that FERC must consider whether a

project "is *or* will be required by the present *or* future public convenience and

necessity" when issuing a certificate.   15 U.S.C. § 717f(e) (emphasis added).

Nonetheless, here, FERC *did* fully consider both Millennium's present plans and

future plans including the potential for Neversink replacement.  Rehearing Order

P 25 ("[W]e have considered Millennium's future plans to the extent feasible and

find that approval of the proposed Minisink Compressor Station should neither

22

foreclose nor necessitate any specific future expansion options."), JA64. Indeed, FERC issued a data request specifically inquiring into Millennium's future expansion plans. *See* Millennium Response 1 to FERC Staff 12/7/2011 Data Request, R.525, JA367-370. Further, FERC found that "[t]here are numerous possibilities for expanding service on the Millennium system that would not require replacement or looping of the Neversink Segment," nor would replacement of the Neversink "address[] all future needs for expansion." Rehearing Order P 25, JA64-65.

FERC's Rehearing Order distinguished the facts of *City of Pittsburgh*, the lone case cited by Petitioners. *Id.* PP 24-25, JA63-65. The *City of Pittsburgh* court held that FERC's predecessor, the Federal Power Commission, erred in failing to consider the effects on future pipeline expansion of abandoning one of the applicant's three mainlines, which would have permanently eliminated significant amounts of unutilized system capacity. *Id.*, JA63-65. Here, no such error is present, given that FERC considered the effects of the Project on future expansions and found none. *Id.*, JA63-65.

## II.  FERC Satisfied Its NEPA Obligations; Petitioners' Arguments Otherwise Are Without Merit.

Petitioners allege deficiencies in three aspects of FERC's NEPA review -- cost-benefit analysis, impacts on property values, and cumulative impacts. Petitioners 40-45. None of these charges has merit.

23

It is well established that "[u]nder NEPA, the court's role is 'simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'" *New River*, 373 F.3d at 1327 (quoting *Baltimore Gas & Elec. v. NRDC*, 462 U.S. 87, 97-98 (1983)). Indeed, "[a]ll that is required is that the agency identify the reasonable alternatives to the contemplated action and look hard at the environmental effects of its decision." *Midcoast*, 198 F.3d at 967-68 (internal quotation marks and citations omitted). Thus, "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 490 U.S. at 350.

FERC more than satisfied its NEPA review obligations for the Project and alternatives and found the Project will not "significantly affect[] the quality of the human environment." Certificate Order P 83, JA29; *see* discussion in sections I.A-I.B above. Similarly, the Environmental Protection Agency (EPA) stated that it does not "anticipate that the proposed Minisink Compressor Station itself would result in significant adverse environmental impacts." EPA Comments at 1 (4/18/2012), R.846, JA621. Petitioner's specific arguments are discussed below.

### A.   FERC Properly Evaluated Costs And Benefits.

Petitioners argue that NEPA "requires" a cost-benefit analysis of major actions. Petitioners 42. Respondent's brief convincingly shows that a formal cost-

24

benefit study was not required.  Respondent 35-37; *see also* 40 C.F.R. § 1502.23 (Under NEPA, "the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations.").

Nevertheless, FERC performed a detailed evaluation of costs and benefits of the Project including alternatives.  *See supra* sections I.A-I.B.4.  Petitioners claim that FERC's cost-benefit analysis was inadequate because it did not consider the fuel issue discussed in Chairman Wellinghoff's dissent to the Certificate Order. Petitioners 42-43.  However, as discussed in section I.C.1, FERC fully considered and properly declined to adopt the Chairman's fuel argument, which is based on incorrect assumptions and is otherwise inconsistent with the record facts.

## B.    FERC Properly Considered Impacts On Property Values.

Petitioners allege that FERC's consideration of the Project's impact on property values was inadequate because it did not address "nuisance, pollution, noise, and potential for explosion."  Petitioners 44.  To the contrary, FERC took a hard look at potential impacts on property values and explained that "[o]n balance, we do not find the potential for [the Project to have] an impact [on property values] sufficient to alter our determination that the [Project] is required by the public convenience and necessity."  Certificate Order P 70, JA25.  Moreover, FERC addressed specific impacts raised by Petitioners.

While Petitioners claim that FERC failed to address noise, FERC, in fact, imposed its strictest noise standard in any certificate order to date, requiring a noise level of "39 dBA at the nearest noise-sensitive [area], significantly below the Commission's standard noise criterion of a day-night noise level of 55 dBA." Certificate Order P 39 (citing Condition 15), JA15.[4]  FERC found that the noise attributable to the Project "will be barely, if at all, noticeable."  Rehearing Order P 30, JA67.  On July 31, 2013, Millennium filed its required noise study verifying that the Project satisfies FERC's noise condition.

With respect to explosion and other pipeline safety concerns, FERC explained that such issues are addressed by the Department of Transportation's Pipeline Hazardous Materials Safety Administration (PHMSA) and that Millennium must comply with all of PHMSA's regulations and orders.  Certificate Order PP 35, 60-61, JA14, 21-22.  In any event, FERC found no safety concerns regarding the Project.  Rehearing Order PP 40, 78, JA73, 91-92.

With respect to air emissions, the EA found that the Project will be only a "minor source" of air emissions.  *Id.* P 66, JA84.  Moreover, Millennium obtained

---

[4]     FERC regulations require that the "noise attributable to any new compressor station ... must not exceed a day-night sound level ($L_{dn}$) of 55 dBA at any pre-existing noise-sensitive area."   18 C.F.R. § 380.12(k)(4)(v)(A).  *See also, e.g.*, *SG Resources Miss., L.L.C.*, 119 FERC ¶ 61,257, P 8 (2007) ("The Commission's regulations have long required that the noise attributable to the operation of any new compressor station or modifications to an existing station not exceed 55 dBA Ldn at any preexisting NSA.").

26

required Clean Air Act permit for the Project, Certificate Order P 43, JA16, showing that the Project "will comply with the Environmental Protection Agency's National Ambient Air Quality Standards (NAAQS), in accordance with the Clean Air Act of 1970."   Rehearing Order P 30, JA67; *see also* EPA Comments at 1 (Project will have no "significant adverse environmental impacts."), R.846, JA621.

Finally, regarding nuisance (although never explained by Petitioners), it is noteworthy that the Project will be built entirely on land owned by Millennium with no need for use of eminent domain, Rehearing Order P 20, JA60-61, whereas for the Wagoner alternative Millennium would need to acquire easements from 58 landowners either through negotiation or condemnation.  Additionally, Millennium consulted with the Town of Minisink on measures to minimize impacts on residents, including land use restrictions for the 70-acre buffer around the Project. *Id.* PP 56-60, JA81-82; Comments of Town of Minisink (5/18/2012), R.858, JA623-628; Millennium Request for Authorization to Construct, Attachment C (8/24/2012) (outlining land use agreement with Town), R.884, JA639-645.

### C.     FERC Properly Evaluated The Project's Cumulative Impacts.

In passing, Petitioners assert that FERC's cumulative impacts analysis is deficient because it fails to consider Millennium's "plans for future development," including the CPV Power Plant and a compression project in Hancock, New York. Petitioners 45.   However, FERC's environmental assessment did consider

potential cumulative impacts of the power plant and the Hancock compressor station and found that any impacts would be limited or not significant. EA 38-39, R.654, JA473-474.

Moreover, FERC stated that it would consider the impacts, including potential cumulative impacts, of those projects if proposed (neither was proposed at the time of the FERC orders). Certificate Order PP 65-67, JA23-24; Rehearing Order P 47, JA76. In that regard, Millennium did later file a proposal to construct the Hancock compressor station, and FERC found the cumulative impacts of the Hancock station and the Project to be "negligible," and the air quality impacts to be "well below levels set by the EPA to protect the health and welfare of even the most sensitive populations," given that the two stations will be more than 50 miles apart. *Millennium Pipeline Co., L.L.C.*, 145 FERC ¶ 61,007, P 52 (2013). Finally, since the Project would not be constructed in the same time frame as the Hancock station or the CPV lateral (if ever built), there would be no cumulative construction impacts.

## III. FERC Correctly Followed Its Siting Guidelines; Petitioners' Criticisms To The Contrary Are Off Base.

Petitioners allege that FERC acted arbitrarily and capriciously in applying its siting guidelines. Petitioners 45. To the contrary, FERC fully complied with those guidelines, which primarily address considerations when a project applicant constructs facilities on land owned by others. Here, Millennium owns the Project

site in fee, which eliminated all direct landowner impacts. Rehearing Order P 50, JA77. Nonetheless, FERC fully complied with the siting guidelines for above-ground structures such as the proposed compressor station, 18 C.F.R. § 380.15(f), ensuring that the Project will be "as unobtrusive as possible," Rehearing Order P 50, JA77, for example, by adopting certificate conditions addressing, site screening, building design, noise requirements, and land use around the Project site. *Id.* PP 36, 50, 56-62, JA70, 77, 81-83.

Initially, the identification of feasible sites for a compressor station is driven by engineering and hydraulic considerations. *Iroquois Gas Transmission Sys. LP*, 101 FERC ¶ 61,131, P 64 (2002) ("[f]easible sites for compressor stations are limited since stations must be adjacent to a specific pipeline at a site along the pipeline route determined by engineering studies to be the most effective for providing the necessary compression."); Rehearing Order P 46, JA75.

Here, in determining the best way to meet shipper capacity demands, Millennium considered a broad range of alternatives, including replacement of the Neversink:

> Millennium's hydraulic modeling showed that even if it replaced the [Neversink] it would be necessary to add a new compressor station .... Therefore, given that a new compressor station would have to be built to meet the capacity demands of its shippers, Millennium then sought to determine if it was possible to meet the capacity demands by adding a compressor station but without replacing the [Neversink]. That analysis showed that a

29

> compressor station located to the east of the [Neversink]
> could meet the 2012 capacity demands of its shippers.

Millennium Response 8 to FERC Staff 9/22/2011 Data Request, R.205, JA346.

Similarly, the EA found that "the site must be within a 2-mile range on

Millennium's system" just east of the Neversink, because "[i]ncreasing the

distance further downstream would increase the horsepower required to meet the

capacity demands (i.e., an increase by about 25 percent horsepower for a move of

only ten miles)." EA 42, R.654, JA477.

The EA evaluated six different sites and the Wagoner alternative "to

determine whether environmental impacts could be reduced or mitigated." EA 42-

54, R.654, JA477-489. The EA found that siting the Project on the Millennium-

owned, 73.4-acre parcel to be environmentally preferable to each of the

alternatives. EA 42-54, R.654, JA477-489. Rehearing Order P 36, JA70 ("The

proposed site was authorized by the Commission only after a thorough

environmental analysis which indicated that approval of the proposed project

would not have a significant impact on the human environment.").

Further, to address landowner concerns and mitigate Project impacts, FERC

conditioned Project approval on strict noise mitigation, Certificate Order,

Condition 15, JA39, a visual site screening plan that FERC will monitor for 5

years, *id.*, Conditions 14 and 21, JA39, 40, and a compressor facility designed "to

blend . . . with surrounding rural residential agricultural landscape." *Id.*, Condition

30

13, JA39.[5]   Additionally, the visual site screening plan and building design were developed in consultation with the Town of Minisink.  *See* Comments of Town of Minisink (5/18/2012), R.858, JA623-628.  Millennium and the Town also reached agreement regarding land use restrictions for the 70-acre buffer around the Project site.  Rehearing Order P 60, JA82.

Petitioners' criticisms of FERC's siting decision are off base.  Petitioners ignore that the "landowner considerations" under the siting guidelines pertain to rights-of-way and construction "*on their property*…."  18 C.F.R. § 380.15(b) (emphasis added).  Indeed, Petitioners omitted the words "on their property" in quoting that guideline.  Petitioners 46.  Here, as noted, Millennium owns the entire Project site, so there will be no construction or rights-of-way on land owned by others.  Rehearing Order P 20, JA60-61.

Additionally, in claiming that the Wagoner alternative site is superior, Petitioners disregard the well-documented problems associated with replacing the Neversink segment.   *Id.* P 52, JA78; *see also supra* sections I.B.1-I.B.4. Petitioners assert that Commissioner LaFleur "recognized the departure from [FERC's] siting guidelines" in FERC's evaluation of short-term and long-term impacts of the Project and the Wagoner alternative.  Petitioners 50.  However, that

---

[5]     Pursuant to the FERC-approved site screening plan, Millennium has planted 155 10-12 foot tall evergreen trees and is required to plant approximately 100 pine and spruce saplings.  Millennium Final Landscaping and Site Screening Plan, Appendix A (8/16/2012), R.881, JA637-638.

argument ignores the direct and long-term impacts of the Wagoner alternative /
Neversink replacement on 58 landowners from whom easements would be
required, as well as the greater disturbance to wetlands, waterbodies, trees and
protected species under that alternative.  Rehearing Order P 67, JA85; EA 53,
R.654, JA488.

Finally, Petitioners' assertion that the Project "will occupy 73.4 acres
permanently, foreclosing any future use for crops or agribusiness" is simply untrue.
Petitioners 49.  The Project will permanently impact only 4.5 acres, while as to the
remainder of the 73.4-acre site "Millennium has agreed [with the Town] to allow
farming to continue on the site and to return much of the land to its natural state."
Rehearing Order P 50, JA77.  Moreover, absent the FERC-jurisdictional Project,
Millennium, as the landowner, would have no obligation to continue farming.

## IV.  Petitioners' Due Process Complaints Are Meritless.

### A.     FERC Properly Found That Its Written Record Was Adequate.

Petitioners argue that FERC should have held a trial-type hearing, which
"would likely have exposed Millennium's plans to upgrade the Neversink."
Petitioners 55.

Petitioners' call for a trial-type hearing should be denied.  It is well
established that under section 7 of the Natural Gas Act, 15 U.S.C. § 717f, "FERC
need not conduct an evidentiary hearing when there are no disputed issues of

material fact, and that even where there are such issues, FERC need not conduct

such a hearing if they may be adequately resolved on the written record." *Moreau*

*v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993) (citations omitted). "FERC's choice

whether to hold an evidentiary hearing is generally discretionary," *Blumenthal v.*

*FERC*, 613 F.3d 1142, 1144 (D.C. Cir. 2010) (internal quotation and citations

omitted), and a "paper hearing . . . may be sufficient to meet the hearing

requirements of the NGA where the paper record provides a sufficient basis for

resolving relevant issues." *CNG Transmission Corp. v. FERC*, 40 F.3d 1289, 1293

(D.C. Cir. 1994) (internal quotation and citations omitted).

Here, FERC reviewed the record and found that:

> The issues raised by all parties in this proceeding have
> been adequately argued, and a determination can be
> made, on the basis of the existing record in this
> proceeding. . . . We find that there is no material issue of
> fact that we cannot resolve on the basis of the written
> record in the proceeding.

Certificate Order P 86, JA30.  Indeed, in the orders on review, FERC addressed all

issues raised in over 600 comments, requests for rehearing, and even the merits of

Petitioners' untimely engineering report (see *infra* section V).

With regard to Millennium's alleged plans to replace the Neversink segment,

Petitioners rely solely on a 2011 marketing presentation, which FERC found, based

on the record and its industry expertise, "does not represent any firm decision by

Millennium as to future construction and thus has little substantive weight here."

Rehearing Order P 32 n.41, JA68.  Moreover, in a data request prompted by a

member of MREPS, FERC did inquire about Millennium's expansion plans, and

Millennium explained that it does not yet have the necessary demand to undertake

a proposal on the scale and cost of replacing the Neversink.  Millennium Response

1 to FERC Staff 12/7/2011 Data Request, R.525, JA367-370.  Further, FERC

found that "there is no evidence" that the Neversink will need to be replaced due to

safety concerns.  Rehearing Order P 40, JA73; *see also supra* section I.B.5.  Those

findings contrast sharply with the *certainty* that the Neversink would need to be

replaced under the Wagoner alternative.  Accordingly, FERC was not required to

hold a trial-type hearing to address Petitioners' unsupported claims and speculation

regarding Neversink replacement.

> **B.    Petitioners Were Provided An Opportunity To Comment On Relevant Hydraulic Analyses.**

Petitioners argue that FERC violated their due process rights to

meaningfully comment on the Project by failing to make publicly available

Millennium's hydraulic analysis of the Project and FERC's review of that analysis.

Petitioners 56-59.  There is no due process violation.  Petitioners received relevant

hydraulic analyses with ample time to comment and FERC acted in accordance

with existing regulations.

Initially, for national security reasons, hydraulic materials related to new

natural gas infrastructure are classified as critical energy infrastructure information

34

(CEII), which FERC regulations treat as non-public subject to disclosure procedures.  18 C.F.R. § 388.113.  Here, Petitioners were provided CEII pertaining to the Project either by FERC or Millennium upon execution of an appropriate non-disclosure agreement.  Rehearing Order P 71, JA87-88.

Significantly, MREPS members and counsel received Millennium's hydraulic materials (in pdf format) 8 weeks prior to the deadline for filing rehearing requests, thus providing Petitioners sufficient time to meaningfully comment:

> [M]embers of MREPS . . . did receive [hydraulic materials] in time to allow for an opportunity comment on rehearing.  They elected not to comment on or dispute Millennium's flow diagram analysis included in the material designated as CEII and made available to MREPS' engineer.

Rehearing Order P 71, JA88.  Further, when Petitioners filed their engineering report three months late, FERC did not reject it based on lateness, but because the report was flawed and did not compel a result different than that reached by FERC.  *See infra* section V.  Thus, Petitioners received relevant hydraulic information, Petitioners commented on that information, and FERC considered Petitioners' comments.

With regard to Petitioners' complaint regarding FERC Staff's analysis, FERC explained that "[w]hile Commission staff in this case reviewed and analyzed all information by project sponsors and other[s] ... to assess its accuracy …

Commission advisory staff did not produce independent 'evidence' to be used by the Commission as a basis for its decisions." Rehearing Order P 73 n.111, JA89. FERC explained that it based Project approval solely "on the record in this proceeding" and that the hydraulic materials released were adequate for Petitioners' meaningful review and participation. *Id.* P 72, JA88. In any event, FERC explained that internal staff materials are protected from release under the deliberative process exemption. *Id.* P 73 n.109, JA89. As noted by Respondent, Petitioners are currently seeking FERC Staff's internal hydraulic analysis under the Freedom of Information Act. Respondent 55-56 & Appendix.

## V.    FERC Properly Denied Petitioners' Request To Reopen The Record To Receive Petitioners' Flawed And Late-Filed Evidence.

Petitioners claim that FERC erred in declining to reopen the record to accept a three-month late report prepared by Petitioners' engineer (Kuprewicz Report) that allegedly "undermines" FERC's approval of the Project. Petitioners 61.

The court reviews "an agency's decision to not reopen the record only for an abuse of discretion" and will "only order the Commission to reopen the record where it clearly appears that the new evidence would compel or persuade to a contrary result." *Cooley v. FERC*, 843 F.2d 1464, 1473 (D.C. Cir. 1988) (internal quotation marks and citations omitted). The court also accords FERC's findings with regard to "scientific data within its technical expertise an extreme degree of deference," *New River*, 373 F.3d at 1327 (internal quotation marks and citations

36

omitted), and "will not second-guess the Commission's technical judgment . . . as long as that judgment was reached through reasoned decisionmaking and supported by substantial evidence." *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010).

Here, FERC reviewed the proffered report and found that it "suffers from several flaws," and "contains only general, unsupported assertions that do not compel a result contrary to that reached in the [Certificate Order]."  Rehearing Order PP 13, 76, JA57, 90-91.  Specifically, FERC concluded that the Kuprewicz Report "provides no support for [the] contention that gas velocity – the only operational issue [it] raises – will prevent the Millennium system from operating in a safe, effective manner."  *Id.* P 77 n.116, JA91.  Indeed, FERC found that the report "provides no support, such as citations to industry standards, regulations, or published papers," for the claim that the alleged "gas velocities are inconsistent with prudent design standards and safety margins." *Id.* P 76, JA90-91.  Indeed, the report concedes that the gas velocities in the Neversink segment are "not illegal." Rehearing Order at P 76 n.114, JA91.

FERC also found that the report was based on the incorrect assumptions that "gas velocities would be constant throughout the year," and only at the level of "high demand" which are both contrary to the record.  Rehearing Order P 66 n.92,

JA84; *see also* Millennium Response 2.a to FERC Staff 9/14/2011 Data Request, Attachment DR-AR-2 n.5, R.203, JA343 (Project expected to run primarily in the winter).  FERC affirmed its findings on rehearing.  Second Rehearing Order P 9, JA102.

Finally, FERC distinguished the lone case cited by Petitioners – *Tennessee Gas Pipeline Co.*, 139 FERC ¶ 61,161 (2011).  In *Tennessee*, FERC disposed of an alternative to a proposed project that would result in gas velocities "above Tennessee's recommended maximum design velocity."  *Id.* P 11, JA103.  Here, by contrast, FERC found that, "the velocities he postulates are not inconsistent with any law, regulation, or order."  Rehearing Order P 76 n.114, JA91.

38

## CONCLUSION

The petitions for review should be denied.

Respectfully submitted,

 /s/*Joseph S. Koury*

| | |
|---|---|
| Gary A. Kruse | Joseph S. Koury |
| Vice President - General Counsel & Secretary | Ryan J. Collins |
| | Wright & Talisman, P.C. |
| Millennium Pipeline Company, L.L.C. | 1200 G Street N.W., |
| One Blue Hill Plaza, Seventh Floor | Suite 600 |
| P.O. Box 1565 | Washington, D.C.  20005 |
| Pearl River, New York  10965 | Tel: (202) 393-1200 |
| Tel: (845) 620-1300 | Fax: (202) 393-1240 |
| Fax: (845) 620-1320 | koury@wrightlaw.com |
| kruse@millenniumpipeline.com | collins@wrightlaw.com |

**Attorneys for
Millennium Pipeline Company, L.L.C.**

Dated:  November 6, 2013

# CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(a)(7)(C)(i), I certify that the Brief of Intervenor Millennium Pipeline Company, L.L.C. in Support of Respondent contains 8,572 words, not including the tables of contents and authorities, the glossary, and the certificates of counsel.

Respectfully submitted,

/s/ *Ryan J. Collins*
Joseph S. Koury
Ryan J. Collins
Wright & Talisman, P.C.
1200 G Street N.W.,
Suite 600
Washington, D.C.  20005
Tel: (202) 393-1200
Fax: (202) 393-1240
koury@wrightlaw.com
collins@wrightlaw.com

**Attorneys for**
**Millennium Pipeline Company, L.L.C.**

Filed:  November 6, 2013

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Appellate Procedure, I hereby certify that I have this 14th day of November, 2013, served the foregoing Brief of Intervenor Millennium Pipeline Company, L.L.C. In Support of Respondent by mailing copies thereof, first class, postage prepaid or via electronic mail to each person listed below:

| Contact Info | Case Number/s | Service Preference | ECF Filing Status |
|---|---|---|---|
| Carolyn Elefant<br>Law Offices of Carolyn Elefant<br>1629 K Street, NW<br>Suite 300<br>Washington, DC 20006<br>Email: loce@his.com | 12-1481; 13-1018 | Email | Active |
| Karin Lea Larson<br>Federal Energy Regulatory Commission<br>(FERC) Office of the Solicitor<br>888 First Street, NE<br>Washington, DC 20426<br>Email: Karin.Larson@ferc.gov | 12-1481; 13-1018 | Email | Active |
| David Leo Morenoff<br>Federal Energy Regulatory Commission<br>(FERC) Office of the Solicitor<br>Room 9A-01<br>888 First Street, NE<br>Washington, DC 20426 | 12-1481 13-1018 | US Mail | |

| Contact Info | Case Number/s | Service Preference | ECF Filing Status |
|---|---|---|---|
| Robert Harris Solomon<br>Federal Energy Regulatory<br>Commission<br>(FERC) Office of the Solicitor<br>Room 9A-01<br>888 First Street, NE<br>Washington, DC 20426<br>Email: robert.solomon@ferc.gov | 12-1481;<br>13-1018 | Email | Active |

Respectfully submitted,


 /s/ *Ryan J. Collins*
Joseph S. Koury
Ryan J. Collins
Wright & Talisman, P.C.
1200 G Street N.W.,
Suite 600
Washington, D.C.  20005
Tel: (202) 393-1200
Fax: (202) 393-1240
koury@wrightlaw.com
collins@wrightlaw.com

**Attorneys for**
**Millennium Pipeline Company, L.L.C.**